# EXHIBIT 1

**RACHEL THOMAS (SBN 244527)**
GREENFIELD LLP
55 S. Market Street, Suite 1500
San Jose, California 95113
Telephone: (408) 995-5600
Email: rthomas@greenfieldlaw.com

**JOHN HARBIN (*Pro Hac Vice* Forthcoming)**
**WARREN THOMAS (*Pro Hac Vice* Forthcoming)**
MEUNIER CARLIN & CURFMAN LLC
999 Peachtree Street NE, Suite 1300
Atlanta, GA 30309
Telephone: (404) 645-7700
Email: jharbin@mcciplaw.com
　　　　wthomas@mcciplaw.com

Attorneys for Plaintiff NUMBER 14 B.V.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NUMBER 14 B.V.,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>ANALOG DEVICES, INC.; and MAXIM<br>INTEGRATED PRODUCTS, INC.,<br><br>　　　　　　　Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

　　　Plaintiff NUMBER 14 B.V. ("Plaintiff" or "Number 14") alleges as follows, and requests trial by jury:

## <u>GENERAL ALLEGATIONS</u>

　　　1.　　　Rudy Eschauzier and Nico van Rijn, two electrical engineers and inventors residing in the Netherlands (collectively, "the Inventors"), previously worked with Defendant Maxim Integrated Products, Inc. ("Maxim"), a Delaware corporation, engaged in the design, development,

1

and manufacture of linear and mixed-signal integrated circuits.

2.      Maxim desired for the Inventors to use their experience and engineering skills to develop technology for Maxim's benefit related to circuit design techniques to lower the power and increase the precision of amplifiers ("Amplifier Design"). Maxim and the Inventors entered into contracts, including an employment agreement and a license agreement, under which the Inventors would be compensated for their services and know-how provided to Maxim.

3.      Under the license agreement, executed between Maxim and the Inventors in July 2007 ("License Agreement"), the Inventors gave Maxim a right of first refusal to license patents that might result from their work in this field ("Patents"). A true and correct copy of the License Agreement is attached hereto and incorporated herein as **Exhibit A**. In return, Maxim agreed to (1) make a one-time payment once Maxim decided to exercise that option, and (2) on an annual basis, pay a royalty on amplifier products that are covered by one or more of the Patents ("Royalty" or "Royalties"). The License Agreement specified a formula for how the Royalty would be calculated, including providing an exemplary calculation of the Royalty ("Formula").

4.      Eventually, the Inventors were issued multiple Patents. Maxim exercised its right of first refusal and thereafter Maxim took licenses to three U.S. Patents. As permitted by the License Agreement, the Inventors, in February 2009, transferred their rights and obligations under the License Agreement to Number 14, an entity wholly owned and controlled by the Inventors. Number 14 owns the Patents.

5.      In 2011, Maxim began paying the annual Royalty (for calendar year 2010) to Number 14 using the Formula set forth in the License Agreement. Maxim continued paying the annual Royalty using that Formula for the next 10 years.

6.      In July 2020, Defendant Analog Devices, Inc. ("ADI") announced its plan to acquire Maxim. ADI completed the acquisition of Maxim in August 2021. According to Maxim's September 7, 2021 Form 10-K/A filing with the Securities and Exchange Commission, Maxim survived the transaction and became a wholly owned subsidiary of ADI.

7.      ADI and/or Maxim (collectively, "Defendants") continued paying to Number 14 the

Royalty pursuant to the Formula under the terms of the License Agreement for the years covering 2021 and 2022.

8.     However, when Defendants made the Royalty payment in January 2024 for sales in 2023, the amount paid was substantially less than in previous years. Number 14 contacted ADI which, on information and belief, had assumed responsibility for calculating and paying the Royalty, to seek an explanation for the decrease. ADI explained that ADI had unilaterally changed the calculation of the Royalty.

9.     ADI agreed that the new ███████████████ caused the ███████████
██████—and thus the Royalty paid on them—to go "down drastically." It also conceded the new Royalty calculation was "not the practice before [by] Maxim" but claimed that the change was due to ADI's ███████████████ in the third quarter of 2023, following its acquisition of Maxim two years earlier.

