MICHAEL J. IOANNOU (SBN 95208)
KEVIN W. ISAACSON (SBN 281067)
ANGIE CHANG (SBN 351887)
AMANDA M. OGATA (SBN 354967)
ROPERS MAJESKI PC
333 W. Santa Clara St., Suite 910
San Jose, CA 95113
Telephone:   408.287.6262
Facsimile:   408.918.4501
Email:       michael.ioannou@ropers.com
             kevin.isaacson@ropers.com
             angie.chang@ropers.com
             amanda.ogata@ropers.com

Attorneys for Defendants and Counterclaimants
ANALOG DEVICES, INC. and
MAXIM INTEGRATED PRODUCTS, INC.

**ROPERS MAJESKI**

A Professional Corporation
San Jose

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NUMBER 14 B.V., | Case No.: 5:24-cv-02435-EJD |
| Plaintiff, | **DECLARATION OF MIHAI MURGULESCU IN SUPPORT OF OPPOSITION TO COUNTER-DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| ANALOG DEVICES, INC.; and MAXIM INTEGRATED PRODUCTS, INC., | PUBLIC VERSION |
| Defendants. | |
| ANALOG DEVICES, INC.; and MAXIM INTEGRATED PRODUCTS, INC., | |
| Counterclaimants, | |
| v. | |
| NUMBER 14 B.V., RUDY ESCHAUZIER, and NICO VAN RIJN. | |
| Counter-Defendants. | |

I, Mihai Murgulescu, declare as follows:

1.      I am employed at Analog Devices Inc. ("ADI") as Patent Prosecution and Litigation Agent and hereby submit this Declaration in support of Defendants and

4871-9920-4055.1

-1-                Declaration of Mihai Murgulescu iso
                   Opposition to Motion to Dismiss
                   Case No. 5:24-CV-02435

1 | Counterclaimants Maxim Integrated Products Inc. ("Maxim") and ADI's Opposition to Plaintiff

2 | and Counter-Defendants Number 14 B.V., Rudy Eschauzier, and Nico van Rijn's Notice of

3 | Motion, Motion to Dismiss, and Memorandum of Points and Authorities in Support of Dismissal

4 | of Defendants' Counterclaims and Related Affirmative Defenses.

5 |     2.    I am familiar with Maxim's business practices and relationships, including its

6 | employment agreements and record keeping. In 2007, when Rudy Eschauzier and Nico van Rijn

7 | were employed with Maxim and at the time the subject License Agreement was signed, Maxim

8 | was headquartered in Sunnyvale, California. Maxim's headquarters have always been located

9 | within California.

10 |     3.    A true and correct copy of the Employment Agreements for Rudy Eschauzier with

11 | Maxim is attached as **Exhibit A**.

12 |     4.    A true and correct copy of the Employment Agreement for Nico van Rijn with

13 | Maxim is attached as **Exhibit B**.

14 |     5.    A true and correct copy of the Settlement Agreement regarding the termination of

15 | employment for Rudy Eschauzier is attached as **Exhibit C**.

16 |     6.    A true and correct copy of the Settlement Agreement regarding the termination of

17 | employment for Nico van Rijn is attached as **Exhibit D**.

18 |     7.    A true and correct copy of the License Agreement between Maxim,

19 | Rudy Eschauzier, and Nico van Rijn is attached as **Exhibit E**.

20 |     I declare under penalty of perjury under the laws of the United States of America that the

21 | foregoing is true and correct.

22 |     Executed this _13_ day of August, 2024 at San Jose, California.

23 |

24 |                      Mihai Murgulescu

25 |

26 |

27 |

28 |

4871-9920-4055.1

A Professional Corporation
San Jose

ROPERS
MAJESKI

# EXHIBIT A

## [PUBLIC VERSION]

## EMPLOYMENT AGREEMENT

### THE UNDERSIGNED:

(1) **MAXIM INTEGRATED PRODUCTS INC.** a company organized under the law of Delaware in the United States, having its head office at 120 San Gabriel Drive, Sunnyvale, California 94086 (the *Company*),

and

(2) **RUDY ESCHAUZIER** residing at (the *Employee*);

### WHEREAS:

(a) the Employee has explicitly declared that he, with the entering of this employment agreement, will not violate a non competition clause or any such similar clauses with a former employer (the *Non Competition Clause)*;

(b) consequently parties have entered into a non-binding letter of intent dated June 22, 2006, that was signed on June 29, 2006 regarding the employment of the Employee with the Company (and the terms of this agreement extinguish and terminates the letter of intent);

(b) and parties have reached agreement on the terms and conditions of employment which they wish to record in writing in this agreement;

(c) the Company, given the fact that the Company has entered in the non-binding letter of intent and consequently entered into this employment agreement, accepts the declaration of the Employee that with this employment agreement he will not be in violation of the Non Competition Clause, but from a business point of view has an interest to minimise the risk that this declaration is not correct, if any such risk exists, as much as possible;

(d) parties therefore explicitly, unambiguously and unmistakably agree that if a former employer would invoke the Non Competition Clause and in (summary) proceedings a court will have (preliminarily) decided that the Employee is in violation of the Non Competition Clause and/or is not allowed to perform his duties on the bases of this employment agreement, this employment agreement will in accordance with article 1.4 of this Agreement terminate until the first date the Employee is no longer subject to the Non Competition Clause as determined by such court. Thereafter, this Agreement shall become re-effective and continue in effect pursuant to the terms and conditions contained herein. The Company will under no circumstances be obligated to pay the Employee any wage, damages, severance or other in respect to such a termination of the employment agreement as a result of the Non Competition

Clause being invoked successfully by a former employer. Parties agree to this all irrespective of unforeseen circumstances, such as illness.

**HEREBY AGREE AS FOLLOWS:**

**1.    COMMENCEMENT AND TERM OF SERVICE**

1.1     This agreement (the **Agreement**), is entered into with effect from September 3, 2007, or such later date as will be agreed upon by parties, for an indefinite period of time.

1.2     This Employment Agreement may be terminated by either party in accordance with Dutch law as per the last day of any calendar month by written notice to the other party; the Employee observing a notice period of one month and the Company observing a notice period of two months.

1.3     The employment will in any case terminate on the first day of the month in which the Employee reaches the age of 65 or the pensionable age under the Company's pension plan if any such plan exists.

1.4     The Agreement will if a former employer would invoke the Non Competition Clause and in (summary) proceedings a court will have (preliminarily) decided that the Employee is in violation of the Non Competition Clause and/or is not allowed to perform his duties on the bases of this Agreement as of that date automatically be dissolved or at least be deemed to be terminated with mutual consent. However, this Agreement shall automatically become effective and continue in effect pursuant to the terms and conditions contained herein on the first date the Employee is no longer subject to the Non Competition Clause as determined by such court. If the Employee or the Company wishes so, the other party will be obliged to cooperate with a formal cantonal court procedure in which the termination of the employment agreement will be asked at such a short term as possible. The Employee will not be entitled to the salary, benefits and all other terms of employment under which (employee) insurances as of the date of the courts decision on the Non Competition Clause. Under no circumstances the Employee will be entitled to any damages, severance or other in respect of the termination of this Agreement as a result of the Non Competition Clause being invoked successfully by a former employer. Parties grant each other full and final settlement of all obligations out of the Agreement and the termination thereof. This article and the stipulation under a, c, and d, are a settlement agreement within the meaning of article 7:900 and following of the Dutch Civil Code.

**2.    DUTIES AND POWERS**

2.1     The Employee is employed in the position of Design Director and Director of Engineering of the Company's design centre to be established in Delft. A job description is attached to this Agreement as **Annex 1**.

2.2     The Employee will devote his full time, energy and skills to the business of the Company.

2.3     The Employee shall also perform the tasks reasonably assigned to him by the Company for any companies affiliated with the Company. Such functions shall be governed by the terms and conditions contained in this Agreement and shall not entitle the Employee to any further remuneration.

2.4     The Employee shall perform his functions from the to be established branch office of the Company (or an affiliate of the Company) in Delft. In case the branch office in Delft has not yet been established upon the commencement date of this agreement, the Employee will, until this office has been established perform his functions from his home address or any other location designated by the Company in Delft. At this moment, it is the Company's intention to keep the design centre in Delft open and operational provided that such design centre satisfies the performance metrics used by the Company to measure performance of its individual design centres. Additionally, as the Company is an international company, the Employee may be required to travel to other locations, such as to the United States, and spend time abroad as demanded by training periods, international activities of the Company and/or requirements of his expected collaboration with Group Companies activities.

