# EXHIBIT 1

PUBLIC VERSION

Execution Version

# LICENSE AGREEMENT

This Patent License Agreement (*the Agreement*) is made effective as of the date of signing by and between:

1. **Maxim Integrated Products, Inc.**, a company organized and existing under the laws of Delaware, U.S.A., having its principal office at 120 San Gabriel Drive, Sunnyvale, CA 94086 USA, United States of America, hereinafter referred to as "*Maxim*",

AND

2. **Rudy Eschauzier**, residing at ███████████████████████████ ████████ hereinafter referred to as "*Eschauzier*",

3. **Nico van Rijn**, residing at ██████████████████████████████, hereinafter referred to as "*Van Rijn*".

Parties under 2 and 3 may hereinafter collectively be referred to as "*the Inventors*".

RECITALS

A. Maxim is a worldwide leader in design, development, and manufacture of linear and mixed-signal integrated circuits;

B. After the date of entering into this License Agreement, the Inventors may use their experience and personal skills to develop certain Know-How relating to Amplifier Design Technology.

C. In the event that Know-How leads to Amplifier Design Patents that have conceptual and economic value, Maxim wishes to obtain a license under these patents pursuant to the terms and conditions in this Agreement;

D. The Parties acknowledge that if Maxim shall not or no longer employ the Inventors, Maxim will be confronted with increased expenses in order to further develop the Amplifier Design Technology and to obtain the Amplifier Design Patents. In case the Inventors shall not or no longer be employed by Maxim, a reduced royalty rate shall apply, which takes into account these increased expenses;

E. The Inventors are willing to grant a licence to Maxim under the conditions set out in this Agreement, which reflect Maxim's privileged position;

NOW THEREFORE, in consideration of the mutual promises and covenants herein contained, the Parties agree as follows:

1. **DEFINITIONS**

1.1 For the purpose of the Agreement the following definitions shall apply:

"Amplifier Design Patent(s)" shall mean any patent(s) in relation to Amplifier Design Technology;

"Amplifier Design Technology" shall mean the technology on amplifier design, which may be developed after the date of entering into this License Agreement. ;

"Concept Development Stage" shall mean the period during which the Inventors shall deliver to Maxim basic schematics related to amplifier design;

"Effective Date" shall mean the date this agreement has been signed.

"Employment Agreement" shall mean the employment agreement between Maxim and the Inventors;

"Gross Margin" shall mean the Net Revenues less Cost of Goods Sold calculated in accordance with U.S. generally accepted accounting principles (GAAP); Gross margin as a % equals gross margin divided by net revenues calculated in accordance with GAAP. For clarification purposes, a calculation of the Gross Margin for an imaginary product is set forth on Annex 2 attached hereto.

"Inventors" shall mean Rudy Eschauzier and Nico van Rijn;

"Know-How" is defined to be all the know-how the Inventors have developed regarding Amplifier Design Technology after the date of entering into this License Agreement;

Parties shall mean the parties to this Agreement, e.g. Maxim and the Inventors;

"Products" is defined to be any products that fall within the scope of the Amplifier Design Patent(s);

"Stand-Alone Amplifiers" shall mean stand alone amplifiers that are similar in functionality to the following kinds of product families: ▌

## 2. GRANT OF RIGHTS

2.1  Maxim shall have a right of first refusal to obtain a perpetual, exclusive and worldwide license – with the right to sub-license - under the Amplifier Design Technology including any and all Amplifier Design Patents resulting from said Amplifier Design Technology as long as the Amplifier Design Patents are in force.

2.2  With regard to the Amplifier Design Patents or patent applications therefor, Maxim would pay (or reimburse) the Inventors for all reasonable legal counselling, filing, prosecution and maintenance costs. Maxim shall be entitled to decide on strategy relating to filing, prosecution and maintenance and Maxim shall be entitled to decide on the appointment of outside counsel, if any. Strategy related to filing means that Maxim may decide that patent applications shall not be filed in case Maxim is advised by outside counsel, and in communication

with the Inventors, that the subject matter is not patentable Also, strategy related to filing means that Maxim, in its sole and absolute discretion, shall be able to decide on the countries for which designate the respective applications, claim construction, priority applications, and the like. The parties to this agreement hereby agree that patent applications will be filed with respect to Amplifier Design Technology used in the four product families (AA1, AA2, AA3 and AA5) as outlined in the attached product and specifications listing provided that the subject matter is patentable.

