UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NUMBER 14 B.V.,

             Plaintiff,

    v.

ANALOG DEVICES INC., et al.,

             Defendants.

Case No.  24-cv-02435-EKL

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. Nos. 43, 94

This action arises from a dispute regarding royalty payments under a patent licensing agreement.  Plaintiff/Counter-Defendant Number 14 B.V. ("Number 14") sued Defendants/Counterclaimants Analog Devices Inc. and Maxim Integrated Products (collectively, "Maxim") for underpaying royalties on the sale of Maxim products that use Number 14's patents. Maxim asserts a host of counterclaims, arguing that it was defrauded into paying royalties on products that do not meet the requirements of the parties' agreement.  The counterclaims are alleged against Number 14, as well as two individuals who invented the patented technology at issue (the "Inventors").  *See* Counterclaim ¶¶ 3-5, ECF No. 90.

Number 14 and the Inventors move to dismiss certain counterclaims and to strike certain affirmative defenses.  Mot., ECF No. 94.  The Court carefully reviewed the parties' briefs and heard argument on the motion.  For the foregoing reasons, the motion is GRANTED.

I.      **BACKGROUND**[1]

Maxim is in the semiconductor industry:  It is "a worldwide leader in the design, development, and manufacture of linear and mixed-signal integration circuits."  Counterclaim ¶ 9.

---

[1] The facts are taken from the complaint, counterclaims, and documents attached to the pleadings as indicated.  Additional facts are discussed where relevant to the Court's rulings.

United States District Court
Northern District of California

Number 14 initiated this action when it sued Maxim for changing the formula it used to calculate royalties to Number 14.  Compl. ¶¶ 3-8, ECF No. 92.  In response to Number 14's complaint, Maxim asserted counterclaims against Number 14 and the Inventors, Rudy Eschauzier and Nico Van Rijn.  Counterclaim ¶¶ 3-5.  The Inventors are citizens of The Netherlands.  *Id*. ¶¶ 4-5.  They previously worked for Maxim at its semiconductor design center in Delft, The Netherlands.  *Id*.  Number 14 is wholly owned by the Inventors.  *Id*. ¶ 3.  The Inventors created Number 14 to receive royalty payments from Maxim under the patent licensing agreement.  *Id*. ¶¶ 26, 58.[2]

On or around July 20, 2007, Maxim and the Inventors executed a patent licensing agreement.  *Id*. ¶ 10; *see also* ECF No. 90-1 (the "Agreement").[3]  The parties contemplated that "the Inventors may use their experience and personal skills to develop certain Know-How relating to Amplifier Design Technology," and if that "Know-How leads to Amplifier Design Patents that have conceptual and economic value, Maxim wishe[d] to obtain a license[.]"  Agreement Recitals.

The Agreement granted Maxim "a right of first refusal to obtain a perpetual, exclusive and worldwide license" to "any and all Amplifier Design Patents" obtained by the Inventors.  *Id*. § 2.1.  To exercise this right, Maxim was required to pay the Inventors a fee "upon confirmation that the Amplifier Design Patents have conceptual and economic value in the market."  *Id*. §§ 2.5, 2.6.  The patents would be deemed to have "conceptual and economic value in the market" if they "enable[d] products that show improvements of 'similar' magnitude as compared to" specifications attached to the Agreement.  *Id*. § 2.7.  Maxim also agreed to pay the Inventors an annual royalty payment on products that were covered by the Amplifier Design Patents.  Counterclaim ¶ 18.  As with the one-time payment, the Inventors' right to receive royalty payments was conditioned on the Amplifier Design Patents having "conceptual and economic value in the market."  *Id*. ¶ 19.

---

[2] On August 26, 2021, Analog Devices Inc. ("ADI") acquired Maxim Integrated Products, and Maxim is now a wholly-owned subsidiary of ADI.  *Id*. ¶ 9.  Because most of the key events relevant to this action involved Maxim pre-acquisition, the Court refers to Counterclaimants collectively as "Maxim" unless it is important to distinguish between the two companies.

[3] All parties agree that the Court may consider the Agreement in ruling on this motion, as it is attached to the Counterclaim.  *See* Mot. at 14-15; Opp. at 15.