10.    By means of the unilateral change to the Royalty calculation, Defendants failed to pay in full the Royalty due to Number 14 for sales in 2023. The change to the Royalty calculation conflicts with the express terms of the License Agreement, including the Formula, and the parties' course of conduct over approximately 13 years of calculations and payments. By this action, Number 14 seeks amounts due and owing pursuant to the License Agreement—the Royalty it is properly owed for the inventions licensed to Maxim—as well as full compensation for the harm caused by the Defendants.

**PARTIES, JURISDICTION, AND VENUE**

11.    Number 14 is a company organized and existing under the laws of the Netherlands, with its principal place of business at Roland Hostlaan 10, 2662 Bergschenhoek, The Netherlands.

12.    Defendant ADI is a Massachusetts corporation with a principal place of business at One Analog Way, Wilmington, MA 01887. ADI also maintains an established place of business at 160 Rio Robles, San Jose, CA 95134.

13.    Defendant Maxim is a Delaware corporation with a principal place of business at 160 Rio Robles, San Jose, CA 95134.

14.     This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1332(a), as there is complete diversity between the Parties and the amount in controversy exceeds $75,000, as specified in paragraph 31, below.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the acts, events, and omissions giving rise to Number 14's claims occurred in this district, and because the License Agreement provides that "[a]ny dispute, controversy or claim arising out of or in connection with this Agreement" and that is initiated by Plaintiff "shall be submitted to the State or Federal Courts in Santa Clara County California."

16.     Personal jurisdiction exists over both Defendants because (1) they each maintain a continuous and systematic place of business within this district and (2) this controversy is related to, or arises out of, their contacts with this forum.

## INTRADISTRICT ASSIGNMENT

17.     Assignment of this action to the San Jose Division is proper under Civil Local Rules 3-2(c) and 3-2(e) because a substantial part of the events giving rise to the claims alleged herein occurred in the County of Santa Clara.

## COMMON FACTUAL ALLEGATIONS

18.     Number 14 hereby realleges and incorporates the allegations in paragraphs 1 through 17, as though fully set forth herein.

19.     The License Agreement is a valid and enforceable contract.

20.     In 2009, the Inventors transferred their rights under the License Agreement to Number 14 in accordance with Section 10.1 of the License Agreement.

GREENFIELD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



31.     This breach of the License Agreement resulted in a significant reduction of the Royalty paid to Number 14 for 2023, an amount believed to be in excess of $1 million. Defendants have indicated that they plan to continue to utilize this new, improper method of calculating the Royalties in further breach of the plain language of the License Agreement and the parties' understanding.

32.     On January 12, 2024, ADI acknowledged in an email that the ████████████ (and thus Royalty) calculation was "not the practice before on [sic] Maxim, it was an adopted process from ADI." ADI further acknowledged that, ████████████████████████ ██████████████

33.     On January 19, 2024, ADI again acknowledged in an email that it implemented ██████████████████████████ with Maxim that "happened few years back." ADI further admitted in that email that the ████████████████████ ██████████ the direct cause of the drastically reduced Royalty payment to Number 14.

34.     On January 22, 2024, ADI referred to the ████████████ in an email and admitted, "The lower royalty payment [Number 14] received is due to ████████████ ██████████████████████ and that this change "effectively and significantly ██████████████████ leading to a significantly reduced Royalty payment.

35.     The changes to the Royalty calculation, ████████████████████ ██████████ were made without notice to, or the agreement of, Number 14.

**<u>CLAIMS FOR RELIEF</u>**

**FIRST CAUSE OF ACTION**
**[Breach of Contract against Maxim]**

36.     Number 14 incorporates by reference the allegations in paragraphs 1 through 35 as though fully set forth herein.

37.     Inventors and Maxim entered into a written agreement, the License Agreement, which is attached hereto as **Exhibit A**. As successor in interest to Inventors, Number 14 assumed all rights and obligations of Inventors under the License Agreement.

38.     Number 14 has performed, or has been excused from performing, its obligations under the License.

39.     Maxim has materially breached the License Agreement by improperly calculating the Royalty and thereby failing to pay the Royalty owed to Number 14 under the terms of the

License Agreement.