2.5     Working hours are from Monday to Friday, 40 hours a week. The Employee is expected to work additional hours as part of his duties under this Agreement for which no additional remuneration will be paid.

## 3.      SALARY AND HOLIDAY ALLOWANCE

3.1     The Employee shall receive                                                                             to be paid after withholding of tax and social security premiums in accordance with the Company's standard payroll practices.

3.2     The salary referred under to 3.1 above is deemed to be inclusive of

3.3     The Employee shall not accept any monies or other remuneration from third parties in connection with his activities for the Company and/or the companies affiliated with the Company.

## 4.      BONUS

4.1     The Employee will participate in the Key Employees' Bonus Program as applicable from time to time, which is performance based and is assessed on Employee's attainment of specific goals during the previous year.

Participation in the Key Employee Bonus Program is contingent upon Employee's continued employment at the Company on the anniversary date of his employment and undergoing a performance review. Payment of a bonus to the Employee in any year will not lead to a right to future bonus payments. The Company is at all times entitled to unilaterally adjust or withdraw the Key Employees' Bonus Program.

4.2     No payment of the bonus as mentioned under 4.1 will be made if this Agreement ends due to: (i) the fact that the Employee has served notice of termination of his employment with the Company; or (ii) if the reason for the termination of his

Page III

employment by the Company is an urgent cause (*dringende reden*) as meant in article 7:678 of the Dutch Civil Code or a severe reason (*gewichtige reden*) as meant in article 7:685 of the Dutch Civil Code for which the Employee can be blamed or which should come for his account.

## 5.    RESTRICTED STOCK UNITS AND ESPP

5.1    Subject to the approval by the Board of Directors of the Company, or a Committee thereof

from the Company's 1996 Stock Incentive Plan (the "Plan"). The RSUs will vest in equal instalments on a quarterly basis ($1/20^{th}$ per quarter) over five (5) years (vesting on February 15, May 15, August 15 and November 15 of each year) with the first vesting date to be November 15, 2007, subject to Employee's continued service to the Company through the relevant vesting dates. The RSUs will be settled in shares of Company common stock on the vesting date with a purchase price of \$0.001 per share (the Company's par value), which will be considered to be paid with past services rendered.  The award of RSUs will be subject to the terms, definitions and provisions of the Plan and the restricted stock unit agreement between to be entered into between you and the Company after the Board's (or a Committee of the Board) approval of the RSUs.

Subject to the approval by the Board of Directors of Maxim or a Committee thereof, the Employee may also be eligible to participate in the performance based stock option grants and restricted stock units, subject to the terms and conditions of the Plan.

5.2    The Employee will be eligible to participate in the Company's 1987 Employee Stock Purchase Plan (the **ESPP**), subject to the terms and conditions in the ESPP and applicable laws.

5.3    The Employee shall comply with every rule of law and every regulation of the Company and Group Companies in force from time to time relating to dealings in shares or other securities.

5.4    Stock options, restricted stock units, awards under the ESPP and annual bonuses paid pursuant to Section 4 are not part of Employee's employment wages and benefits.

## 6.    PENSIONS

The Company shall enter into an agreement with an insurance company to arrange a pension for the Employee on the basis of a defined contribution in accordance with the Dutch Pension Act dated 1 January 2007. The annual premium will be equal to the percentage of the pensionable salary (which is the annual base salary exclusive holiday allowance minus the franchise amount related to the state old age pension benefits) based on the age of the Employee, as mentioned in the so called "Premiestaffelbesluit" of the Dutch Minister of Finance dated 28 April 2003, taking into account an old age pension and a postponed build up partner pension inclusive a premium exemption in case of disability. The Company will pay the pension premiums due to the insurance company of which the Employee will contribute one-

third ($1/3^{rd}$). The Employee agrees with the Company that the Employee's contribution will monthly be withhold from his gross base salary.

## 7.   EXPENSE REIMBURSEMENT; HEALTH BENEFITS AND ACCIDENTAL, LIFE AND DISMEMBERMENT INSURANCE



7.2   Necessary and reasonable expenses incurred by the Employee in the performance of his activities under this Agreement shall, upon submission of written evidence of such expenses in accordance with the Company's Expense Policy, be paid or reimbursed by the Company to the Employee. In addition for any one expenses in excess of €200 per month or aggregate expenses in excess of €500 per month upfront the written approval from the Vice President of the Company is required.

7.2   The Employee and eligible dependents may participate in the Company taken out health and dental insurance programs. The Company will reimburse the premium if and as far as this is a legal obligation on the basis of the Health Insurance Act (*Wet op de Zorgverzekering*). Such health and dental insurance programs are reviewed by the Company on a periodic basis and are therefore subject to change by the Company.

7.3   The Employee will also be eligible to participate in the Company sponsored disability and accidental, life and dismemberment insurance programs, and the Company will reimburse or pay the base premiums for such insurance programs. Such insurance programs are reviewed by the Company on a periodic basis and are subject to change by the Company.

## 8.   VACATION AND HOLIDAYS

For each full calendar year during which this employment hereunder continues, the Employee shall be entitled to

(which Employee may take on any day subject to the limitation in the next sentence).. Vacation and holidays are to be taken in consultation with and with the approval of the Company.  Employee will be subject to the Company's vacation and holiday hour ceiling caps for its employees.

## 9.   ILLNESS OR DISABLEMENT

9.1   In the event that the Employee is prevented from performing his duties under this Agreement as a result of illness, injury or other incapacity, he shall be required to give notice thereof to the Company at the earliest possible opportunity.

9.2   During a period of illness or incapacity, the Employee shall (i) comply with all provisions of Dutch law regarding illness or disability, (ii) follow all instructions or directions of the Company and/or any other authority so designated by the relevant

Industrial Board (*bedrijfsvereniging*), if any, and (iii) co-operate with a medical examination by a physician to be appointed by the Company, if such examination is required by the Company in addition to (i) and (ii) hereof.



9.4     Consecutive periods of illness, injury or other physical incapacity interrupted by one or more periods of less than four weeks each, during which the Employee performs (part of) his duties under this Agreement, will be deemed to be one period of illness or incapacity for the determination of the time during which the Company shall continue to pay the base salary of the Employee as referred to above.

9.5     The payments as referred to in paragraph 9.3 will be made less any amounts paid directly to the Employee under any insurance taken out by the Employee or the Company and/or legal insurances in this respect and/or benefits and/or claims in respect of loss of income vis-à-vis third parties in connection with said illness or disability.

9.6     In the event that a third party or parties may be liable for the incapacity of the Employee, the Company shall only make payments where there is no recourse of the Employee against such third party. The Company may, however, advance to the Employee during such period sums not yet recovered by the Employee from such third party, against such security as may be required by the Company.

## 10.     CONFIDENTIALITY, NON-DISCLOSURE AND COMPANY PROPERTY

10.1     The Employee shall not during the continuance of his employment with the Company or at any time after termination thereof, print, publish or communicate or otherwise disclose to any person, firm or company or use directly or indirectly (except in the proper performance of his duties hereunder): the contents of this Agreement or any trade secret or know-how, or any information of knowledge concerning or in any way relating to the business of the Company, its subsidiaries or affiliated companies or the Company's parent company, or any information or knowledge relating to the clients, affairs, finances, dealings and concerns of the Company, its subsidiaries or affiliated companies or the Company's parent company which may have become known to the Employee during the course of his employment and shall use his best endeavour to prevent the publication or disclosure thereof.

10.2     In the event that the Employee is ordered to refrain from active duty and upon termination of this Agreement – irrespective of the manner in which and the reasons for which his employment may be terminated – the Employee shall at the Company's first request to that effect surrender to the Company all property of the Company in his possession as well as all documents which in any way relate to the Company and/or the companies affiliated with the Company and/or its customers and other

business relations, all this in the broadest sense, as well as all copies of such documents and property and he shall refrain from making, retaining, or distributing any copies thereof.