2.3  In case Maxim wishes to exercise its right of first refusal under clause 2.1 above, Maxim shall be obligated to do so within 200 days from the date of issuance of the Amplifier Design Patents by giving the Inventors written notice. The Inventors shall inform Maxim immediately in writing as soon as the date of grant of a particular Amplifier Design Patent becomes known. In case the Inventors do not inform Maxim timely, the 200-day period will start running as of the moment Maxim is informed by the Inventors in writing.

2.4  Each Amplifier Design Patent will be offered individually to Maxim.

2.5  The first time that Maxim exercises its right of first refusal (i.e. the first time that Maxim wishes to obtain a license under the Amplifier Design Patents), subject to clause 2.6 below, Maxim shall pay to the Inventors jointly (i.e. to be divided by them in accordance with written instructions from the Inventors given to Maxim) ███████████████████,- to license the Amplifier Design Patents in accordance with the terms contained herein. This fee shall be paid only once and shall not be due in the event Maxim wishes to exercise its right of first refusal in relation to any subsequent Amplifier Design Patent(s).

2.6  The ███████████████████,- that is mentioned in clause 2.5 above, shall only be paid by Maxim to the Inventors upon confirmation that the Amplifier Design Patents have conceptual and economic value in the market.

2.7  The conceptual and economic value of the Amplifier Design Patents in the market, as mentioned in clause 2.6 above, will be based on the product and specification listing attached as Annex 1. The Parties agree that if the Amplifier Design Patents enable products that show improvements of "similar" magnitude as compared to the attached product and specifications listing, then this will establish that the Amplifier Design Patents have conceptual and economic value in the market for the purpose of payment of the fee specified above.

2.8  In the event Maxim decides to license one or more Amplifier Design Patents (on an exclusive, worldwide and perpetual basis), Maxim will use its commercially reasonable efforts to commercialize and sell stand-alone amplifiers utilizing such Amplifier Design Patents at a profit.

2.9  In the event Maxim elects not to exercise its right of first refusal to license a particular Amplifier Design Patent, the Inventors shall be free to grant licences to third parties under said particular Amplifier Design Patent. Maxim will be deemed to have made such election, if it will not have exercised its right of first refusal within the 200-day period meant in clause 2.3 above.

3. 

3.1

3.2  Maxim shall evaluate each Stand-Alone Amplifier product launch. Payment of the amount under clause 3.1 above, if any, shall be conditioned upon the technology covered by the Amplifier Design Patents giving the product significant economic value and adds demonstrable benefits to the product. Assessment of the value and benefits will be governed by the product and specifications listing as outlined in clause 2.7 above.

3.3  A certain portion of a design center that Maxim is planning to establish in Delft, The Netherlands, would be dedicated to designing stand-alone amplifiers and defined by local product definers in Delft. Maxim shall decide on any product launch and a Business Unit executive at Maxim's headquarters in Sunnyvale, California, USA, shall need to approve any such launch. The parties to this Agreement shall agree beforehand on the launch of four product families (AA1, AA2, AA3 and AA5) as outlined in the attached product and specifications listing.

4.

4.1 





### 5. OTHER INTELLECTUAL PROPERTY

5.1 Intellectual Property not including the Amplifier Design Technology as defined in this Agreement that is conceived and developed by the Inventors in the course of their employment with Maxim is made subject to clause 13 of the Employment Agreement (Intellectual Property Rights).

### 6. TERM AND TERMINATION

6.1 This Agreement shall come into force as of the Effective Date and shall continue in full force and effect until terminated.

6.2 This Agreement can only be terminated with the explicit written consent of the Parties.

6.3 Termination of the Employment Agreement, by whatever cause, will not result in termination of this agreement or any existing license agreement between the Parties, including the payment obligation of Maxim pursuant to such agreement. Termination of the Employment Agreement will not affect Maxim's right of first refusal with respect to any projects that are in the Concept Development Stage or that already passed that stage at the time of such termination. However, upon request by the Inventors, Maxim will be obligated to indicate to the Inventors within 200 days after such request, whether it intends to execute its right of first refusal.

### 7. CONFIDENTIALITY

7.1 Each party agrees not to disclose to any third party and not to use, except for the purpose of the Agreement, any information of a confidential nature including but not limited to composition, technical information and know-how, commercial information and know-how, price structures, sales and costs, hereinafter referred to as "information". The above does not apply to technical information and know-how if the Inventors, on the basis of the other provisions of this agreement, are entitled to grant licenses to third parties, only to the extent that such information and know-how is essential for use of the licenses granted or to be granted.