United States District Court
Northern District of California

1   Maxim agreed that, if it chose to license the Amplifier Design Patents, it would use

2   "commercially reasonable efforts to commercialize and sell" products utilizing the patents.

3   Agreement § 2.8.  The Agreement provides that "Maxim shall evaluate . . . each product launch."

4   *Id*. § 3.2.  The Agreement further provides that "Maxim shall decide on any product launch and a

5   Business Unit executive at Maxim's headquarters in Sunnyvale, California, USA, shall need to

6   approve any such launch."  *Id*. § 3.3.

7   On or around September 3, 2007, the Inventors became Maxim employees.  Counterclaim

8   ¶ 12.  In or around 2009, the Inventors "represented to Maxim that they had completed the

9   Amplifier Design Patents which would enable products" meeting the specifications in the

10  Agreement.  *Id*. ¶ 27.  In 2010, the Inventors represented to Maxim that they had developed

11  products utilizing Amplifier Design Patents "sufficient to receive [r]oyalties under the License

12  Agreement."  *Id*. ¶ 29.  In 2010, Maxim began making royalty payments to the Inventors for

13  products covered by the Amplifier Design Patents, and it has continued to do so.  *See id.* ¶ 30.

14  The crux of Maxim's counterclaims is that the Inventors "misrepresented to Maxim that

15  they were entitled to receive [r]oyalty payments," and they were aware that the products "did not

16  meet the specification standards" in the Agreement.  *Id*. ¶ 32.  Maxim claims that, while the

17  Inventors were Maxim employees, they "controlled development" of Maxim's products that were

18  covered by the Amplifier Design Patents and they "had actual and detailed knowledge of the

19  abilities and specifications" of those products.  *Id*. ¶ 17.  Maxim further alleges that, even after

20  their employment terminated on May 31, 2015, the Inventors "continued to allow" Maxim to

21  believe that the products meet the specifications in the Agreement.  *Id*. ¶¶ 34-35.  Maxim alleges

22  that the "Inventors have identified additional . . . royalty-bearing products, thereby representing

23  that such products meet the specifications required in the License Agreement."  *Id*. ¶ 36.

24  The Inventors move to dismiss all counterclaims asserted against them under the doctrine

25  of *forum non conveniens*.  They contend that a forum-selection clause in the Agreement requires

26  Maxim to bring its counterclaims against them in The Netherlands.  Additionally, Number 14 and

27  the Inventors move to dismiss Maxim's counterclaims for:  breach of contract (counterclaim 1),

28  breach of the covenant of good faith and fair dealing (counterclaim 2), intentional

1    misrepresentation (counterclaim 4), negligent misrepresentation (counterclaim 5), fraud or

2    constructive fraud by omission (counterclaim 6), detrimental reliance (counterclaim 7), open book

3    account, Cal. Civ. Proc. Code § 425.30 (counterclaim 11), money had and received (counterclaim

4    12), and unjust enrichment (counterclaim 13).  Counterclaim ¶¶ 57-149.  Number 14 and the

5    Inventors also move to strike or dismiss Maxim's fifth and seventh affirmative defenses for unjust

6    enrichment and unclean hands.

7        The Court first addresses the motion to dismiss for *forum non conveniens*, then turns to the

8    motion to dismiss for failure to state a claim.

9    **II.    MOTION TO DISMISS FOR *FORUM NON CONVENIENS***

10       **A.    Legal Standard**

11       A party may "enforce a forum-selection clause pointing to a state or foreign forum" and

12   seek dismissal of an action "through the doctrine of *forum non conveniens*."  *Atl. Marine Constr.*

13   *Co. v. U.S. Dist. Court*, 571 U.S. 49, 60 (2013).  The first step of the analysis is to determine

14   whether the parties agreed to a valid forum-selection clause that applies to the case.  *See id.* at 62

15   n.5.  If a valid forum-selection clause applies, then at the second step, the court engages in a

16   modified version of the traditional *forum non conveniens* analysis.  *Id.* at 62-63.  The court gives

17   "no weight" to the plaintiff's choice of forum and does "not consider arguments about the parties'

18   private interests," including the convenience of the parties and witnesses.  *Id.* at 63-64.  The court

19   is limited to "arguments about public-interest factors only," *id.* at 64, including the local interest in

20   the case, the court's familiarity with the governing law, and the burden on local courts and juries,

21   *id.* at 62 n.6.  However, the public-interest factors "will rarely defeat" enforcement of a valid

22   forum-selection clause.  *Id.* at 64.  "In all but the most unusual cases, therefore, 'the interest of

23   justice' is served by holding parties to their bargain."  *Id.* at 66.