40.     As a direct and proximate result of Maxim's breach of the License Agreement, Number 14 has suffered damages of at least $1 million plus other and further damages according to proof.

**SECOND CAUSE OF ACTION**
**[Breach of the Covenant of Good Faith and Fair Dealing against Maxim]**

41.     Number 14 incorporates by reference the allegations in paragraphs 1 through 40 as though fully set forth herein.

42.     Inventors and Maxim entered into a written agreement, the License Agreement, which is attached hereto and incorporated herein as **Exhibit A**. As successor in interest to Inventors, Number 14 assumed all rights and obligations of Inventors under the License Agreement.

43.     Number 14 has performed, or has been excused from performing, of its obligations under the License.

44.     All conditions of the License Agreement required for Maxim's performance of its obligations to properly calculate and pay the Royalty to Number 14 have occurred or were excused or waived.

45.     In every contract, parties have a duty to act in good faith and deal with each other fairly. Maxim had such a duty to act in good faith with respect to Number 14 under the License Agreement. This included Maxim's duty to calculate the Formula for the Royalty and pay the Royalty pursuant to the terms of the License Agreement and not to unilaterally alter the Formula to deprive Number 14 of the benefits it is entitled to under the License Agreement.

46.     Both the express terms of the License Agreement, and Maxim's course of performance over the course of 13 years, between 2010 and 2023, manifest Maxim's assent to, and understanding of, the calculation of Royalties and Formula as specified in the License Agreement. Nevertheless, Maxim failed to correctly calculate and pay the 2023 Royalty ███████████

██████████████████████████████████████████████████████████

GREENFIELD

1   ████████████████████████████████████ and ultimately failing to pay the 2023

2   Royalty due to Number 14 under the License Agreement.

3         47.    ADI subsequently claimed the change was in accordance ████████████

4   ████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ██████████████████████████████████████. Maxim

8   breached the implied covenant of good faith and fair dealing by altering the product cost and

9   Royalty calculations and failing to pay the Royalty in full. The change to the Royalty calculation

10  caused Number 14 to receive a significantly lower Royalty payment. This shortfall will be

11  perpetuated throughout the term of the License Agreement if the breach continues.

12        48.    As a result of the breach of the implied covenant of good faith and fair dealing,

13  Number 14 has been damaged as set forth above.

14                          **THIRD CAUSE OF ACTION**
15        **[Intentional Interference with Contractual Relations against ADI]**

16        49.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 40 above

17  as though fully set forth herein.

18        50.    Inventors and Maxim entered into a written agreement, the License Agreement,

19  which is attached hereto as **Exhibit A**. As successor in interest to Inventors, Number 14 assumed

20  all rights and obligations of Inventors under the License Agreement.

21        51.    Upon acquiring Maxim, ADI was aware of Number 14's License Agreement with

22  Maxim and Number 14's business expectations under that agreement. ADI was aware of the course

23  of performance over the many years that Number 14 received Royalty payments from Maxim

24  under the License Agreement. ADI was also aware that Number 14 received the Royalty payments

25  in accordance with the License Agreement in 2022 and 2023 (for sales occurring in 2021 and

26  2022), following ADI's acquisition of Maxim.

27        52.    Despite knowing about the plain terms of the License Agreement and the parties'

28

GREENFIELD

longstanding practice of calculating Royalty payments in accordance with the License Agreement, ADI intentionally and unilaterally prevented Maxim's payment of the Royalty to Number 14 by ███████████████████████████████ ADI imposed a ███████████ that it admitted was "not the practice before on [sic] Maxim," but "it was an adopted process from ADI."

53. ADI's unilateral change to the Royalty calculation was intended to disrupt the performance of the License Agreement, or ADI knew that the disruption of correct payment of the Royalty was certain or substantially certain to occur, by improperly calculating the Royalty and reducing the Royalty payments properly owed to Number 14.

54. Number 14 was harmed by ADI's conduct, which has deprived Number 14 of at least $1 million of Royalty revenue to date.