## 11.    NON-COMPETITION

11.1    During the agreement and for a period of one year after termination of this Agreement, the Employee shall not without prior written approval of the Company be permitted to do any of the following in the Netherlands other than in the performance of his duties under this agreement:

(a)    work for or be involved with, in any manner, whether directly or indirectly and whether paid or unpaid, any person, organisation, company or enterprise pursuing activities in competition with, or similar or related to, the activities of the Company and/or the companies affiliated with the Company, and/or to have or take any interest in such organisation, company or enterprise;

(b)    maintain in any manner whatsoever, whether directly or indirectly, business contacts with any person, organisation, company or enterprise with whom during the last two years preceding the termination of his employment the Company has had any business contact  (hereinafter referred to as "Clients"). The Company shall either regularly maintain a list of its Clients or maintain other documents in the regular course of business that substantiate the name of its Clients, and the Company shall provide a list of its Clients at the effective date of termination of this Agreement (or within 10 (ten) days thereafter). The Employee shall sign this list of Clients.

(c)    induce present employees of the Company and/or companies affiliated with the Company or persons who in the period of two years preceding the termination of his employment have been or were employed by the Company and/or the companies affiliated with the Company to terminate their employment and/or to hire such present or former employees.

11.2    The Employee undertakes and covenants with the Company that at no time after the termination of this Agreement, he/she shall directly or indirectly present himself as being interested in or employed by or in any other way connected with any group company other than as a former employee of the Company.

11.3    Paragraphs 11.1 (a) and (b) of this Article 11 shall not apply in the event that the Company terminates Employee's employment.

11.4    The restrictive covenants contained in this Article will remain applicable if (part of) the business of the Company in which the Employee is active is transferred to a third party within the meaning of Article 7:662 and onwards of the Dutch Civil Code.

**12.    SIDE ACTIVITIES**

12.1    Except as may be permitted by the License Agreement, the Employee shall not perform any paid or unpaid professional or business side activities without prior written approval of the Company.

12.2    During his employment hereunder the Employee shall not be permitted to have or take in any way, whether directly or indirectly, any interest in companies pursuing activities in competition with or similar or related to the activities of the Company and/or the companies affiliated with the Company, or any interest in companies who are suppliers and/or licensors and/or principals and/or buyers and/or licensees of the Company and/or the companies affiliated with the Company unless the shares are traded on a recognised stock exchange

**13.    INTELLECTUAL PROPERTY RIGHTS**

13.1    The parties have concluded a License Agreement of even date herewith in relation to Amplifier Design Patents. This article 13 does not apply to the Amplifier Design Patents and licenses granted under the Amplifier Design Patents in the Agreement of even date herewith. In relation to any other (intellectual property) rights as specified hereafter, insofar as they are not vested in the Company by operation of law on the grounds of the employment relation between the parties, the Employee hereby explicitly states that he shall transfer and, to the extent possible, hereby in advance transfers to the Company any intellectual property rights of whatever nature in or arising from any work, ideas, concepts, discoveries, inventions, improvements and/or developments made or acquired by the Employee in the discharge of his duties for the Company or companies affiliated to the Company.

13.2    The Employee shall promptly disclose to the Company fully and completely any and all of the work, ideas, concepts, discoveries, inventions, improvements and/or developments, made or acquired by the Employee in the discharge of his duties for the Company or companies affiliated to the Company.

13.3    The Employee shall at the Company's request execute all documents and perform all acts as in the opinion of the Company may be necessary to obtain, or assist the Company in obtaining, any and all intellectual property rights together with all rights which may belong or accrue thereto in respect of any work, ideas, concepts, discoveries, inventions, improvements and/or developments as referred to in paragraph 1 of this Clause and to vest the same solely in the Company and for the exclusive benefit of the Company and/or companies affiliated with the Company, to the extent that the same have not already vested in the Company by law.

13.4    The Employee acknowledges that his salary includes reasonable compensation for the fact that the intellectual property rights, referred to above, will vest in the Company by operation of law or for the transfer to the Company of such rights pursuant to paragraph 1 and 3 of this Clause.

13.5    The Employee shall not disclose or bring into the Company's premises any proprietary information or trade secrets belonging to a third party.

**14.     REMEDIES**

In deviation of Sections 3, 4 and 5 of article 7:650 of the Dutch Civil Code, the Employee will forfeit to the Company for each breach of any of the provisions of clauses 10, 11, and 13 hereof immediately, without prior notice or any judicial intervention being required, a penalty of € 25,000 (*in words twenty-five thousand euros*) per breach plus € 2,500 (*in words two-thousand and five hundred euros*)   for each day that such breach continues, without prejudice to:

(a)     the Company's right to claim instead compensation for the actual damage suffered by it, or its affiliated companies through such breach; and

(b)     any other relief to which the Company may be entitled to.

**15.     FINAL PROVISIONS**

15.1     This Agreement shall be governed by and construed in accordance with the laws of the Netherlands.

15.2     The Company reserves the right to unilaterally amend the provisions of this Agreement from time to time in accordance with Article 7:613 of the Dutch Civil Code.

15.3     All payments under this Agreement will be made less the usual deductions under the applicable tax and social security laws to be withheld by employers in the Netherlands unless it follows from the nature of the payment that it may be made tax-free.

15.4     This employment is not governed by a collective labour agreement.

15.5     The foregoing constitutes the entire employment agreement between the parties and supersedes all employment agreements previously made and given by and between the Employee and the (bodies of the) Company and/or companies affiliated with the Company.

15.6     The Company will establish either a separate subsidiary or a branch office of one its existing European subsidiaries within a reasonable period of time following the opening of its design center in Delft, Holland.  Thereafter, the Company may assign this Agreement to such subsidiary (and/or transfer Employee to be an employee of such subsidiary) provided that all of the material terms and conditions of employment and this Agreement remain in effect without change.  It is the Company's current intention to establish a subsidiary in the Netherlands in the form of a private, limited liability company (Besloten Vennootschap (BV)) following the opening of its design center in Delft, Holland.

In witness whereof this Agreement was executed in duplicate and signed by the parties in Sunnyvale, California on July __, 2007.

THE COMPANY
Maxim Integrated Products, Inc.

By:
Title:

THE EMPLOYEE
Rudy Eschauzier

**Annex 1**

**(Job Description)**

Employee is responsible for the definition, design and development of integrated circuit products for the Company's MultiMedia Business Unit. These products include high performance operational amplifiers, instrumentation amplifiers, comparators, video products and audio products. Employee is also responsible for the overall management of the Delft Design Centre, and his duties will involve issues related to the facility, the recruiting of design engineers and other technical staff, maintaining projects on schedule, communicating project status back to the Company's corporate headquarters, and communicating information received from the Company's corporate headquarters to the staff in the Delft Design Centre.

# EXHIBIT B

## [PUBLIC VERSION]

## EMPLOYMENT AGREEMENT

### THE UNDERSIGNED:

(1)     **MAXIM INTEGRATED PRODUCTS INC.** a company organized under the
law of Delaware in the United States, having its head office at 120 San Gabriel
Drive, Sunnyvale, California 94086 (the *Company*),

and

(2)     **NICO VAN RIJN** residing at
                          hereinafter referred to as (the *Employee*);

### WHEREAS:

(a)     the Employee has explicitly declared that he, with the entering of this
employment agreement, will not violate a non competition clause or any such
similar clauses with a former employer (the *Non Competition Clause)*;

(b)     consequently parties have entered into a non-binding letter of intent dated June
22, 2006, that was signed on June 29, 2006 regarding the employment of the
Employee with the Company (and the terms of this agreement extinguish and
terminates the letter of intent);

(b)     and parties have reached agreement on the terms and conditions of
employment which they wish to record in writing in this agreement;

(c)     the Company, given the fact that the Company has entered in the non-binding
letter of intent and consequently entered into this employment agreement,
accepts the declaration of the Employee that with this employment agreement
he will not be in violation of the Non Competition Clause, but from a business
point of view has an interest to minimise the risk that this declaration is not
correct, if any such risk exists, as much as possible;

(d)     parties therefore explicitly, unambiguously and unmistakably agree that if a
former employer would invoke the Non Competition Clause and in (summary)
proceedings a court will have (preliminarily) decided that the Employee is in
violation of the Non Competition Clause and/or is not allowed to perform his
duties on the bases of this employment agreement, this employment agreement
will in accordance with article 1.4 of this Agreement terminate until the first
date the Employee is no longer subject to the Non Competition Clause as
determined by such court. Thereafter, this Agreement shall become re-
effective and continue in effect pursuant to the terms and conditions contained
herein. The Company will under no circumstances be obligated to pay the
Employee any wage, damages, severance or other in respect to such a
termination of the employment agreement as a result of the Non Competition
Clause being invoked successfully by a former employer. Parties agree to this
all irrespective of unforeseen circumstances, such as illness.