7.2 It is expressly understood that all information provided by each party to the other party and supplied to third parties is to be used solely for the purpose of this Agreement and is deemed strictly confidential.

7.3 Each party shall take all steps to effectively ensure the confidential nature of the Information.

7.4 This Agreement is confidential and each party undertakes not to disclose its contents, terms and provisions, except as to the purposes described above.

7.5 The provisions of this clause shall remain in force even after the termination for whatever reason, with the exception of Technical Information and Know-How.

## 8. VALIDITY AND ENFORCEMENT OF THE AMPLIFIER DESIGN PATENTS

8.1 The Inventors warrant that they

    (i) have not made publicly available, and/or;

    (ii) have not otherwise put to use, any information including documents, drawings, technical data, commercial information etc. that might jeopardize the prosecution and grant Amplifier Design Patents.

8.2 It is understood that any particular licence mentioned under Article 2.1 will terminate upon expiration, nullification or revocation of the particular Amplifier Design Patent under which the particular license was granted. If as a result of actions of third parties any particular Amplifier Design Patent or a substantial part thereof shall be declared null and void by way of an irreversible decision, such that no enforceable claim covers the products in the particular territory, the obligation to pay royalties under articles 2, 3 and 4 above ceases to exist for products that were manufactured, distributed or sold after the date of such declaration.

8.3 At all times shall Maxim be entitled to enforce the Amplifier Design Patents. Immediately upon request from Maxim, the Inventors shall execute all documents necessary to enable Maxim to enforce the Amplifier Design Patents. In case this is necessary, the Inventors shall join Maxim in infringement proceedings at the direction of Maxim. The Inventors shall provide all reasonable assistance if so required by Maxim in the context of infringement proceedings. In case Maxim wishes to enforce a particular Amplifier Design Patent, Maxim shall pay for all costs related thereto. In case the Inventors whish to enforce the Amplifier Design Patents they shall have to inform Maxim prior to initiating any action. In the event Maxim shall decide not to enforce said particular Amplifier Design Patent, any costs related to infringement actions shall be born by the Inventors.

## 9. INDEMNIFICATION OF THE INVENTORS BY MAXIM

9.1 In the event Maxim exercises its right of first refusal to obtain a license under a particular Amplifier Design Patent, then Maxim will defend and indemnify the Inventors for all expenses and damages for claims alleging that the particular Amplifier Design Patent infringes a third party's patent, unless Maxim

establishes that the Inventors had actual knowledge - prior to filing the particular Amplifier Design Patent application - of the third party's patent.

## 10. MISCELLANEOUS

10.1 The Inventors shall be entitled to transfer any of the rights that they will have pursuant to clauses 2, 3 and 4 above to an entity directly or indirectly owned or controlled by the Inventors (in which no third parties have (partial) control or (partial) ownership of the rights), provided that this entity is not a competitor of Maxim, as determined by Maxim. Such transfer must be made, if at all, only before Maxim exercises its right of first of first refusal with respect to a particular Amplifier Design Patent. In case of such transfer Maxim will enter into license agreements with and make royalty payments, if any, to the transferee, at the direction of the Inventors, provided that there are no adverse tax or other adverse consequences to Maxim. In case of transfer of the Amplifier Design Patents the transferee shall be bound to the relevant provisions in this Agreement relating to ownership of the Amplifier Design Patents, including (but not excluding others) clause 8.3 above.

## 11. CHOICE OF LAW AND FORUM

11.1 Any dispute, controversy or claim arising out of or in connection with this Agreement which the Parties fail to settle amicably shall be governed by the following provisions:

   (i) If Maxim is the party that files, initiates or asserts a claim in the capacity of a plaintiff, then such claim shall be submitted to a court of law in the Netherlands, in which case the Agreement shall be governed by and construed in accordance with the laws of the Netherlands.

   (ii) If any or both of the Inventors is the party that files, initiates or asserts a claim in the capacity of a plaintiff, then such claim shall be submitted to the State or Federal Courts in Santa Clara County California, in which case the Agreement shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF the Parties hereto have caused the Agreement to be executed in threefold.

**Maxim Integrated Products, Inc.**

Name: *[signature]*

Title: *Sr. OM*

Place:

Date: 7/11/07

*[signature]*

**Rudy Eschauzier**

Place: Delft

Date: 7/20/07

*[signature]*

**Nico van Rijn**

Place: Delft

Date: 7/20/07

# ANNEX 1

## Product and Specification Listing
(attached)



Execution Version

# ANNEX 2

## Sample Royalty Calculation