24       The party opposing enforcement of a forum-selection clause bears a "heavy burden of

25   showing the sort of exceptional circumstances that would justify disregarding a forum-selection

26   clause."  *Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1084 (9th Cir. 2018); *see also*

27   *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 16 (1972) (A forum-selection clause is

28   controlling "absent a strong showing that it should be set aside.").  Exceptional circumstances

United States District Court
Northern District of California

1    include where the clause is invalid due to "fraud or overreaching," where its enforcement would

2    be "unreasonable and unjust" or "contrary to the public policy of the forum," or where the plaintiff

3    would be "effectively deprived of its day in court." *M/S Bremen*, 407 U.S. at 15, 18-19. "What is

4    critical is not whether a party will be disadvantaged by the forum-selection clause, but whether the

5    forum will be adequate: whether 'an alternative forum is available where the defendant is

6    amenable to service of process and the forum provides some remedy for the wrong at issue.'"

7    *Lewis v. Liberty Mut. Ins. Co.*, 953 F.3d 1160, 1168 (9th Cir. 2020) (quoting *Tuazon v. R.J.*

8    *Reynolds Tobacco Co.*, 433 F.3d 1163, 1178 (9th Cir. 2006)).

9        **B.    Discussion**

10       The Inventors contend that all counterclaims asserted against them should be dismissed on

11   the grounds of *forum non conveniens* because the parties executed a valid forum-selection clause

12   that requires Maxim to bring its counterclaims in The Netherlands. Mot. at 8-14. The forum-

13   selection clause provides:

14       11.1 Any dispute, controversy or claim arising out of or in connection with this
         Agreement which the Parties fail to settle amicably shall be governed by the
15       following provisions:

16          (i) If Maxim is the party that files, initiates or asserts a claim in the capacity of a
17              plaintiff, then such claim shall be submitted to a court of law in the
                Netherlands, in which case the Agreement shall be governed by and construed
18              in accordance with the laws of the Netherlands.

19          (ii) If any or both of the Inventors is the party that files, initiates or asserts a claim
20              in the capacity of a plaintiff, then such a claim shall be submitted to the State
                or Federal Courts in Santa Clara County California, in which case the
21              Agreement shall be governed by and construed in accordance with the laws of
22              the State of California.

23   Agreement § 11.1.

24       At the first step of the analysis, the Court concludes that the forum-selection clause is

25   valid, and it applies to this action. Maxim does not dispute the validity of the forum-selection

26   clause. Opp. at 11, ECF No. 91. And the forum-selection clause applies here because it extends

27   to any "dispute, controversy or claim arising out of or in connection with" the Agreement.

28   Agreement § 11.1; *see also Sun*, 901 F.3d at 1086 (construing a similar forum-selection clause to

United States District Court
Northern District of California

5

cover "any dispute that has some logical or causal connection" to the agreement containing the clause). Here, the parties' performance under the Agreement is the very heart of this action.

Although the parties agree that the forum-selection clause is valid and applicable, they disagree as to its meaning. The Inventors argue that the forum-selection clause requires Maxim to litigate its counterclaims against them in The Netherlands because a counterclaim is a claim asserted "in the capacity of a plaintiff." Because the Agreement does not define the term "in the capacity of a plaintiff," the Court looks to its ordinary meaning. *See* Cal. Civ. Code § 1644. Here, as the Ninth Circuit has recognized: "It is well established that a counterclaim results in shifting the parties so that the party counterclaiming becomes the plaintiff on the counterclaim and the original plaintiff becomes the defendant." *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 839 (9th Cir. 2010). Thus, consistent with the ordinary meaning of "plaintiff" in this context, Maxim's counterclaims are claims asserted "in the capacity of a plaintiff." *See id.* Accordingly, Maxim's counterclaims against the Inventors must be "submitted to a court of law in [T]he Netherlands." Agreement § 11.1(i).