55. ADI acted intentionally and with knowledge that its new calculations of the Royalty were in violation of the License Agreement. On information and belief, ADI took its actions notwithstanding that knowledge so as to maximize its own profits.

56. ADI committed its wrongful acts intentionally and with knowledge of the harm it was doing to Number 14 and punitive damages should be assessed against ADI.

**FOURTH CAUSE OF ACTION**
**[Intentional Interference with Prospective Economic Relations against ADI]**

57. Number 14 incorporates herein by reference the allegations in paragraphs 1 through 35 and 50 through 56 as though fully set forth herein.

58. Pursuant to the License Agreement, Number 14, as licensor, and Maxim, as licensee, are, and have been since 2009, in an economic relationship whereby it was probable that Plaintiff would have economically benefited in the future in connection to Royalty payments.

59. Upon acquiring Maxim, ADI became aware of Number 14 and Maxim's economic and contractual relationship under the License Agreement.

60. ADI intentionally and unilaterally prevented Maxim's full payment of the Royalty to Number 14 by ███████████████████████. By engaging in this conduct, ADI actually disrupted the relationship between Number 14 and Maxim or knew the relationship

GREENFIELD

between Number 14 and Maxim would be disrupted.

61.     As a result, Plaintiff has and will continue to suffer economic harm which was proximately caused by ADI's improper application of the Formula and the consequential underpayment of the Royalty to Number 14.

**FIFTH CAUSE OF ACTION**
**[Open Book Account – Cal. Code Civ. Proc., § 425.30 – against Maxim]**

62.     Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 35 as though fully set forth herein.

63.     Since 2021, Number 14, as creditor and licensor, and Maxim, as debtor and licensee, have financially transacted with each other in connection with the License Agreement.

64.     Number 14, in the regular course of business, kept a written account of net revenues related to Number 14's Patents, ██████████ and Royalty payments made by Defendants.

65.     Maxim owes Number 14 money on the account pursuant to the License Agreement, i.e., the difference in the Royalty not paid to Number 14 as a result of Defendants' improper calculation of the Formula and Royalty.

66.     Pursuant to Number 14's record-keeping of previous Royalty payments from 2009 to 2023, Number 14 is informed and believes and thereon alleges that Maxim owes Plaintiff the sum of at least $1 million.

**SIXTH CAUSE OF ACTION**
**[Money Due and Owing/Indebtedness – Cal. Code Civ. Proc., § 425.30 – against Maxim]**

67.     Number 14 incorporates herein by reference the allegations contained in paragraphs 1 through 35 as though fully set forth herein.

68.     Within the past two years, Maxim became, ever since has been, and now is, indebted to Number 14 in the sum of at least $1 million for money due and owing to Number 14 in consideration for the use and benefit of Plaintiff's patent license(s) as set forth in the License Agreement.

69.     Despite Number 14's demand, no part of such sum has been paid. It is now due, and owing, and Number 14 is entitled to damages according to proof.

## SEVENTH CAUSE OF ACTION
### [Accounting – against Maxim]

70.      Number 14 incorporates herein by reference the allegations contained in paragraphs 1 through 35 as though fully set forth herein.

71.     Number 14, as creditor and licensor, has a contractual relationship with Maxim, as debtor and licensee, under the License Agreement.

72.     Given Defendants' improper calculations of the Royalty owed to Number 14 for 2023, Maxim owes a balance to Number 14 which can only be genuinely ascertained with an accounting.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Number 14 hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     Damages according to proof sufficient to compensate Number 14 for damages sustained as a result of Defendants' actions as alleged herein, including but not limited to losses for Maxim's breach of contract and related duties, and for ADI's tortious interference with Number 14's License Agreement with Maxim;

2.     An award of punitive and exemplary damages, according to proof;

3.     An award of pre-judgment and post-judgment interest on all monetary relief prayed for above, and as may be permitted by law;

4.     An accounting; and

5.     All such other and further relief as the Court may deem just and proper.

//

//

GREENFIELD LLP

Dated: April 24, 2024                    By: _____/s/ Rachel Thomas_____
                                              RACHEL THOMAS
                                              Attorneys for Plaintiff NUMBER 14 B.V.