### HEREBY AGREE AS FOLLOWS:

1.    **COMMENCEMENT AND TERM OF SERVICE**

1.1    This agreement (the **Agreement**), is entered into with effect from September 3, 2007, or such later date as will be agreed upon by parties, for an indefinite period of time.

1.2    This Employment Agreement may be terminated by either party in accordance with Dutch law as per the last day of any calendar month by written notice to the other party; the Employee observing a notice period of one month and the Company observing a notice period of two months.

1.3    The employment will in any case terminate on the first day of the month in which the Employee reaches the age of 65 or the pensionable age under the Company's pension plan if any such plan exists.

1.4    The Agreement will if a former employer would invoke the Non Competition Clause and in (summary) proceedings a court will have (preliminarily) decided that the Employee is in violation of the Non Competition Clause and/or is not allowed to perform his duties on the bases of this Agreement as of that date automatically be dissolved or at least be deemed to be terminated with mutual consent. However, this Agreement shall automatically become effective and continue in effect pursuant to the terms and conditions contained herein on the first date the Employee is no longer subject to the Non Competition Clause as determined by such court. If the Employee or the Company wishes so, the other party will be obliged to cooperate with a formal cantonal court procedure in which the termination of the employment agreement will be asked at such a short term as possible. The Employee will not be entitled to the salary, benefits and all other terms of employment under which (employee) insurances as of the date of the courts decision on the Non Competition Clause. Under no circumstances the Employee will be entitled to any damages, severance or other in respect of the termination of this Agreement as a result of the Non Competition Clause being invoked successfully by a former employer. Parties grant each other full and final settlement of all obligations out of the Agreement and the termination thereof. This article and the stipulation under a, c, and d, are a settlement agreement within the meaning of article 7:900 and following of the Dutch Civil Code.

2.    **DUTIES AND POWERS**

2.1    The Employee is employed in the position of Principal Member of Technical Staff of the Company's design centre to be established in Delft. A job description is attached to this Agreement as **Annex 1**.

2.2    The Employee will devote his full time, energy and skills to the business of the Company.

2.3    The Employee shall also perform the tasks reasonably assigned to him by the Company for any companies affiliated with the Company. Such functions shall be governed by the terms and conditions contained in this Agreement and shall not entitle the Employee to any further remuneration.

2.4     The Employee shall perform his functions from the to be established branch office of the Company (or an affiliate of the Company) in Delft. In case the branch office in Delft has not yet been established upon the commencement date of this agreement, the Employee will, until this office has been established perform his functions from his home address or any other location designated by the Company in Delft. At this moment, it is the Company's intention to keep the design centre in Delft open and operational provided that such design centre satisfies the performance metrics used by the Company to measure performance of its individual design centres. Additionally, as the Company is an international company, the Employee may be required to travel to other locations, such as to the United States, and spend time abroad as demanded by training periods, international activities of the Company and/or requirements of his expected collaboration with Group Companies activities.

2.5     Working hours are from Monday to Friday, 40 hours a week. The Employee is expected to work additional hours as part of his duties under this Agreement for which no additional remuneration will be paid.

## 3.     SALARY AND HOLIDAY ALLOWANCE

3.1     The Employee shall receive                                                                                      to be paid after withholding of tax and social security premiums in accordance with the Company's standard payroll practices.

3.2     The salary referred under to 3.1 above is deemed to be inclusive of a

3.3     The Employee shall not accept any monies or other remuneration from third parties in connection with his activities for the Company and/or the companies affiliated with the Company.

## 4.     BONUS

4.1     The Employee will participate in the Key Employees' Bonus Program as applicable from time to time, which is performance based and is assessed on Employee's attainment of specific goals during the previous year.

Participation in the Key Employee Bonus Program is contingent upon Employee's continued employment at the Company on the anniversary date of his employment and undergoing a performance review. Payment of a bonus to the Employee in any year will not lead to a right to future bonus payments. The Company is at all times entitled to unilaterally adjust or withdraw the Key Employees' Bonus Program.

4.2     No payment of the bonus as mentioned under 4.1 will be made if this Agreement ends due to: (i) the fact that the Employee has served notice of termination of his employment with the Company; or (ii) if the reason for the termination of his employment by the Company is an urgent cause (*dringende reden*) as meant in article 7:678 of the Dutch Civil Code or a severe reason (*gewichtige reden*) as meant in article 7:685 of the Dutch Civil Code for which the Employee can be blamed or which should come for his account.

## 5.  RESTRICTED STOCK UNITS AND ESPP

5.1   Subject to the approval by the Board of Directors of the Company, or a Committee thereof,

from the Company's 1996 Stock Incentive Plan (the "Plan"). The RSUs will vest in equal instalments on a quarterly basis ($1/20^{th}$ per quarter) over five (5) years (vesting on February 15, May 15, August 15 and November 15 of each year) with the first vesting date to be November 15, 2007, subject to Employee's continued service to the Company through the relevant vesting dates. The RSUs will be settled in shares of Company common stock on the vesting date with a purchase price of \$0.001 per share (the Company's par value), which will be considered to be paid with past services rendered.  The award of RSUs will be subject to the terms, definitions and provisions of the Plan and the restricted stock unit agreement between to be entered into between you and the Company after the Board's (or a Committee of the Board) approval of the RSUs.

Subject to the approval by the Board of Directors of Maxim or a Committee thereof, the Employee may also be eligible to participate in the performance based stock option grants and restricted stock units, subject to the terms and conditions of the Plan.

5.2   The Employee will be eligible to participate in the Company's 1987 Employee Stock Purchase Plan (the **ESPP**), subject to the terms and conditions in the ESPP and applicable laws.

5.3   The Employee shall comply with every rule of law and every regulation of the Company and Group Companies in force from time to time relating to dealings in shares or other securities.

5.4   Stock options, restricted stock units, awards under the ESPP and annual bonuses paid pursuant to Section 4 are not part of Employee's employment wages and benefits.

## 6.  PENSIONS

The Company shall enter into an agreement with an insurance company to arrange a pension for the Employee on the basis of a defined contribution in accordance with the Dutch Pension Act dated 1 January 2007. The annual premium will be equal to the percentage of the pensionable salary (which is the annual base salary exclusive holiday allowance minus the franchise amount related to the state old age pension benefits) based on the age of the Employee, as mentioned in the so called "Premiestaffelbesluit" of the Dutch Minister of Finance dated 28 April 2003, taking into account an old age pension and a postponed build up partner pension inclusive a premium exemption in case of disability. The Company will pay the pension premiums due to the insurance company of which the Employee will contribute one-third ($1/3^{rd}$). The Employee agrees with the Company that the Employee's contribution will monthly be withhold from his gross base salary.

## 7. EXPENSE REIMBURSEMENT; HEALTH BENEFITS AND ACCIDENTAL, LIFE AND DISMEMBERMENT INSURANCE



7.2 Necessary and reasonable expenses incurred by the Employee in the performance of his activities under this Agreement shall, upon submission of written evidence of such expenses in accordance with the Company's Expense Policy, be paid or reimbursed by the Company to the Employee. In addition for any one expenses in excess of €200 per month or aggregate expenses in excess of €500 per month upfront the written approval from the Vice President of the Company is required.

7.2 The Employee and eligible dependents may participate in the Company taken out health and dental insurance programs. The Company will reimburse the premium if and as far as this is a legal obligation on the basis of the Health Insurance Act (*Wet op de Zorgverzekering*). Such health and dental insurance programs are reviewed by the Company on a periodic basis and are therefore subject to change by the Company.

7.3 The Employee will also be eligible to participate in the Company sponsored disability and accidental, life and dismemberment insurance programs, and the Company will reimburse or pay the base premiums for such insurance programs. Such insurance programs are reviewed by the Company on a periodic basis and are subject to change by the Company.

## 8. VACATION AND HOLIDAYS

For each full calendar year during which this employment hereunder continues, the Employee shall be entitled to
(which Employee may take on any day subject to the limitation in the next sentence).. Vacation and holidays are to be taken in consultation with and with the approval of the Company. Employee will be subject to the Company's vacation and holiday hour ceiling caps for its employees.

## 9. ILLNESS OR DISABLEMENT

9.1 In the event that the Employee is prevented from performing his duties under this Agreement as a result of illness, injury or other incapacity, he shall be required to give notice thereof to the Company at the earliest possible opportunity.