Maxim interprets the forum-selection clause differently, but its reasons are not persuasive. First, Maxim points to the other part of the clause, which provides a forum in Santa Clara County for claims that the Inventors file, initiate, or assert in the capacity of a plaintiff. *See* Opp. at 11-12. Maxim suggests that, because the Inventors initiated this action, all counterclaims brought in the same action must be litigated in the same forum. But nothing in the Agreement supports this reading. *See Polimaster*, 623 F.3d at 839 ("Absolutely nothing in these agreements suggests that the parties understood the term 'defendant' as a formal designation limited to the party initially on the defensive."). Additionally, Maxim's interpretation is inconsistent with the plain language of the forum-selection clause, which provides for a forum based on the *claims* asserted. Maxim's interpretation would rewrite the clause such that the forum would apply to the entire *action*.[4] *See* Opp. at 11 (arguing that "[v]enue is properly determined by . . . the party who initiated, filed, or

---

[4] *Compare* Fed. R. Civ. P. 3 ("A civil <u>action</u> is commenced by filing a complaint with the court." (emphasis added)) *with* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate <u>claims</u> or defenses as it has[.]" (emphasis added)). *See also S&M Inv. Co. v. Tahoe Reg'l Plan. Agency*, 911 F.2d 324, 327 (9th Cir. 1990) (defining "action" to mean "all the formal proceedings in a court").

asserted the claims, as the Plaintiff of the <u>action</u>" (emphasis added)).  That hypothetical clause might read:  "If any or both of the Inventors is the party that files, initiates or asserts a claim in the capacity of a plaintiff, then such <u>action</u> shall be submitted to the State or Federal Courts in Santa Clara County[.]"  But that is not the language the parties used.

Second, Maxim argues that this interpretation is "nonsensical" because it would result in separate actions on overlapping issues.  *See* Opp. at 12.  To the contrary, it makes sense that each party to the Agreement would bargain for the right to defend claims brought against them in a familiar and convenient local forum.  And it makes sense that the parties would bargain for this right to apply reciprocally, so that the Inventors and Maxim each have an equal right to defend claims against them in their preferred forum.  The forum-selection clause "may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place."  *Atl. Marine*, 571 U.S. at 66.  Accordingly, the Court will enforce the clause as it is written, according to its express terms.

Finally, Maxim argues that courts have declined to enforce forum-selection clauses where the result would be to split overlapping claims into separate proceedings.  *See* Opp. at 12.  But in the cases cited by Maxim, the parties agreed to multiple conflicting forum-selection clauses and the court could not possibly enforce them all.  *B&O Mfg. v. Home Depot U.S.A., Inc.*, No. C 07-02864 JSW, 2007 WL 3232276, at *3 (N.D. Cal. Nov. 1, 2007) (declining to enforce "conflicting forum selection clauses" where "neither party suggests that the claims . . . should be divided and litigated in separate forums" and because "the two conflicting forum selection clauses . . . counteract one another"); *Frigate Ltd. v. Damia*, 3:06-cv-04734-CRB, 2007 WL 127996, at *3 (N.D. Cal. Jan. 12, 2007) (declining to enforce "mutually incompatible forum selection clauses").  Here, by contrast, there is just one forum-selection clause, and it contains no conflicts or contradictions.  By design, the clause provides that some claims must be litigated in California, and others must be litigated in The Netherlands.

At the second step of the *forum non conveniens* analysis, the Court considers whether Maxim has met its "heavy burden" to show that "exceptional circumstances . . . justify

disregarding [the] forum-selection clause." *Sun*, 901 F.3d at 1084.  Maxim does not suggest that the forum-selection clause is the result of fraud or overreaching, or that its enforcement would be contrary to public policy.  Maxim also does not argue that it would be "effectively deprived of its day in court" if it must litigate its counterclaims in The Netherlands.  *M/S Bremen*, 407 U.S. at 15, 18-19; *see also* Opp. at 9, 14.[5]  To the extent Maxim believes it would be unreasonable to enforce the clause, for the reasons discussed above, the Court disagrees.