# EXHIBIT A

## LICENSE AGREEMENT

This Patent License Agreement (*the Agreement*) is made effective as of the date of signing by and between:

1. **Maxim Integrated Products, Inc.**, a company organized and existing under the laws of Delaware, U.S.A., having its principal office at 120 San Gabriel Drive, Sunnyvale, CA 94086 USA, United States of America, hereinafter referred to as "*Maxim*",

AND

2. **Rudy Eschauzier**, residing at ▮▮▮ ▮▮▮▮▮▮▮ ▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮ hereinafter referred to as "*Eschauzier*",

3. **Nico van Rijn**, residing at ▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮ hereinafter referred to as "*Van Rijn*".

    Parties under 2 and 3 may hereinafter collectively be referred to as "*the Inventors*".

RECITALS

A. Maxim is a worldwide leader in design, development, and manufacture of linear and mixed-signal integrated circuits;

B. After the date of entering into this License Agreement, the Inventors may use their experience and personal skills to develop certain Know-How relating to Amplifier Design Technology.

C. In the event that Know-How leads to Amplifier Design Patents that have conceptual and economic value, Maxim wishes to obtain a license under these patents pursuant to the terms and conditions in this Agreement;

D. The Parties acknowledge that if Maxim shall not or no longer employ the Inventors, Maxim will be confronted with increased expenses in order to further develop the Amplifier Design Technology and to obtain the Amplifier Design Patents. In case the Inventors shall not or no longer be employed by Maxim, a reduced royalty rate shall apply, which takes into account these increased expenses;

E. The Inventors are willing to grant a licence to Maxim under the conditions set out in this Agreement, which reflect Maxim's privileged position;

NOW THEREFORE, in consideration of the mutual promises and covenants herein contained, the Parties agree as follows:

1. **DEFINITIONS**

1.1   For the purpose of the Agreement the following definitions shall apply:

"Amplifier Design Patent(s)" shall mean any patent(s) in relation to Amplifier Design Technology;

"Amplifier Design Technology" shall mean the technology on amplifier design, which may be developed after the date of entering into this License Agreement. ;

"Concept Development Stage" shall mean the period during which the Inventors shall deliver to Maxim basic schematics related to amplifier design;

"Effective Date" shall mean the date this agreement has been signed.

"Employment Agreement" shall mean the employment agreement between Maxim and the Inventors;



"Inventors" shall mean Rudy Eschauzier and Nico van Rijn;

"Know-How" is defined to be all the know-how the Inventors have developed regarding Amplifier Design Technology after the date of entering into this License Agreement;

Parties shall mean the parties to this Agreement, e.g. Maxim and the Inventors;

"Products" is defined to be any products that fall within the scope of the Amplifier Design Patent(s);

"Stand-Alone Amplifiers" shall mean stand alone amplifiers that are similar in functionality to the following kinds of product families: ███████████

## 2.    GRANT OF RIGHTS

2.1    Maxim shall have a right of first refusal to obtain a perpetual, exclusive and worldwide license – with the right to sub-license - under the Amplifier Design Technology including any and all Amplifier Design Patents resulting from said Amplifier Design Technology as long as the Amplifier Design Patents are in force.

2.2    With regard to the Amplifier Design Patents or patent applications therefor, Maxim would pay (or reimburse) the Inventors for all reasonable legal counselling, filing, prosecution and maintenance costs. Maxim shall be entitled to decide on strategy relating to filing, prosecution and maintenance and Maxim shall be entitled to decide on the appointment of outside counsel, if any. Strategy related to filing means that Maxim may decide that patent applications shall not be filed in case Maxim is advised by outside counsel, and in communication

with the Inventors, that the subject matter is not patentable Also, strategy related to filing means that Maxim, in its sole and absolute discretion, shall be able to decide on the countries for which designate the respective applications, claim construction, priority applications, and the like. The parties to this agreement hereby agree that patent applications will be filed with respect to Amplifier Design Technology used in the four product families ███ ████████ ███ ███ as outlined in the attached product and specifications listing provided that the subject matter is patentable.