9.2 During a period of illness or incapacity, the Employee shall (i) comply with all provisions of Dutch law regarding illness or disability, (ii) follow all instructions or directions of the Company and/or any other authority so designated by the relevant Industrial Board (*bedrijfsvereniging*), if any, and (iii) co-operate with a medical examination by a physician to be appointed by the Company, if such examination is required by the Company in addition to (i) and (ii) hereof.



9.4     Consecutive periods of illness, injury or other physical incapacity interrupted by one or more periods of less than four weeks each, during which the Employee performs (part of) his duties under this Agreement, will be deemed to be one period of illness or incapacity for the determination of the time during which the Company shall continue to pay the base salary of the Employee as referred to above.

9.5     The payments as referred to in paragraph 9.3 will be made less any amounts paid directly to the Employee under any insurance taken out by the Employee or the Company and/or legal insurances in this respect and/or benefits and/or claims in respect of loss of income vis-à-vis third parties in connection with said illness or disability.

9.6     In the event that a third party or parties may be liable for the incapacity of the Employee, the Company shall only make payments where there is no recourse of the Employee against such third party. The Company may, however, advance to the Employee during such period sums not yet recovered by the Employee from such third party, against such security as may be required by the Company.

## 10.    CONFIDENTIALITY, NON-DISCLOSURE AND COMPANY PROPERTY

10.1     The Employee shall not during the continuance of his employment with the Company or at any time after termination thereof, print, publish or communicate or otherwise disclose to any person, firm or company or use directly or indirectly (except in the proper performance of his duties hereunder): the contents of this Agreement or any trade secret or know-how, or any information of knowledge concerning or in any way relating to the business of the Company, its subsidiaries or affiliated companies or the Company's parent company, or any information or knowledge relating to the clients, affairs, finances, dealings and concerns of the Company, its subsidiaries or affiliated companies or the Company's parent company which may have become known to the Employee during the course of his employment and shall use his best endeavour to prevent the publication or disclosure thereof.

10.2     In the event that the Employee is ordered to refrain from active duty and upon termination of this Agreement – irrespective of the manner in which and the reasons for which his employment may be terminated – the Employee shall at the Company's first request to that effect surrender to the Company all property of the Company in his possession as well as all documents which in any way relate to the Company and/or the companies affiliated with the Company and/or its customers and other business relations, all this in the broadest sense, as well as all copies of such documents and property and he shall refrain from making, retaining, or distributing any copies thereof.

## 11.    NON-COMPETITION

11.1    During the agreement and for a period of one year after termination of this Agreement, the Employee shall not without prior written approval of the Company be permitted to do any of the following in the Netherlands other than in the performance of his duties under this agreement:

(a)    work for or be involved with, in any manner, whether directly or indirectly and whether paid or unpaid, any person, organisation, company or enterprise pursuing activities in competition with, or similar or related to, the activities of the Company and/or the companies affiliated with the Company, and/or to have or take any interest in such organisation, company or enterprise;

(b)    maintain in any manner whatsoever, whether directly or indirectly, business contacts with any person, organisation, company or enterprise with whom during the last two years preceding the termination of his employment the Company has had any business contact  (hereinafter referred to as "Clients"). The Company shall either regularly maintain a list of its Clients or maintain other documents in the regular course of business that substantiate the name of its Clients, and the Company shall provide a list of its Clients at the effective date of termination of this Agreement (or within 10 (ten) days thereafter). The Employee shall sign this list of Clients.

(c)    induce present employees of the Company and/or companies affiliated with the Company or persons who in the period of two years preceding the termination of his employment have been or were employed by the Company and/or the companies affiliated with the Company to terminate their employment and/or to hire such present or former employees.

11.2    The Employee undertakes and covenants with the Company that at no time after the termination of this Agreement, he/she shall directly or indirectly present himself as being interested in or employed by or in any other way connected with any group company other than as a former employee of the Company.

11.3    Paragraphs 11.1 (a) and (b) of this Article 11 shall not apply in the event that the Company terminates Employee's employment.

11.4    The restrictive covenants contained in this Article will remain applicable if (part of) the business of the Company in which the Employee is active is transferred to a third party within the meaning of Article 7:662 and onwards of the Dutch Civil Code.

## 12.    SIDE ACTIVITIES

12.1    Except as may be permitted by the License Agreement, the Employee shall not perform any paid or unpaid professional or business side activities without prior written approval of the Company.

12.2    During his employment hereunder the Employee shall not be permitted to have or take in any way, whether directly or indirectly, any interest in companies

pursuing activities in competition with or similar or related to the activities of the Company and/or the companies affiliated with the Company, or any interest in companies who are suppliers and/or licensors and/or principals and/or buyers and/or licensees of the Company and/or the companies affiliated with the Company unless the shares are traded on a recognised stock exchange

## 13.    INTELLECTUAL PROPERTY RIGHTS

13.1    The parties have concluded a License Agreement of even date herewith in relation to Amplifier Design Patents. This article 13 does not apply to the Amplifier Design Patents and licenses granted under the Amplifier Design Patents in the Agreement of even date herewith. In relation to any other (intellectual property) rights as specified hereafter, insofar as they are not vested in the Company by operation of law on the grounds of the employment relation between the parties, the Employee hereby explicitly states that he shall transfer and, to the extent possible, hereby in advance transfers to the Company any intellectual property rights of whatever nature in or arising from any work, ideas, concepts, discoveries, inventions, improvements and/or developments made or acquired by the Employee in the discharge of his duties for the Company or companies affiliated to the Company.

13.2    The Employee shall promptly disclose to the Company fully and completely any and all of the work, ideas, concepts, discoveries, inventions, improvements and/or developments, made or acquired by the Employee in the discharge of his duties for the Company or companies affiliated to the Company.

13.3    The Employee shall at the Company's request execute all documents and perform all acts as in the opinion of the Company may be necessary to obtain, or assist the Company in obtaining, any and all intellectual property rights together with all rights which may belong or accrue thereto in respect of any work, ideas, concepts, discoveries, inventions, improvements and/or developments as referred to in paragraph 1 of this Clause and to vest the same solely in the Company and for the exclusive benefit of the Company and/or companies affiliated with the Company, to the extent that the same have not already vested in the Company by law.

13.4    The Employee acknowledges that his salary includes reasonable compensation for the fact that the intellectual property rights, referred to above, will vest in the Company by operation of law or for the transfer to the Company of such rights pursuant to paragraph 1 and 3 of this Clause.

13.5    The Employee shall not disclose or bring into the Company's premises any proprietary information or trade secrets belonging to a third party.

## 14.    REMEDIES

In deviation of Sections 3, 4 and 5 of article 7:650 of the Dutch Civil Code, the Employee will forfeit to the Company for each breach of any of the provisions of clauses 10, 11, and 13 hereof immediately, without prior notice or any judicial intervention being required, a penalty of € 25,000 (*in words twenty-five thousand euros*) per breach plus € 2,500 (*in words two-thousand and five hundred euros*)   for each day that such breach continues, without prejudice to:

(a)     the Company's right to claim instead compensation for the actual damage suffered by it, or its affiliated companies through such breach; and

(b)     any other relief to which the Company may be entitled to.

## 15.    FINAL PROVISIONS

15.1    This Agreement shall be governed by and construed in accordance with the laws of the Netherlands.

15.2    The Company reserves the right to unilaterally amend the provisions of this Agreement from time to time in accordance with Article 7:613 of the Dutch Civil Code.

15.3    All payments under this Agreement will be made less the usual deductions under the applicable tax and social security laws to be withheld by employers in the Netherlands unless it follows from the nature of the payment that it may be made tax-free.

15.4    This employment is not governed by a collective labour agreement.

15.5    The foregoing constitutes the entire employment agreement between the parties and supersedes all employment agreements previously made and given by and between the Employee and the (bodies of the) Company and/or companies affiliated with the Company.

15.6    The Company will establish either a separate subsidiary or a branch office of one its existing European subsidiaries within a reasonable period of time following the opening of its design center in Delft, Holland.  Thereafter, the Company may assign this Agreement to such subsidiary (and/or transfer Employee to be an employee of such subsidiary) provided that all of the material terms and conditions of employment and this Agreement remain in effect without change.  It is the Company's current intention to establish a subsidiary in the Netherlands in the form of a private, limited liability company (Besloten Vennootschap (BV)) following the opening of its design center in Delft, Holland.

In witness whereof this Agreement was executed in duplicate and signed by the parties in Sunnyvale, California on July __, 2007.

THE COMPANY
Maxim Integrated Products, Inc.