Maxim also cites public interest factors, including California's interest in the dispute, the fact that California law will apply, and the fact that splitting the counterclaims would increase burdens on the courts.  These factors are not compelling.  First, as the Inventors are citizens, The Netherlands also has an interest in enforcement of its citizens' bargained-for rights.  *See* Counterclaim ¶¶ 4-5.  Second, the law of The Netherlands will apply to the counterclaims under the choice of law provision, and Dutch courts are better positioned to apply that law.

Accordingly, the Court GRANTS the Inventors' motion to dismiss on the grounds of *forum non conveniens*.  Dismissal is without prejudice to the claims being refiled in the parties' agreed-upon forum, The Netherlands.[6]

## III.    12(B)(6) MOTION TO DISMISS

### A.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To avoid dismissal, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the pleaded facts allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Affirmative defenses must satisfy the same

---

[5] Maxim argues that it would be inconvenient to litigate in The Netherlands and raises other private interest factors.  *See* Opp. at 14.  But the Court cannot consider these factors given the existence of a valid forum-selection clause.  *Atl. Marine*, 571 U.S. at 63-64.

[6] Given the Court's disposition of the claims against the Inventors on *forum non conveniens* grounds, the Court does not reach the alternative basis for dismissal for lack of personal jurisdiction.

United States District Court
Northern District of California

1  plausibility requirement.  *See, e.g.*, *Neo4j, Inc. v. PureThink, LLC*, 480 F. Supp. 3d 1071, 1075
2  (N.D. Cal. 2020).

3       Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances
4  constituting fraud or mistake."  To meet this heightened pleading standard, plaintiffs must allege
5  the "'who, what, when, where, and how' of the misconduct charged."  *Kearns v. Ford Motor Co.*,
6  567 F.3d 1120, 1124 (9th Cir. 2009) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106
7  (9th Cir. 2003)).  "Rule 9(b) applies where a claim is 'grounded in fraud' or 'sound[s] in fraud,'
8  even if fraud is not an essential element of the cause of action."  *In re Finjan Holdings, Inc.*,
9  58 F.4th 1048, 1057 (9th Cir. 2023) (quoting *Vess*, 317 F.3d at 1103).  "[W]here fraud is not an
10 essential element of the claim, and where allegations of both fraudulent and non-fraudulent
11 conduct are made in the complaint," only allegations "of fraudulent conduct must satisfy the
12 heightened pleading requirements of Rule 9(b)."  *Vess*, 317 F.3d at 1104-05.  "It is established law
13 that Rule 9(b)'s particularity requirement applies to state law causes of action relating to fraud
14 when asserted in federal court."  *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
15 998 F.3d 397, 404 (9th Cir. 2021) (citing *Vess*, 317 F.3d at 1103).

16      For purposes of a Rule 12(b)(6) motion, the court generally "accept[s] factual allegations
17 in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving
18 party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).
19 However, the court need not "assume the truth of legal conclusions merely because they are cast in
20 the form of factual allegations."  *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per
21 curiam) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).

22      If the court finds that dismissal pursuant to Rule 12(b)(6) is warranted, the "court should
23 grant leave to amend even if no request to amend the pleading was made, unless it determines that
24 the pleading could not possibly be cured by the allegation of other facts."  *Lopez v. Smith*,
25 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quoting *Doe v. United States*, 58 F.3d 494, 497
26 (9th Cir. 1995)).

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.    Discussion**

Number 14 moves to dismiss counterclaims 1, 2, 4-7, and 11-13, and to strike Maxim's fifth and seventh affirmative defenses.[7]  All counterclaims and defenses at issue here are based on the theory that Number 14 and the Inventors improperly accepted royalty payments despite not delivering patents that contributed economic value to Maxim's products.  The Court addresses the counterclaims and affirmative defenses in order.

### 1.    Breach of contract (counterclaim 1)

The breach of contract counterclaim requires "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011).  A contract must be interpreted "to give effect to the mutual intention of the parties as it existed at the time of contracting."  Cal. Civ. Code § 1636.  The contract's language governs if it is "clear and explicit."  *Id*. § 1638.