2.3 In case Maxim wishes to exercise its right of first refusal under clause 2.1 above, Maxim shall be obligated to do so within 200 days from the date of issuance of the Amplifier Design Patents by giving the Inventors written notice. The Inventors shall inform Maxim immediately in writing as soon as the date of grant of a particular Amplifier Design Patent becomes known. In case the Inventors do not inform Maxim timely, the 200-day period will start running as of the moment Maxim is informed by the Inventors in writing.

2.4 Each Amplifier Design Patent will be offered individually to Maxim.

2.5 The first time that Maxim exercises its right of first refusal (i.e. the first time that Maxim wishes to obtain a license under the Amplifier Design Patents), subject to clause 2.6 below, Maxim shall pay to the Inventors jointly (i.e. to be divided by them in accordance with written instructions from the Inventors given to Maxim) ████ ███ ██ █████ ██████ - to license the Amplifier Design Patents in accordance with the terms contained herein. This fee shall be paid only once and shall not be due in the event Maxim wishes to exercise its right of first refusal in relation to any subsequent Amplifier Design Patent(s).

2.6 The ████ ██ █████ ██████ - that is mentioned in clause 2.5 above, shall only be paid by Maxim to the Inventors upon confirmation that the Amplifier Design Patents have conceptual and economic value in the market.

2.7 The conceptual and economic value of the Amplifier Design Patents in the market, as mentioned in clause 2.6 above, will be based on the product and specification listing attached as Annex 1. The Parties agree that if the Amplifier Design Patents enable products that show improvements of "similar" magnitude as compared to the attached product and specifications listing, then this will establish that the Amplifier Design Patents have conceptual and economic value in the market for the purpose of payment of the fee specified above.

2.8 In the event Maxim decides to license one or more Amplifier Design Patents (on an exclusive, worldwide and perpetual basis), Maxim will use its commercially reasonable efforts to commercialize and sell stand-alone amplifiers utilizing such Amplifier Design Patents at a profit.

2.9 In the event Maxim elects not to exercise its right of first refusal to license a particular Amplifier Design Patent, the Inventors shall be free to grant licences to third parties under said particular Amplifier Design Patent. Maxim will be deemed to have made such election, if it will not have exercised its right of first refusal within the 200-day period meant in clause 2.3 above.







### 5.   OTHER INTELLECTUAL PROPERTY

5.1   Intellectual Property not including the Amplifier Design Technology as defined
in this Agreement that is conceived and developed by the Inventors in the course
of their employment with Maxim is made subject to clause 13 of the
Employment Agreement (Intellectual Property Rights).

### 6.   TERM AND TERMINATION

6.1   This Agreement shall come into force as of the Effective Date and shall continue
in full force and effect until terminated.

6.2   This Agreement can only be terminated with the explicit written consent of the
Parties.

6.3   Termination of the Employment Agreement, by whatever cause, will not result
in termination of this agreement or any existing license agreement between the
Parties, including the payment obligation of Maxim pursuant to such agreement.
Termination of the Employment Agreement will not affect Maxim's right of
first refusal with respect to any projects that are in the Concept Development
Stage or that already passed that stage at the time of such termination. However,
upon request by the Inventors, Maxim will be obligated to indicate to the
Inventors within 200 days after such request, whether it intends to execute its
right of first refusal.

### 7.   CONFIDENTIALITY

7.1   Each party agrees not to disclose to any third party and not to use, except for the
purpose of the Agreement, any information of a confidential nature including
but not limited to composition, technical information and know-how,
commercial information and know-how, price structures, sales and costs,
hereinafter referred to as "information". The above does not apply to technical
information and know-how if the Inventors, on the basis of the other provisions
of this agreement, are entitled to grant licenses to third parties, only to the extent
that such information and know-how is essential for use of the licenses granted
or to be granted.

7.2   It is expressly understood that all information provided by each party to the
other party and supplied to third parties is to be used solely for the purpose of
this Agreement and is deemed strictly confidential.

7.3 Each party shall take all steps to effectively ensure the confidential nature of the Information.

7.4 This Agreement is confidential and each party undertakes not to disclose its contents, terms and provisions, except as to the purposes described above.