By:
Title:

THE EMPLOYEE
Nico van Rijn

## Annex 1

### (Job Description)

Employee is responsible for the definition, design and development of integrated circuit products for Maxim's MultiMedia Business Unit.  These products include high performance operational amplifiers, instrumentation amplifiers, comparators, video products and audio products.

# EXHIBIT C

**[PUBLIC VERSION]**

## SETTLEMENT AGREEMENT
('*vaststellingsovereenkomst*')

**THE UNDERSIGNED:**

1.     The company with limited liability **MAXIM INTEGRATED PRODUCTS NETHERLANDS B.V.,** having its registered seat and office address in Delft (2628 XJ) at the Delftechpark 37 c-d, in this matter lawfully represented by Mark Casper, Director, hereinafter to be referred to as "**Employer**";

and

2.     Mr. **Rudy Eschauzier**, residing at ███████████████████ ███████████ hereinafter to be referred to as "**Employee**";

Hereinafter jointly referred to as "**Parties**". "

Whereby both parties agreed on the following on March 31st 2015, which is agreed to be the effective date of this Agreement.

**WHEREAS:**

A.     Employee entered into employment with Employer on September 3, 2007. Employee currently holds the position of Director, IC Design for Employer;

B.     ████████████████████████████████████████████████

C.     The Employer has decided to restructure its organization and as a result of this decision the office is closing and the Employee's position is redundant.

D.     Employer has investigated whether any alternative position for Employee within the organization was available or would become available in the short term. Employer had to conclude that no alternative position is available for Employee, nor in the foreseeable future and that Employer consequently has no other alternative than to seek termination of the employment;

E.     Based on the foregoing, Employer has taken the initiative to terminate the employment contract with Employee. There is neither an urgent cause [in Dutch: "*dringende reden*"] within the meaning of article 7:678 of the Dutch Civil Code nor is Employee to blame [in Dutch: "*geen verwijtbaar gedrag*"] for the termination of the employment contract;

F.     The reason for termination is not related to any ban on termination [in Dutch: "*opzegverbod*"] within the meaning of articles 7:647, 648, 670 and 670a of the Dutch Civil Code or any other ban on termination of the employment contract;

Initial Employer:                                                                                         Initial Employee:

G.  Employer has advised Employee to seek legal advice before signing this settlement agreement (the "**Agreement**").

H.  Parties reached an agreement in respect of the termination of the employment contract and wish to lay down the terms and conditions of the termination of the employment contract in this present Agreement.

I.  With the present Agreement Parties envisaged to conclude an exhaustive, comprehensive agreement.

**HAVE AGREED ON THE FOLLOWING:**

1.  The employment agreement shall terminate by mutual consent (in Dutch: "*met wederzijds goedvinden*") as per May 31, 2015 (the "**Termination Date**") on the terms and conditions provided in this Agreement. Termination of the employment contract is *not* based on any urgent reason within the meaning of Section 678 of Book 7 of the Dutch Civil Code (*Burgerlijk Wetboek*) for which the Employee may be blamed. Neither has the employment contract been terminated by the Employee or at his request as a result of serious objections attaching to its continuation such that any such continuation could not reasonably be required from him.

2.  Employee's base salary, holiday allowance and any other perquisites will be paid as usual until the Termination Date. A final settlement will be effected and paid on May 25th 2015. Any rights to bonus payments will lapse as at the Termination Date.

3.  

4.  Any days' holiday accrued but not taken will be deemed to have been taken before the Termination Date. In other words, there will be no right to payment of such days.

Initial Employer:                                                      Initial Employee:

5. ██████████████████████████████████████████

6. ██████████████████████████████████████████

7. Until the Termination Date Employer shall fulfill its pension obligations on the grounds of the Dutch Pension Act [*Pensioenwet*].

8. In the event that Employee dies after execution of the Settlement Agreement but prior to the Termination Date, the amounts promised pursuant to this Settlement Agreement shall be payable to Employee's heirs.

9. Employee shall return any and all records and property made available to him within the framework of his position (such as the laptop, corporate credit card, passwords, Engineering notebooks, to Employer in good condition before the Termination Date.

10. The post-contractual obligations set forth in the employment contract will remain in full force with the exception of the non competition clause and/or the non-solicitation clause and article 11.1 (c) in relation to Maxim Integrated Products Netherlands B.V employees.

11. Exclusively at the Employee's express request, Employer may issue positive references and positively written testimonials.

12. Any refusal or suspension of benefits or a reduction in benefits under the social security legislation will not affect the validity of this Agreement. Employer is not liable for the risks arising from the so-called fictitious notice period. Employer will cooperate with any request for benefits under the WW by the Employee, but accepts no liability in respect of obtaining such benefits fully or partly and/or timely.

13. The Parties shall consult each other on time as to whether and how any internal and/or external statements will be made about the termination of the employment contract.

14. The Parties shall observe absolute confidentiality in respect of third parties as to the contents of the Agreement, unless the Parties are legally required to disclose such information. In that case, Parties shall consult each other about this in advance.

15. This Agreement constitutes the entire agreement and understanding between the Parties with respect to its subject matter and replaces and supersedes all prior agreements, arrangements, undertakings or statements regarding such subject matter. The agreements as laid down in this Agreement are meant to settle the termination of the employment contract in an exhaustive manner as well as any other legal relationship that existed between the Parties.

16. Each of the Parties hereby waives the right to nullify (in Dutch: "*vernietigen*"), rescind ((in Dutch: "*ontbinden*"), amend (in Dutch: "*wijzigen*") or to terminate (in Dutch: "*opzeggen*")

Initial Employer:

Initial Employee:



this Agreement by serving notice, in whole or in part, or to request nullification, rescission, amendment or termination by serving notice of this Agreement, in whole or in part, including on the basis of articles 3:35, 6:228, 6:230 or 6:265 Dutch Civil Code.

17. The Parties mutually undertake to refrain from making such statements about each other in respect of third parties that their justified interests could be prejudiced as a consequence.

18. Once the obligations set forth above have been fulfilled, Employer and any companies affiliated with it, on the one hand, and Employee, on the other, will have no more additional obligations in respect of each other on the basis of the employment between them, its termination, or on any other basis whatsoever, and the Parties shall grant each other final discharge under the laws of any and all jurisdictions.

19. This Agreement shall be governed by and construed in accordance with the laws of the Netherlands.

20. The foregoing qualifies as a settlement agreement within the meaning of Section 7:900 of the Dutch Civil Code. Changes to the Agreement must be in writing in order to be valid.

Thus agreed upon and executed in duplicate.

**Maxim Integrated Products Netherlands B.V.**
Mark Casper
Director

Rudy Eschauzier

Initial Employer:                                                                                                    Initial Employee:

# EXHIBIT D

**[PUBLIC VERSION]**

## SETTLEMENT AGREEMENT
('*vaststellingsovereenkomst*')

**THE UNDERSIGNED:**

1.　The company with limited liability **MAXIM INTEGRATED PRODUCTS NETHERLANDS B.V.**, having its registered seat and office address in Delft (2628 XJ) at the Delftechpark 37 c-d, in this matter lawfully represented by Mark Casper, Director, hereinafter to be referred to as "**Employer**";

and

2.　Mr. **Nico Van Rijn** residing at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ hereinafter to be referred to as "**Employee**";

Hereinafter jointly referred to as "**Parties**".

Whereby both parties agreed on the following on March 31ˢᵗ 2015, which is agreed to be the effective date of this Agreement.

**WHEREAS:**

A.　Employee entered into employment with Employer on September 3, 2007 Employee currently holds the position of Senior Principal MTS, IC Design for Employer;

B.　▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

C.　The Employer has decided to restructure its organization and as a result of this decision the office is closing and the Employee's position is redundant.

D.　Employer has investigated whether any alternative position for Employee within the organization was available or would become available in the short term. Employer had to conclude that no alternative position is available for Employee, nor in the foreseeable future and that Employer consequently has no other alternative than to seek termination of the employment;

E.　Based on the foregoing, Employer has taken the initiative to terminate the employment contract with Employee. There is neither an urgent cause [in Dutch: "*dringende reden*"] within the meaning of article 7:678 of the Dutch Civil Code nor is Employee to blame [in Dutch: "*geen verwijtbaar gedrag*"] for the termination of the employment contract;

F.　The reason for termination is not related to any ban on termination [in Dutch: "*opzegverbod*"] within the meaning of articles 7:647, 648, 670 and 670a of the Dutch Civil Code or any other ban on termination of the employment contract;

Initial Employer:　　　　　　　　　　　　　　　　　　　　　　Initial Employee:　*NvR*

G.   Employer has advised Employee to seek legal advice before signing this settlement agreement (the "**Agreement**").

H.   Parties reached an agreement in respect of the termination of the employment contract and wish to lay down the terms and conditions of the termination of the employment contract in this present Agreement.