Here, the primary contested issue is breach.  Maxim's theory is that Number 14 (through the Inventors) breached the Agreement by requesting and accepting royalty payments on products that did not meet the "agreed-upon specifications."  Opp. at 15-16.  These conclusory allegations fail to plausibly allege breach of the Agreement for two reasons.

First, Maxim does not allege how the products fell short of the specifications.  The Agreement provides that, to earn royalties, the products must "show improvements of 'similar' magnitude as compared to" the specifications attached to the Agreement.  *Id*. § 2.7.  Maxim alleges generally, without any detail, that the products "did not meet the specification standards."  *See* Counterclaim ¶¶ 31, 32, 35, 39-42.  But Maxim does not allege that the products did not show improvements of a "similar" magnitude to the specifications, or how the products were deficient.  In context, these details matter.  According to the Counterclaim, the Inventors were awarded patents, and Maxim profitably commercialized products utilizing the patents for more than a

---

[7] Number 14 does not seek dismissal of counterclaims 8, 9, and 10, which request declaratory relief.  Due to a numbering error in the Counterclaim, there is no counterclaim 3.

United States District Court
Northern District of California

1    decade. *See* Counterclaim ¶¶ 27-30, 48. Maxim must allege some detail to give Number 14 basic

2    notice of the alleged breach.

3         Second, no term in the Agreement prohibits Number 14 or the Inventors from requesting or

4    accepting royalty payments on products. The Agreement provides that royalties are conditioned

5    upon the Amplifier Design Patents giving the products significant economic value. *Id*. §§ 2.7, 3.2.

6    The parties agreed on how to determine that value: by reference to the attached specifications.

7    But the Agreement does not expressly state which party is responsible for determining whether the

8    products enabled improvements of a "similar" magnitude to the specifications. The Agreement

9    provides that "Maxim shall evaluate each . . . product launch" and "shall decide" and "approve"

10    any product launch. *Id*. §§ 3.2, 3.3. At this stage, the Court need not decide whether these terms –

11    and common sense – imply that Maxim, as the party paying the royalties and deciding whether to

12    launch products, was responsible for determining whether products meet the specifications. In any

13    event, these terms do not seem to place that burden on the Inventors.

14         Accordingly, Number 14's motion to dismiss this counterclaim is GRANTED with leave

15    to amend.

16
17         **2.      Breach of the implied covenant of good faith and fair dealing (counterclaim 2), unclean hands (seventh affirmative defense)**

18         Breach of the implied covenant of good faith and fair dealing requires "a failure or refusal

19    to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or

20    negligence but rather by a conscious and deliberate act[.]" *VFLA Eventco, LLC v. William Morris*

21    *Endeavor Ent., LLC*, 100 Cal. App. 5th 287, 312-13 (2024) (quoting *Careau & Co. v. Sec. Pac.*

22    *Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990)).

23         "[B]reach of a specific provision of [a] contract is not a necessary prerequisite" for a claim

24    alleging violation of the covenant of good faith and fair dealing. *Carma Devs. (Cal.), Inc. v.*

25    *Marathon Dev. Cal., Inc*., 2 Cal. 4th 342, 373 (1992) (in bank). However, "the scope of conduct

26    prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the

27    contract." *Id.* Therefore, the implied covenant cannot require action that contradicts the rights and

28    obligations set forth by a contract's express terms. The Supreme Court of California has

observed:  "We are aware of no reported case in which a court has held the covenant of good faith may be read to prohibit a party from doing that which is expressly permitted by an agreement.  On the contrary, as a general matter, implied terms should never be read to vary express terms."  *Id.* at 373-74; *see also Song fi Inc. v. Google, Inc.*, 108 F. Supp. 3d 876, 885 (N.D. Cal. 2015) ("Plaintiffs cannot state a claim for breach of the implied covenant of good faith and fair dealing, because 'if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.'" (quoting *Carma*, 2 Cal. 4th at 374)).

Maxim contends that Number 14 acted in bad faith by failing to use its "best efforts" to ensure that the patents would enable products that met the Agreement's specifications.  Opp. at 17. This counterclaim assumes that the products did not meet specifications – but, as discussed above, this fact is not plausibly alleged.  Additionally, if the products failed to meet specifications, Number 14 does not allege any facts permitting an inference that this was caused by a "conscious and deliberate act," rather than a mere failure to perform under the Agreement.