7.5 The provisions of this clause shall remain in force even after the termination for whatever reason, with the exception of Technical Information and Know-How.

**8.    VALIDITY AND ENFORCEMENT OF THE AMPLIFIER DESIGN PATENTS**

8.1 The Inventors warrant that they

(i)    have not made publicly available, and/or;

(ii)   have not otherwise put to use, any information including documents, drawings, technical data, commercial information etc. that might jeopardize the prosecution and grant Amplifier Design Patents.

8.2 It is understood that any particular licence mentioned under Article 2.1 will terminate upon expiration, nullification or revocation of the particular Amplifier Design Patent under which the particular license was granted. If as a result of actions of third parties any particular Amplifier Design Patent or a substantial part thereof shall be declared null and void by way of an irreversible decision, such that no enforceable claim covers the products in the particular territory, the obligation to pay royalties under articles 2, 3 and 4 above ceases to exist for products that were manufactured, distributed or sold after the date of such declaration.

8.3 At all times shall Maxim be entitled to enforce the Amplifier Design Patents. Immediately upon request from Maxim, the Inventors shall execute all documents necessary to enable Maxim to enforce the Amplifier Design Patents. In case this is necessary, the Inventors shall join Maxim in infringement proceedings at the direction of Maxim. The Inventors shall provide all reasonable assistance if so required by Maxim in the context of infringement proceedings. In case Maxim wishes to enforce a particular Amplifier Design Patent, Maxim shall pay for all costs related thereto. In case the Inventors whish to enforce the Amplifier Design Patents they shall have to inform Maxim prior to initiating any action. In the event Maxim shall decide not to enforce said particular Amplifier Design Patent, any costs related to infringement actions shall be born by the Inventors.

**9.    INDEMNIFICATION OF THE INVENTORS BY MAXIM**

9.1 In the event Maxim exercises its right of first refusal to obtain a license under a particular Amplifier Design Patent, then Maxim will defend and indemnify the Inventors for all expenses and damages for claims alleging that the particular Amplifier Design Patent infringes a third party's patent, unless Maxim

establishes that the Inventors had actual knowledge - prior to filing the particular Amplifier Design Patent application - of the third party's patent.

**10.   MISCELLANEOUS**

10.1  The Inventors shall be entitled to transfer any of the rights that they will have pursuant to clauses 2, 3 and 4 above to an entity directly or indirectly owned or controlled by the Inventors (in which no third parties have (partial) control or (partial) ownership of the rights), provided that this entity is not a competitor of Maxim, as determined by Maxim. Such transfer must be made, if at all, only before Maxim exercises its right of first of first refusal with respect to a particular Amplifier Design Patent. In case of such transfer Maxim will enter into license agreements with and make royalty payments, if any, to the transferee, at the direction of the Inventors, provided that there are no adverse tax or other adverse consequences to Maxim. In case of transfer of the Amplifier Design Patents the transferee shall be bound to the relevant provisions in this Agreement relating to ownership of the Amplifier Design Patents, including (but not excluding others) clause 8.3 above.

**11.   CHOICE OF LAW AND FORUM**

11.1  Any dispute, controversy or claim arising out of or in connection with this Agreement which the Parties fail to settle amicably shall be governed by the following provisions:

> (i)     If Maxim is the party that files, initiates or asserts a claim in the capacity of a plaintiff, then such claim shall be submitted to a court of law in the Netherlands, in which case the Agreement shall be governed by and construed in accordance with the laws of the Netherlands.

> (ii)    If any or both of the Inventors is the party that files, initiates or asserts a claim in the capacity of a plaintiff, then such claim shall be submitted to the State or Federal Courts in Santa Clara County California, in which case the Agreement shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF the Parties hereto have caused the Agreement to be executed in threefold.

**Maxim Integrated Products, Inc.**

Name:

Title:

Place:

Date: 7/11/07

**Rudy Eschauzier**

Place: Delft

Date: 7/20/07

**Nico van Rijn**

Place: Delft

Date: 7/20/07

Execution Version

## ANNEX 1

**Product and Specification Listing**
**(attached)**



Execution Version

## ANNEX 2

## Sample Royalty Calculation