I.   With the present Agreement Parties envisaged to conclude an exhaustive, comprehensive agreement.

**HAVE AGREED ON THE FOLLOWING:**

1.   The employment agreement shall terminate by mutual consent (in Dutch: "*met wederzijds goedvinden*") as per May 31, 2015 (the "**Termination Date**") on the terms and conditions provided in this Agreement. Termination of the employment contract is *not* based on any urgent reason within the meaning of Section 678 of Book 7 of the Dutch Civil Code (*Burgerlijk Wetboek*) for which the Employee may be blamed. Neither has the employment contract been terminated by the Employee or at his request as a result of serious objections attaching to its continuation such that any such continuation could not reasonably be required from him.

2.   Employee's base salary, holiday allowance and any other perquisites will be paid as usual until the Termination Date. A final settlement will be effected and paid on May 25th 2015. Any rights to bonus payments will lapse as at the Termination Date.

3.   

4.   Any days' holiday accrued but not taken will be deemed to have been taken before the Termination Date. In other words, there will be no right to payment of such days.

Initial Employer:                                                    Initial Employee:

                                                                     *NvR*

5. ███████████████████████████████████

6. ███████████████████████████████████

7. Until the Termination Date Employer shall fulfill its pension obligations on the grounds of the Dutch Pension Act [*Pensioenwer*].

8. In the event that Employee dies after execution of the Settlement Agreement but prior to the Termination Date, the amounts promised pursuant to this Settlement Agreement shall be payable to Employee's heirs.

9. Employee shall return any and all records and property made available to him within the framework of his position (such as the laptop, corporate credit card, mobile telephone, passwords, Engineering notebooks, to Employer in good condition before the Termination Date.

10. The post-contractual obligations set forth in the employment contract will remain in full force with the exception of the non competition clause and/or the non-solicitation clause and article 11.1 (c) in relation to Maxim Integrated Products Netherlands B.V employees.

11. Exclusively at the Employee's express request, Employer may issue positive references and positively written testimonials.

12. Any refusal or suspension of benefits or a reduction in benefits under the social security legislation will not affect the validity of this Agreement. Employer is not liable for the risks arising from the so-called fictitious notice period. Employer will cooperate with any request for benefits under the WW by the Employee, but accepts no liability in respect of obtaining such benefits fully or partly and/or timely.

13. The Parties shall consult each other on time as to whether and how any internal and/or external statements will be made about the termination of the employment contract.

14. The Parties shall observe absolute confidentiality in respect of third parties as to the contents of the Agreement, unless the Parties are legally required to disclose such information. In that case, Parties shall consult each other about this in advance.

15. This Agreement constitutes the entire agreement and understanding between the Parties with respect to its subject matter and replaces and supersedes all prior agreements, arrangements, undertakings or statements regarding such subject matter. The agreements as laid down in this Agreement are meant to settle the termination of the employment contract in an exhaustive manner as well as any other legal relationship that existed between the Parties.

Initial Employer:                                                    Initial Employee:

*NvR*

16. Each of the Parties hereby waives the right to nullify (in Dutch: *"vernietigen"*), rescind ((in Dutch: *"ontbinden"*), amend (in Dutch: *"wijzigen"*) or to terminate (in Dutch: *"opzeggen"*) this Agreement by serving notice, in whole or in part, or to request nullification, rescission, amendment or termination by serving notice of this Agreement, in whole or in part, including on the basis of articles 3:35, 6:228, 6:230 or 6:265 Dutch Civil Code.

17. The Parties mutually undertake to refrain from making such statements about each other in respect of third parties that their justified interests could be prejudiced as a consequence.

18. Once the obligations set forth above have been fulfilled, Employer and any companies affiliated with it, on the one hand, and Employee, on the other, will have no more additional obligations in respect of each other on the basis of the employment between them, its termination, or on any other basis whatsoever, and the Parties shall grant each other final discharge under the laws of any and all jurisdictions.

19. This Agreement shall be governed by and construed in accordance with the laws of the Netherlands.

20. The foregoing qualifies as a settlement agreement within the meaning of Section 7:900 of the Dutch Civil Code. Changes to the Agreement must be in writing in order to be valid.

Thus agreed upon and executed in duplicate.

**Maxim Integrated Products Netherlands B.V.**
Mark Casper
Director

Nico Van Rijn

Initial Employer:

Initial Employee:

*NvR*

# EXHIBIT E

# [PUBLIC VERSION]

Execution Version

## LICENSE AGREEMENT

This Patent License Agreement (*the Agreement*) is made effective as of the date of signing by and between:

1. **Maxim Integrated Products, Inc.**, a company organized and existing under the laws of Delaware, U.S.A., having its principal office at 120 San Gabriel Drive, Sunnyvale, CA 94086 USA, United States of America, hereinafter referred to as "*Maxim*",

AND

2. **Rudy Eschauzier**, residing at ███ ████████ ██ ██████████ ████████ hereinafter referred to as "*Eschauzier*",

3. **Nico van Rijn**, residing at ████████ ████████ ██████ ████████ hereinafter referred to as "*Van Rijn*".

   Parties under 2 and 3 may hereinafter collectively be referred to as "*the Inventors*".

RECITALS

A. Maxim is a worldwide leader in design, development, and manufacture of linear and mixed-signal integrated circuits;

B. After the date of entering into this License Agreement, the Inventors may use their experience and personal skills to develop certain Know-How relating to Amplifier Design Technology.

C. In the event that Know-How leads to Amplifier Design Patents that have conceptual and economic value, Maxim wishes to obtain a license under these patents pursuant to the terms and conditions in this Agreement;

D. The Parties acknowledge that if Maxim shall not or no longer employ the Inventors, Maxim will be confronted with increased expenses in order to further develop the Amplifier Design Technology and to obtain the Amplifier Design Patents. In case the Inventors shall not or no longer be employed by Maxim, a reduced royalty rate shall apply, which takes into account these increased expenses;

E. The Inventors are willing to grant a licence to Maxim under the conditions set out in this Agreement, which reflect Maxim's privileged position;

NOW THEREFORE, in consideration of the mutual promises and covenants herein contained, the Parties agree as follows:

## 1. DEFINITIONS

1.1   For the purpose of the Agreement the following definitions shall apply:

"Amplifier Design Patent(s)" shall mean any patent(s) in relation to Amplifier Design Technology;

"Amplifier Design Technology" shall mean the technology on amplifier design, which may be developed after the date of entering into this License Agreement. ;

"Concept Development Stage" shall mean the period during which the Inventors shall deliver to Maxim basic schematics related to amplifier design;

"Effective Date" shall mean the date this agreement has been signed.

"Employment Agreement" shall mean the employment agreement between Maxim and the Inventors;



"Inventors" shall mean Rudy Eschauzier and Nico van Rijn;

"Know-How" is defined to be all the know-how the Inventors have developed regarding Amplifier Design Technology after the date of entering into this License Agreement;

Parties shall mean the parties to this Agreement, e.g. Maxim and the Inventors;

"Products" is defined to be any products that fall within the scope of the Amplifier Design Patent(s);

"Stand-Alone Amplifiers" shall mean stand alone amplifiers that are similar in functionality to the following kinds of product families: ██████████
██ ██ ██ ████████ ██ ████ ███ ██

## 2.    GRANT OF RIGHTS

2.1    Maxim shall have a right of first refusal to obtain a perpetual, exclusive and worldwide license – with the right to sub-license - under the Amplifier Design Technology including any and all Amplifier Design Patents resulting from said Amplifier Design Patents as long as the Amplifier Design Patents are in force.

2.2    With regard to the Amplifier Design Patents or patent applications therefor, Maxim would pay (or reimburse) the Inventors for all reasonable legal counselling, filing, prosecution and maintenance costs. Maxim shall be entitled to decide on strategy relating to filing, prosecution and maintenance and Maxim shall be entitled to decide on the appointment of outside counsel, if any. Strategy related to filing means that Maxim may decide that patent applications shall not be filed in case Maxim is advised by outside counsel, and in communication

with the Inventors, that the subject matter is not patentable Also, strategy related to filing means that Maxim, in its sole and absolute discretion, shall be able to decide on the countries for which designate the respective applications, claim construction, priority applications, and the like. The parties to this agreement hereby agree that patent applications will be filed with respect to Amplifier Design Technology used in the four product families ██████  ████████  ██ ██████ as outlined in the attached product and specifications listing provided that the subject matter is patentable.