Additionally, Maxim's affirmative defense of unclean hands applies only where the plaintiff "has violated conscience, good faith or other equitable principles in his prior conduct." *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989).  Given the lack of plausible allegations of bad faith, the unclean hands defense fails as well.

Accordingly, Number 14's motion to dismiss this counterclaim is GRANTED, and the affirmative defense of unclean hands is STRICKEN, with leave to amend.

### 3.    Fraud, misrepresentation, detrimental reliance (counterclaims 4-7)

The Court addresses Maxim's counterclaims 4 through 7 together because they suffer from similar pleading deficiencies, though their elements vary.  The counterclaims for intentional misrepresentation and fraud (counterclaims 4 and 6) require: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage."  *Small v. Fritz Cos.*, 30 Cal. 4th 167, 173 (2003) (quoting *Lazar v. Super. Court*, 12 Cal. 4th 631, 638 (1996)).  The counterclaim for negligent misrepresentation (counterclaim 5) requires: "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it

to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Aton Ctr., Inc. v. United Healthcare Ins. Co.*, 93 Cal. App. 5th 1214, 1245-46 (2023) (quoting *Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 243 (2007)).  The counterclaim for detrimental reliance (counterclaim 7) requires "(1) a clear and unambiguous promise by the promisor, and (2) reasonable, foreseeable and detrimental reliance by the promisee." *Bushell v. JPMorgan Chase Bank, N.A.*, 220 Cal. App. 4th 915, 929 (2013).[8]

The common deficiency of these counterclaims is that Maxim does not plausibly allege a misrepresentation – whether intentional or negligent – or a "clear and unambiguous promise" as required for detrimental reliance.  Maxim references just two "statements" during the relevant period:[9]

> Counterclaim Defendants inquired about their 2023 Royalty payments in emails asking "Do you know what the status is for this year's royalty payment" thus implying Counterclaim Defendants had met the requirements in the License Agreement to be entitled to Royalties.

> On or around July 11, 2023 Mr. Eschauzier, on behalf of Counterclaim Defendants, contacted Maxim and stated "We have added two more parts to the royalty list: MAX40108 MAX40263". Maxim inquired how Counterclaim Defendants' team arrived at the conclusion to add the parts. Mr. Eschauzier again failed to disclose that neither MAX40108 nor MAX40263 met the express specifications in Annex 1.

Counterclaim ¶¶ 68, 69.  Neither statement misrepresents a fact about the products at issue. The first statement is a question about the status of a royalty payment, and the second is a request to add to the list of royalty-eligible products.  Maxim infers from these statements a misrepresentation that the products met specifications they did not meet.  But such an inference is not enough even for a negligent misrepresentation claim, much less fraud, intentional misrepresentation, or a "clear and unambiguous promise."  *See Wilson v. Century 21 Great W. Realty*, 15 Cal. App. 4th 298, 306 (1993) ("An 'implied' assertion or representation is not enough"

---

[8] Maxim agrees that the Rule 9(b) heightened pleading standard applies to allegations of fraud with respect to counterclaims 4, 6, and 7.  *See* Opp. at 17.

[9] Maxim bases its counterclaims on statements allegedly made in 2023 and 2024 only.  *See, e.g.*, Counterclaim ¶¶ 75, 89.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    for a negligent misrepresentation claim.).  Maxim's allegations are also insufficient because it has

2    not alleged how the products failed to meet specifications.

3    Finally, the context of these statements is important.  These statements were made eight

4    years after the Inventors terminated their employment with Maxim.  *See* Counterclaim ¶ 34.  And,

5    as discussed above, it is not clear which party was responsible for determining that products were

6    eligible for royalties.  Maxim has not cited any term of the Agreement that clearly places that

7    obligation on Number 14 or the Inventors.  Particularly given the heightened pleading standard for

8    fraud, and the nature of the parties' relationship based on Maxim's allegations, there is no reason

9    to infer fraud rather than a request that Maxim evaluate a request for royalties.