2.3   In case Maxim wishes to exercise its right of first refusal under clause 2.1 above, Maxim shall be obligated to do so within 200 days from the date of issuance of the Amplifier Design Patents by giving the Inventors written notice. The Inventors shall inform Maxim immediately in writing as soon as the date of grant of a particular Amplifier Design Patent becomes known. In case the Inventors do not inform Maxim timely, the 200-day period will start running as of the moment Maxim is informed by the Inventors in writing.

2.4   Each Amplifier Design Patent will be offered individually to Maxim.

2.5   The first time that Maxim exercises its right of first refusal (i.e. the first time that Maxim wishes to obtain a license under the Amplifier Design Patents), subject to clause 2.6 below, Maxim shall pay to the Inventors jointly (i.e. to be divided by them in accordance with written instructions from the Inventors given to Maxim) ████ ██ ██ ██████ ██████ - to license the Amplifier Design Patents in accordance with the terms contained herein. This fee shall be paid only once and shall not be due in the event Maxim wishes to exercise its right of first refusal in relation to any subsequent Amplifier Design Patent(s).

2.6   The ████ ██ ██████ ██████ - that is mentioned in clause 2.5 above, shall only be paid by Maxim to the Inventors upon confirmation that the Amplifier Design Patents have conceptual and economic value in the market.

2.7   The conceptual and economic value of the Amplifier Design Patents in the market, as mentioned in clause 2.6 above, will be based on the product and specification listing attached as Annex 1. The Parties agree that if the Amplifier Design Patents enable products that show improvements of "similar" magnitude as compared to the attached product and specifications listing, then this will establish that the Amplifier Design Patents have conceptual and economic value in the market for the purpose of payment of the fee specified above.

2.8   In the event Maxim decides to license one or more Amplifier Design Patents (on an exclusive, worldwide and perpetual basis), Maxim will use its commercially reasonable efforts to commercialize and sell stand-alone amplifiers utilizing such Amplifier Design Patents at a profit.

2.9   In the event Maxim elects not to exercise its right of first refusal to license a particular Amplifier Design Patent, the Inventors shall be free to grant licences to third parties under said particular Amplifier Design Patent. Maxim will be deemed to have made such election, if it will not have exercised its right of first refusal within the 200-day period meant in clause 2.3 above.







## 5.   OTHER INTELLECTUAL PROPERTY

5.1   Intellectual Property not including the Amplifier Design Technology as defined in this Agreement that is conceived and developed by the Inventors in the course of their employment with Maxim is made subject to clause 13 of the Employment Agreement (Intellectual Property Rights).

## 6.   TERM AND TERMINATION

6.1   This Agreement shall come into force as of the Effective Date and shall continue in full force and effect until terminated.

6.2   This Agreement can only be terminated with the explicit written consent of the Parties.

6.3   Termination of the Employment Agreement, by whatever cause, will not result in termination of this agreement or any existing license agreement between the Parties, including the payment obligation of Maxim pursuant to such agreement. Termination of the Employment Agreement will not affect Maxim's right of first refusal with respect to any projects that are in the Concept Development Stage or that already passed that stage at the time of such termination. However, upon request by the Inventors, Maxim will be obligated to indicate to the Inventors within 200 days after such request, whether it intends to execute its right of first refusal.

## 7.   CONFIDENTIALITY

7.1   Each party agrees not to disclose to any third party and not to use, except for the purpose of the Agreement, any information of a confidential nature including but not limited to composition, technical information and know-how, commercial information and know-how, price structures, sales and costs, hereinafter referred to as "information". The above does not apply to technical information and know-how if the Inventors, on the basis of the other provisions of this agreement, are entitled to grant licenses to third parties, only to the extent that such information and know-how is essential for use of the licenses granted or to be granted.

7.2   It is expressly understood that all information provided by each party to the other party and supplied to third parties is to be used solely for the purpose of this Agreement and is deemed strictly confidential.

7.3   Each party shall take all steps to effectively ensure the confidential nature of the Information.

7.4   This Agreement is confidential and each party undertakes not to disclose its contents, terms and provisions, except as to the purposes described above.

7.5   The provisions of this clause shall remain in force even after the termination for whatever reason, with the exception of Technical Information and Know-How.

## 8.   VALIDITY AND ENFORCEMENT OF THE AMPLIFIER DESIGN PATENTS

8.1   The Inventors warrant that they

      (i)     have not made publicly available, and/or;

      (ii)    have not otherwise put to use, any information including documents, drawings, technical data, commercial information etc. that might jeopardize the prosecution and grant Amplifier Design Patents.

8.2   It is understood that any particular licence mentioned under Article 2.1 will terminate upon expiration, nullification or revocation of the particular Amplifier Design Patent under which the particular license was granted. If as a result of actions of third parties any particular Amplifier Design Patent or a substantial part thereof shall be declared null and void by way of an irreversible decision, such that no enforceable claim covers the products in the particular territory, the obligation to pay royalties under articles 2, 3 and 4 above ceases to exist for products that were manufactured, distributed or sold after the date of such declaration.

8.3   At all times shall Maxim be entitled to enforce the Amplifier Design Patents. Immediately upon request from Maxim, the Inventors shall execute all documents necessary to enable Maxim to enforce the Amplifier Design Patents. In case this is necessary, the Inventors shall join Maxim in infringement proceedings at the direction of Maxim. The Inventors shall provide all reasonable assistance if so required by Maxim in the context of infringement proceedings. In case Maxim wishes to enforce a particular Amplifier Design Patent, Maxim shall pay for all costs related thereto. In case the Inventors whish to enforce the Amplifier Design Patents they shall have to inform Maxim prior to initiating any action. In the event Maxim shall decide not to enforce said particular Amplifier Design Patent, any costs related to infringement actions shall be born by the Inventors.

## 9.   INDEMNIFICATION OF THE INVENTORS BY MAXIM

9.1   In the event Maxim exercises its right of first refusal to obtain a license under a particular Amplifier Design Patent, then Maxim will defend and indemnify the Inventors for all expenses and damages for claims alleging that the particular Amplifier Design Patent infringes a third party's patent, unless Maxim

establishes that the Inventors had actual knowledge - prior to filing the particular Amplifier Design Patent application - of the third party's patent.

**10.   MISCELLANEOUS**

10.1   The Inventors shall be entitled to transfer any of the rights that they will have pursuant to clauses 2, 3 and 4 above to an entity directly or indirectly owned or controlled by the Inventors (in which no third parties have (partial) control or (partial) ownership of the rights), provided that this entity is not a competitor of Maxim, as determined by Maxim. Such transfer must be made, if at all, only before Maxim exercises its right of first of first refusal with respect to a particular Amplifier Design Patent. In case of such transfer Maxim will enter into license agreements with and make royalty payments, if any, to the transferee, at the direction of the Inventors, provided that there are no adverse tax or other adverse consequences to Maxim. In case of transfer of the Amplifier Design Patents the transferee shall be bound to the relevant provisions in this Agreement relating to ownership of the Amplifier Design Patents, including (but not excluding others) clause 8.3 above.

**11.   CHOICE OF LAW AND FORUM**

11.1   Any dispute, controversy or claim arising out of or in connection with this Agreement which the Parties fail to settle amicably shall be governed by the following provisions:

   (i)   If Maxim is the party that files, initiates or asserts a claim in the capacity of a plaintiff, then such claim shall be submitted to a court of law in the Netherlands, in which case the Agreement shall be governed by and construed in accordance with the laws of the Netherlands.

   (ii)   If any or both of the Inventors is the party that files, initiates or asserts a claim in the capacity of a plaintiff, then such claim shall be submitted to the State or Federal Courts in Santa Clara County California, in which case the Agreement shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF the Parties hereto have caused the Agreement to be executed in threefold.

**Maxim Integrated Products, Inc.**

Name:

Title:

Place:

Date: 7/11/07

**Rudy Eschauzier**

Place: Delft

Date: 7/20/07

**Nico van Rijn**

Place: Delft

Date: 7/20/07

Execution Version

## ANNEX 1

**Product and Specification Listing**
**(attached)**



Execution Version

## ANNEX 2

## Sample Royalty Calculation