10    Accordingly, Number 14's motion to dismiss counterclaims 4 through 7 is GRANTED

11    with leave to amend.

12    **4.    Open book account, money had and received (counterclaims 11 & 12)**

13    At the motion hearing, counsel stipulated that the claims for open book account

14    (counterclaim 11) and money had and received (counterclaim 12) may be dismissed without leave

15    to amend.  10/23/24 Hr'g Tr. 27:18-25, ECF No. 95 ("We would have no objection to them being

16    dismissed without leave to amend at this stage."); *see also id.* 32:12-14 (requesting leave to amend

17    on all counts except for open book and money had and received).

18    Accordingly, Number 14's motion to dismiss these counterclaims is GRANTED without

19    leave to amend.

20    **5.    Unjust enrichment (counterclaim 13 & fifth affirmative defense)**

21    Number 14 contends that the unjust enrichment counterclaim and affirmative defense must

22    be dismissed with prejudice because unjust enrichment "is not a cause of action under California

23    law."  Mot. at 22.  That is an incomplete statement of the law.  "In California, '[t]here is no cause

24    of action for unjust enrichment.  Rather, unjust enrichment is a basis for obtaining restitution

25    based on quasi-contract or imposition of a constructive trust.'"  *Myers-Armstrong v. Actavis*

26    *Totowa, LLC*, 382 F. App'x 545, 548 (9th Cir. 2010) (quoting *McKell v. Wash. Mutual, Inc.*, 142

27    Cal. App. 4th 1457, 1490 (2006)); *see also Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307

28    (2011) ("Unjust enrichment is not a cause of action, just a restitution claim.").  Thus, "[w]hen a

plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2013)); *see also Hartford Cas. Ins. Co. v. J.R. Mktg. L.L.C.*, 61 Cal. 4th 988, 998 (2015) ("Where the doctrine [of unjust enrichment] applies, the law implies a restitutionary obligation, even if no contract between the parties itself expresses or implies such a duty.").

To state a counterclaim for unjust enrichment, Maxim must allege that Number 14 "received and unjustly retained a benefit at [Maxim's] expense." *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016). Maxim contends that Number 14 "accepted and retained royalties" that it was "not entitled to" because Maxim's "products did not satisfy the Agreement's specifications." Opp. at 23. As discussed above, Maxim has not alleged how the products failed to meet specifications.[10]

Accordingly, Number 14's motion to dismiss this counterclaim is GRANTED, and the related fifth affirmative defense for unjust enrichment is STRICKEN, with leave to amend.

## IV.    CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. The motion to dismiss all counterclaims against the Inventors on the grounds of *forum non conveniens* is GRANTED without prejudice to the claims being refiled in The Netherlands.

2. The motion to dismiss for failure to state a claim is GRANTED with leave to amend as to counterclaims 1, 2, 4, 5, 6, 7, and 13.

---

[10] In its Reply, Number 14 argues that a claim for unjust enrichment must be dismissed as "duplicative" or as inapplicable where the parties' relationship is governed by a contract. Reply at 15, ECF No. 93. The Ninth Circuit has recognized that, under California law, a claim for quasi-contract "does not lie when an enforceable, binding agreement exists defining the rights of the parties." *Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996). However, at the pleading stage, it is appropriate to plead a quasi-contract theory of harm in the alternative to a breach of contract. *Boobuli's LLC v. State Farm Fire & Cas. Co.*, 562 F. Supp. 3d 469, 487 (N.D. Cal. 2021); *see also Astiana*, 783 F.3d at 762-63 ("To the extent the district court concluded that the [quasi-contract] cause of action was nonsensical because it was duplicative of . . . other claims, this is not grounds for dismissal." (citing Fed. R. Civ. P. 8(d)(2))).

United States District Court
Northern District of California

3.  The Court STRIKES Maxim's fifth and seventh affirmative defenses with leave to amend.

4.  The motion to dismiss for failure to state a claim is GRANTED without leave to amend as to counterclaims 11 and 12.

Maxim shall file an amended answer and counterclaim within 21 days of this Order.

**IT IS SO ORDERED.**

Dated: March 31, 2025

_____

Eumi K. Lee
United States District Judge

United States District Court
Northern District of California

16