1  MICHAEL J. IOANNOU (SBN 95208)
   KEVIN W. ISAACSON (SBN 281067)
2  PAULA B. NYSTROM (SBN 329651)
   AMANDA M. OGATA (SBN 354967)
3  ROPERS MAJESKI PC
   333 W. Santa Clara St., Suite 930
4  San Jose, CA  95113
   Telephone:    408.287.6262
5  Facsimile:    408.918.4501
   Email:        michael.ioannou@ropers.com
6                kevin.isaacson@ropers.com
                 paula.nystrom@ropers.com
7                amanda.ogata@ropers.com

8  Attorneys for Defendants and Counterclaimants
   ANALOG DEVICES, INC. and
9  MAXIM INTEGRATED PRODUCTS, INC.

10                    UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12                         SAN JOSE DIVISION

13

14  NUMBER 14 B.V.,                          Case No. 5:24-cv-02435-EKL

15              Plaintiff,                    **DEFENDANTS AND**
                                              **COUNTERCLAIMANTS ANALOG**
16       v.                                   **DEVICES, INC. AND MAXIM**
                                              **INTEGRATED PRODUCTS, INC.'S**
17  ANALOG DEVICES, INC.; and MAXIM           **FIRST AMENDED ANSWER TO**
    INTEGRATED PRODUCTS, INC.                 **PLAINTIFF'S COMPLAINT WITH**
18                                            **AFFIRMATIVE DEFENSES AND**
                Defendants.                   **COUNTERCLAIMS**
19

20  ANALOG DEVICES, INC.; and MAXIM
    INTEGRATED PRODUCTS, INC.,
21
                Counterclaimants,
22
         v.
23
    NUMBER 14 B.V.,
24
                Counter-Defendant.
25

26       Defendants ANALOG DEVICES, INC. and MAXIM INTEGRATED PRODUCTS, INC.

27  ("Defendants") respond and assert their defenses to the Complaint filed by Plaintiff NUMBER 14

28

4909-6066-5399.9

B.V. ("Plaintiff") as follows[1]:

## GENERAL ALLEGATIONS

1.    In response to paragraph 1 of the Complaint, Defendants admit that Rudy Eschauzier and Nico van Rijn ("the Inventors") were two electrical engineers and inventors residing in the Netherlands.  Defendants further admit that the Inventors previously worked with Defendant Maxim, a Delaware corporation, and worked in the design, development, and/or manufacturing of linear and mixed-signal integrated circuits.

2.    In response to paragraph 2 of the Complaint, Defendants admit that Maxim and the Inventors entered into an employment agreement and license agreement.  However, the terms of the License Agreement speak for themselves, and any attempts in this paragraph 2 to paraphrase or characterize them are expressly denied, along with all other allegations of paragraph 2.

3.    In response to paragraph 3 of the Complaint, Defendants admit that Maxim and the Inventors executed a License Agreement in July 2007.  The terms of the License Agreement speak for themselves in this paragraph 3, and any attempts to paraphrase or characterize them are expressly denied, along with all other allegations of paragraph 3.

4.    In response to paragraph 4 of the Complaint, Defendants admit that Inventors were issued multiple Patents and Maxim exercised its right of first refusal to license a number of these patents.  Defendants lack sufficient information to form a belief as to the truth of the remaining allegations, and on that basis, Defendants deny all remaining allegations in paragraph 4.

5.    In response to paragraph 5 of the Complaint, Defendants admit that Maxim made Royalty payments to Number 14 in 2011 (for the calendar year 2010).  Except as specifically admitted, Defendants deny the remaining allegations in paragraph 5.

6.    In response to paragraph 6 of the Complaint, Defendants admit that in July 2020 Analog Devices, Inc. ("ADI") announced its plan to acquire Maxim and the acquisition was completed in August 2021.  Defendants further admit that the September 7, 2021 Form 10-K/A filing with the Securities and Exchange Commission confirmed that Maxim became a wholly

---

[1] Pursuant to Section VII(A) of the Court's Standing Order, Defendants attach **Exhibit 7**, which is a redlined document showing the changes made to the previously-filed pleading.

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS
MAJESKI

A Professional Corporation
San Jose

1   owned subsidiary of ADI.  Except as specifically admitted, Defendants deny the remaining

2   allegations in paragraph 6.

3          7.      In response to paragraph 7 of the Complaint, Defendants admit that Maxim

4   continued to make Royalty payments to Number 14.  Except as specifically admitted, Defendants

5   deny all remaining allegations in paragraph 7.

6          8.      In response to paragraph 8 of the Complaint, Defendants deny each and every

7   allegation contained therein.

8          9.      In response to paragraph 9 of the Complaint, Defendants admit that its employee

9   wrote the quoted phrases in a January 12, 2024 email response.  However, any attempts in this

10  paragraph 9 to paraphrase or characterize the email are expressly denied, along with all other

11  allegations of paragraph 9.

12         10.     In response to paragraph 10 of the Complaint, Defendants deny each and every

13  allegation contained therein.

14                          **PARTIES, JURISDICTION, AND VENUE**

15         11.     In response to paragraph 11 of the Complaint, Defendants lack sufficient

16  information to form a belief as to the truth of the allegations therein and on that basis denies the

17  allegations.

18         12.     In response to paragraph 12 of the Complaint, Defendants admit that ADI is a

19  Massachusetts corporation with its principal place of business at One Analog Way, Wilmington,

20  MA 01887.  Defendants further admit that ADI also has an established place of business located

21  at 160 Rio Robles, San Jose, CA 95134.

22         13.     In response to paragraph 13 of the Complaint, Defendants admit that Maxim is a

23  Delaware Corporation with its principal place of business located at 160 Rio Robles, San Jose,

24  CA 95134.

25         14.     Paragraph 14 constitutes statements or conclusions of law to which no admission

26  or denial is required.  To the extent a response is required, Defendants admit that this court has

27  jurisdiction over this action.

28         15.     Paragraph 15 constitutes statements or conclusions of law to which no admission

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1   or denial is required. To the extent a response is required, Defendants admit that venue is proper
2   in this judicial district.
3       16.    Paragraph 16 constitutes statements or conclusions of law to which no admission
4   or denial is required. To the extent a response is required, Defendants admit that this court has
5   personal jurisdiction over the action.

6                          **INTRADISTRICT ASSIGNMENT**

7       17.    Paragraph 17 constitutes statements or conclusions of law to which no admission
8   or denial is required. To the extent a response is required, Defendants admit that the assignment
9   of this action to the San Jose Division is proper under the Civil Local Rules.

10                     **COMMON FACTUAL ALLEGATIONS**

11      18.    In response to Paragraph 18 of the Complaint, Defendants repeat and incorporate
12  the responses contained in paragraphs 1 through 18 above.

13      19.    Paragraph 19 contains statements or conclusions of law to which no admission or
14  denial is required. To the extent a response is required, Defendants lack sufficient information to
15  form a belief as to the truth of the allegations and on that basis denies the allegations in
16  Paragraph 19.

17      20.    In response to Paragraph 20, Defendants lack sufficient information to form a
18  belief as to the truth of the allegations and on that basis denies the allegations.

19      21.    The terms of the License Agreement speak for themselves, and any attempts in this
20  Paragraph 21 to paraphrase or characterize them are expressly denied, along with all other
21  allegations of Paragraph 21.

22      22.    The terms of the License Agreement speak for themselves, and any attempts in this
23  Paragraph 22 to paraphrase or characterize them are expressly denied, along with all other
24  allegations of Paragraph 22.

25      23.    The terms of the License Agreement speak for themselves, and any attempts in this
26  Paragraph 23 to paraphrase or characterize them are expressly denied, along with all other
27  allegations of Paragraph 23.

28      24.    In response to paragraph 24 of the Complaint, Defendants deny each and every

ROPERS
MAJESKI

A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1    allegation contained therein.

2    25.    In response to paragraph 25 of the Complaint, Defendants deny each and every

3    allegation contained therein.

4    26.    In response to paragraph 26 of the Complaint, Defendants deny each and every

5    allegation contained therein.

6    27.    In response to paragraph 27 of the Complaint, Defendants deny each and every

7    allegation contained therein.

8    28.    In response to paragraph 28 of the Complaint, Defendants admit that "in at least

9    the years 2010 to 2020" Maxim calculated Royalty payments and Gross Margin in accordance

10    with GAAP compliant methods based on the terms in the License Agreement.  Except as

11    expressly admitted, Defendants deny all remaining allegations in paragraph 28.

12    29.    In response to paragraph 29 of the Complaint, Defendants admit that "for the years

13    2021 and 2022" after ADI acquired Maxim, Maxim calculated Royalty payments and Gross

14    Margin in accordance with GAAP compliant methods based on the terms in the License

15    Agreement.  Except as expressly admitted, Defendants deny all remaining allegations in

16    paragraph 29.

17    30.    In response to paragraph 30 of the Complaint, Defendants deny each and every

18    allegation contained therein.

19    31.    In response to paragraph 31 of the Complaint, Defendants deny each and every

20    allegation contained therein.

21    32.    In response to paragraph 32 of the Complaint, Defendant ADI admits that it

22    communicated the quoted language to Plaintiff.  However, the January 12, 2024 email speaks for

23    itself, and any attempts in this Paragraph 32 to paraphrase or characterize it are expressly denied.

24    33.    In response to paragraph 33 of the Complaint, Defendant ADI admits that it

25    communicated the quoted language to Plaintiff.  However, the January 19, 2024 email speaks for

26    itself, and any attempts in this Paragraph 33 to paraphrase or characterize it are expressly denied.

27    34.    In response to paragraph 34 of the Complaint, Defendant ADI admits that it

28    communicated the quoted language to Plaintiff.  However, the January 22, 2024 email speaks for

ROPERS
MAJESKI

A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1   itself, and any attempts in this Paragraph 34 to paraphrase or characterize it are expressly denied.

2       35.     In response to Paragraph 35 of the Complaint, Defendants deny each and every

3   allegation contained therein.

4                                    **<u>CLAIMS FOR RELIEF</u>**

5                                  **<u>FIRST CAUSE OF ACTION</u>**

6                              **[Breach of Contract against Maxim]**

7       36.     In response to paragraph 36 of the Complaint, Defendants repeat and incorporate

8   the responses contained in paragraphs 1 through 35 above.

9       37.     In response to paragraph 37 of the Complaint, Defendants admit the Inventors and

10  Maxim entered into a written agreement, the License Agreement, which is attached as Exhibit 1.

11  Except as expressly admitted, Defendants lack sufficient information to form a belief as to the

12  truth of the remaining allegations and on that basis denies those allegations.

13      38.     In response to paragraph 38 of the Complaint, Defendants deny each and every

14  allegation contained therein.

15      39.     In response to paragraph 39 of the complaint, Defendants deny each and every

16  allegation contained therein.

17      40.     In response to paragraph 40 of the Complaint, Defendants lack sufficient

18  knowledge or information to form a belief as to the truth of the allegations, and on that basis deny

19  those allegations.

20                                **<u>SECOND CAUSE OF ACTION</u>**

21          **[Breach of the Covenant of Good Faith and Fair Dealing against Maxim]**

22      41.     In response to paragraph 41 of the Complaint, Defendants repeat and incorporate

23  the responses contained in paragraphs 1 through 40 above.

24      42.     In response to paragraph 42 of the Complaint, Defendants admit the Inventors and

25  Maxim entered into a written agreement, the License Agreement, which is attached as Exhibit 1.

26  Except as expressly admitted, Defendants lack sufficient information to form a belief as to the

27  truth of the remaining allegations and on that basis denies those allegations.

28      43.     In response to paragraph 43 of the Complaint, Defendants deny each and every

ROPERS MAJESKI
A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1    allegation contained therein.

2        44.    In response to paragraph 44 of the Complaint, deny each and every allegation

3    contained therein.

4        45.    In response to paragraph 45 of the Complaint, paragraph 45 contains statements or

5    conclusions of law to which no admission or denial is required.  To the extent a response is

6    required, Defendants deny each and every allegation contained therein.

7        46.    In response to paragraph 46 of the Complaint, Defendants deny each and every

8    allegation contained therein.

9        47.    In response to paragraph 47 of the Complaint, Defendants admit its calculation of

10   Gross Margin has always been consistent with GAAP.  Except as specifically admitted,

11   Defendants deny the remaining allegations in paragraph 47.

12       48.    In response to paragraph 48 of the Complaint, Defendants lack sufficient

13   information to form a belief as to the truth of the allegations, and on that basis denies the

14   allegations.

15                    **THIRD CAUSE OF ACTION**

16      **[Intentional Interference with Contractual Relations against ADI]**

17       49.    In response to paragraph 49 of the Complaint, Defendants repeat and incorporate

18   the responses contained in paragraphs 1 through 48 above.

19       50.    In response to paragraph 50 of the Complaint, Defendants admit the Inventors and

20   Maxim entered into a written agreement, the License Agreement, which is attached as Exhibit 1.

21   Except as expressly admitted, Defendants lack sufficient information to form a belief as to the

22   truth of the remaining allegations and on that basis denies those allegations.

23       51.    In response to paragraph 51 of the Complaint, Defendants lack sufficient

24   information to form a belief as to the truth of the remaining allegations and on that basis denies

25   those allegations.

26       52.    In response to paragraph 52 of the Complaint, the quoted communications and

27   documents speak for themselves, and any attempts in this paragraph 52 to paraphrase or

28   characterize them are expressly denied.  Defendants also deny all remaining allegations.

ROPERS
MAJESKI

A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS
MAJESKI

A Professional Corporation
San Jose

53.     In response to paragraph 53 of the Complaint, Defendants deny each and every allegation contained therein.

54.     In response to paragraph 54 of the Complaint, Defendants deny each and every allegation contained therein.

55.     In response to paragraph 55 of the Complaint, Defendants deny each and every allegation contained therein.

56.     In response to paragraph 56 of the Complaint, Defendants deny each and every allegation contained therein.

## FOURTH CAUSE OF ACTION

### [Intentional Interference with Prospective Economic Relations against ADI]

57.     In response to paragraph 57 of the Complaint, Defendants repeat the responses contained in paragraphs 1 through 56 above.

58.     In response to paragraph 58 of the Complaint, Defendants admit that since 2010, Maxim has paid Royalties to Number 14 as required in the License Agreement and as requested by the Inventors.  Defendants lack sufficient information to form a belief as to the truth of the remaining allegations, and on that basis denies those allegations.

59.     In response to paragraph 59 of the Complaint, contains statements or conclusions of law to which no admission or denial is required.  To the extent a response is required, Defendants lack sufficient information to form a belief as to the truth of the allegations, and on that basis denies the allegations.

60.     In response to paragraph 60 of the Complaint, Defendants deny each and every allegation contained therein.

61.     In response to paragraph 61 of the Complaint, Defendants deny each and every allegation contained therein.

## FIFTH CAUSE OF ACTION

### [Open Book Account – Cal. Code Civ. Proc., § 425.30 – against Maxim]

62.     In response to paragraph 62 of the Complaint, Defendants repeat the responses contained in paragraphs 1 through 61 above.

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

63.    In response to paragraph 63 of the Complaint, Defendants admit that since 2021, Maxim has paid Royalties to Number 14 as required in the License Agreement and as requested by the Inventors.  Except as specifically admitted, Defendants deny all remaining allegations in paragraph 63.

64.    In response to paragraph 64 of the Complaint, Defendants lack sufficient information to form a belief as to the truth of the allegations, and on that basis denies the allegations.

65.    In response to paragraph 65 of the Complaint, Defendants deny each and every allegation contained therein.

66.    In response to paragraph 66 of the Complaint, Defendants deny each and every allegation contained therein.

## SIXTH CAUSE OF ACTION

### [Money Due and Owing/Indebtedness – Cal. Code Civ. Proc., § 425.30 – against Maxim]

67.    In response to paragraph 67 of the Complaint, Defendants repeat the responses contained in paragraphs 1 through 66 above.

68.    In response to paragraph 68 of the Complaint, Defendants deny each and every allegation contained therein.

69.    In response to paragraph 69 of the Complaint, Defendants deny each and every allegation contained therein.

## SEVENTH CAUSE OF ACTION

### [Accounting – against Maxim]

70.    In response to paragraph 70 of the Complaint, Defendants repeat the responses contained in paragraphs 1 through 69 above.

71.    In response to paragraph 71 of the Complaint, Defendants admit that Maxim has paid Royalties to Number 14 as required in the License Agreement and requested by the Inventors.  Except as specifically admitted, Defendants deny all remaining allegations in paragraph 71.

72.    In response to paragraph 72 of the Complaint, Defendants deny each and every

ROPERS MAJESKI
A Professional Corporation
San Jose

4909-6066-5399.9

1  allegation contained therein.

2  ## DEMAND FOR JURY TRIAL

3  Defendants admit that Plaintiff purports to demand a jury trial, while reserving all rights in

4  connection therewith.

5  ## RESPONSE TO PRAYER FOR RELIEF

6  Defendants deny that Plaintiff is entitled to any relief whatsoever, including any of the

7  relief requested in its Prayer for Relief.

8  ## AFFIRMATIVE DEFENSES

9  Without assuming the burden of proof on any matters that would otherwise rest with the

10 Plaintiff, expressly denying all wrongdoing, and subject to a reasonable opportunity for further

11 investigation and discovery, Defendants allege the following defenses:

12 ## FIRST AFFIRMATIVE DEFENSE

13 ### (Failure to State a Claim)

14 AS A FIRST, SEPARATE AND AFFIRMATIVE DEFENSE TO THE COMPLAINT

15 ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION CONTAINED

16 THEREIN, Defendants allege that Plaintiff's Complaint regarding its purported causes of action

17 for Breach of Contract against Maxim, Breach of the Covenant of Good Faith and Fair Dealing

18 against Maxim, Intentional Interference with Contractual Relations against ADI, and Intentional

19 Interference with Economic Relations against ADI, fail to state facts sufficient to state a plausible

20 claim for relief against Defendants.

21 ## SECOND AFFIRMATIVE DEFENSE

22 ### (Unilateral Mistake)

23 AS A SECOND, SEPARATE AND AFFIRMATIVE DEFENSE TO THE COMPLAINT

24 ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION CONTAINED

25 THEREIN, Defendants are informed and believe, and thereon allege, that at all relevant times, the

26 parties to the purported agreement were acting under a unilateral mistake of fact as to one or more

27 facts that were a material part of the contract, and would not have entered into that contract had

28 the true facts been known.

ROPERS MAJESKI

A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1    At the time Defendant Maxim and the Inventors executed the License Agreement, Maxim

2  believed that the "Gross Margin" and Royalty calculation method set out in Section 1.1 and

3  Section 2.7 in the License Agreement are based on "U.S. generally accepted accounting

4  principles (GAAP)" and not restricted to the alleged "Formula" or "Sample Royalty Calculation"

5  Plaintiff's reference to in Annex 2.  Maxim and thus ADI continue to believe and interpret the

6  Agreement's Royalty payment calculation, including "Gross Margin" to be based on any GAAP-

7  compliant calculation method.  After ADI's acquisition of Maxim, ADI harmonized Maxim's

8  financials and operations with methods ADI used.  As part of this financial harmonization,

9  Maxim's fiscal year was harmonized with ADI's fiscal year.  Additionally, Maxim's accounting

10  for royalties was harmonized to the process ADI used to account for royalties.  ADI's process to

11  account for royalties is a GAAP-compliant method approved by ADI's auditors.  In order to

12  remain GAAP-complaint, ADI must use the same GAAP-compliant method to account for all

13  royalties, or its accounting would not be GAAP-compliant. ADI's process for accounting is

14  utilized uniformly for all company purposes, including calculation of royalties, where applicable.

15    At the time Defendant Maxim and the Inventors executed the License Agreement, the

16  Inventors were aware that Maxim defined the Royalty calculation method based on the plain

17  language of the License Agreement which specified any GAAP-complaint calculation of Gross

18  Margin.  To the extent Plaintiff claims the License Agreement required a singular, specific Gross

19  Margin calculation, Plaintiff knew or should have known of Maxim's mistaken interpretation of

20  the provision and the mistake was not caused by Defendants' alleged "unilateral" altering of the

21  term.  A GAAP-complaint calculation method is a flexible standard that can be satisfied by a

22  variety of acceptable calculation methods.  Defendants' mistake was not caused by recklessness

23  and instead, adhered to a plain reading of the License Agreement provisions.  Had Maxim known

24  about the mistake, it would not have entered into the License Agreement.  The Inventors

25  knowledge of Maxim's mistake requires the License Agreement to be interpreted in accordance

26  with Maxim's understanding that the License Agreement permitted any GAAP-complaint

27  calculation of Gross Margin.

28

ROPERS MAJESKI
A Professional Corporation
San Jose

4909-6066-5399.9

ROPERS
MAJESKI
A Professional Corporation
San Jose

**THIRD AFFIRMATIVE DEFENSE**

**(Assumption of Risk)**

AS A THIRD, SEPARATE AND AFFIRMATIVE DEFENSE TO THE COMPLAINT ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION CONTAINED THEREIN, Defendants allege that Plaintiff's causes of action against Maxim/ADI, are barred by an assumption of risk.  The Inventors and Plaintiff expressly, voluntarily, and knowingly assumed all risks about which are complained in the Complaint and Defendants are not responsible in law or fact for Plaintiff's injury, if any.  The Inventors and Plaintiff assumed the risk of a potential change to the Royalty calculation caused by a GAAP-compliant change in Maxim's accounting system, including as happened after ADI acquired Maxim. ADI's use of a GAAP compliant calculation method ensured uniform GAAP compliance across all of ADI's royalty payments.  In addition, subsection "D" in the Recitals provided "[t]he Parties acknowledge that if Maxim shall not or no longer employ the Inventors, Maxim will be confronted with increased expenses in order to further develop the Amplifier Design Technology and to obtain the Amplifier Design Patents.  In case the Inventors shall not or no longer be employed by Maxim*, a reduced royalty rate shall apply, which takes into account these increased expenses*" (emphasis added). Defendants are not liable for any alleged harm as the Inventors and Plaintiff assumed all risk of the alleged harm.

**FOURTH AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

AS A FOURTH, SEPARATE AND AFFIRMATIVE DEFENSE TO THE COMPLAINT ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION CONTAINED THEREIN, Defendants allege that Plaintiff's claim accrued more than 14 years prior to the commencement of this action.  The statute of limitations for Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations is two years. Code Civ. Proc., § 339.  Plaintiff's Third and Fourth causes of action for "Intentional Interference with Contractual Relations" and "Intentional Interference with Prospective Economic Relations" against ADI, are limited to events before 2022.  Next, under California Code of Civil

4909-6066-5399.9

1  Procedure, § 337, the statute of limitations for a breach of a written contract is four years. Cal.

2  Civ. Proc. Code § 337. Based on Plaintiff's Fifth cause of action for "Open Book Account",

3  Plaintiff attempts to claim Royalty payments from 2009 to 2023 that have a "sum of at least $1

4  million." Thus, this action is, barred by the applicable two and four-year statute of limitations,

5  under Cal. Civ. Proc. Code §§ 339 and 337.

6  **FIFTH AFFIRMATIVE DEFENSE**

7  **(Unjust Enrichment)**

8  AS A FIFTH, SEPARATE AND AFFIRMATIVE DEFENSE TO THE COMPLAINT

9  ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION CONTAINED

10  THEREIN, Defendants are informed and believe that any recovery by Plaintiff would be

11  inequitable under the circumstances of the case, as Plaintiff has received and unjustly retained a

12  benefit at Defendants' expense.

13  Defendants allege that Plaintiff's principals were involved in the development of the

14  Stand-Alone Amplifier products as employees of Maxim and had full knowledge of both the

15  product specifications and the required specifications the products had to meet under the License

16  Agreement. Once Plaintiff's principals were no longer employees of Maxim, they still had full

17  knowledge of both the product specifications and the required specifications under the License

18  Agreement because the product datasheets are publicly available. Plaintiff knew that the

19  amplifier design patents developed under the License Agreement (U.S. Patent No. 7,812,665;

20  U.S. Patent No. 7,898,330; U.S. Patent No. 7,973,596; U.S. Patent No. 8,102,204, collectively

21  "Licensed Patents[2]") and the subsequent Stand-Alone Amplifier products did not meet the

22  required specifications in the License Agreement to be eligible for Royalties. Plaintiff also knew

23  that the Stand-Alone Amplifier products did not utilize the Licensed Patents. Nonetheless,

24  Plaintiff accepted and retained the benefit conferred upon it despite knowing or disregarding that

25  it was ineligible to receive the Royalty payments. Defendants' Royalty payments were contingent

26  on the Licensed Patents being valid patents; the Licensed Patents resulting in Stand-Alone

27  Amplifier products that meet the required specifications in Annex 1; and could provide

28

---

[2] Used interchangeably with Amplifier Design Patents

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS
MAJESKI

A Professional Corporation
San Jose

A Professional Corporation
San Jose

ROPERS
MAJESKI

1  Defendants with significant economic benefits. However, Plaintiff has been and is still being

2  unjustly enriched by retaining the benefits (economic and otherwise), without providing Licensed

3  Patents that meet such specifications. Throughout the parties' relationship under the License

4  Agreement, Plaintiff has been unjustly enriched by Royalties because the Licensed Patents that

5  would entitle Plaintiff to Royalties were invalid to start with. Plaintiff's acceptance and retention

6  of such benefits under the circumstances make it inequitable for it to retain the benefits without

7  compensation of its value.

8       Should Plaintiff prevail on any of its claims against Defendants, Plaintiff's requested relief

9  would result in unjust enrichment. Defendants are entitled to offset any alleged damages any

10  amount of the unjust enrichment.

11                     **SIXTH AFFIRMATIVE DEFENSE**

12                          **(Unclean Hands)**

13       AS A SIXTH, SEPARATE AND AFFIRMATIVE DEFENSE TO THE COMPLAINT

14  ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION CONTAINED

15  THEREIN,

16       Defendants allege that the causes of action in Plaintiff's Complaint are barred because

17  Plaintiff knew, as set forth above, that the subsequent Stand-Alone Amplifier products did not

18  meet the required specifications in the License Agreement to be eligible for Royalties.

19  Furthermore, Plaintiff also knew that the Stand-Alone Amplifier products did not utilize the

20  Licensed Patents. Nonetheless, Plaintiff accepted and retained the benefit conferred upon it

21  despite knowing or disregarding that it was ineligible to receive the Royalty payments.

22  Defendants' Royalty payments were contingent on the Licensed Patents being valid patents; the

23  Licensed Patents resulting in Stand-Alone Amplifier products that meet the required

24  specifications in Annex 1; and could provide Defendants with significant economic benefits.

25                     **SEVENTH AFFIRMATIVE DEFENSE**

26                        **(Speculative Damages)**

27       AS A SEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE TO THE

28  COMPLAINT ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1  CONTAINED THEREIN, Defendants are informed and believe that Plaintiff seeks to recover

2  damages that are completely speculative in nature.

3  **EIGHTH AFFIRMATIVE DEFENSE**

4  **(Uncertain Terms)**

5       AS AN EIGHTH, SEPARATE AND AFFIRMATIVE DEFENSE TO THE

6  COMPLAINT ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION

7  CONTAINED THEREIN, Defendants allege that Plaintiff's causes of action for breach of

8  contract fail because there was no meeting of the minds regarding the terms of the contract that

9  were too vague, indefinite, ambiguous and/or uncertain to be enforced.  The ambiguous terms

10  include: the definition of GAAP when calculating Royalties; when "[a]ssessment of the value and

11  benefits [of Products covered by the Amplifier Design Patents] will be governed by the product

12  and specifications listing as outlined in clause 2.7"; whether this assessment could be modified

13  over time, were ambiguous or undefined; and how the parties "agree that if Amplifier Design

14  Patents enable products that show *improvements* of 'similar' magnitude" and how the "Amplifier

15  Design Patents have *conceptual and economic value* in the market for the purpose of payment of

16  the fee specified . . ." (emphasis added).  To the extent Plaintiff is attempting to indicate that the

17  Sample Royalty Calculation in Annex 2 of the License Agreement is the definitive formula to

18  calculate royalty would incorrectly and purposefully interpret the terms and conditions of the

19  License Agreement against Defendants.

20  **NINTH AFFIRMATIVE DEFENSE**

21  **(Failure of Condition Precedent)**

22       AS A NINTH, SEPARATE AND AFFIRMATIVE DEFENSE TO THE COMPLAINT

23  ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION CONTAINED

24  THEREIN, Defendants allege that Plaintiff's purported causes of action for Breach of Contract

25  against Maxim, Breach of the Covenant of Good Faith and Fair Dealing against Maxim,

26  Intentional Interference with Contractual Relations against ADI, and Intentional Interference with

27  Economic Relations against ADI, are barred because of a failure of a condition precedent.

28       The License Agreement provides, "[i]n the event the Amplifier Design Patents are utilized

ROPERS MAJESKI

A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1    in one or more Stand-Alone Amplifiers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮    Defendants allege that at least one Amplifier Design Patent, which includes U.S.

4    Patent No. 7,973,596; U.S. Patent No. 7,812,665; U.S. Patent No. 8,102,204; and U.S. Patent No.

5    7,898,330, was not used in any Stand-Alone Amplifier product Plaintiff claims is royalty eligible.

6         Under License Agreement Section 3.2, "Maxim shall evaluate each Stand-Alone

7    Amplifier product launch" and "payment of the amount for the use of a particular Amplifier

8    Design Patent utilized by one or more Stand-Along Amplifier" is premised on the product giving

9    "significant economic value and adds demonstrable benefits to the product." Defendants allege

10   that the technology covered by the Amplifier Design Patents did not/does not give the product(s)

11   Plaintiff claim(s) is royalty eligible significant economic value and did not/does not add

12   demonstrable benefit to such product. Further, Defendants allege that at least one of the

13   Amplifier Design Patents fails to enable at least one product Plaintiff claims is royalty eligible

14   that show improvements of similar magnitude as compared to the product and specifications

15   listing attached to the License Agreement; and thus, the Amplifier Design Patent(s) do not have

16   conceptual and economic value in the market for the purpose of payment of royalties as outlined

17   in the License Agreement.

18         Section 2.6 also provides that any "confirmation that the Amplifier Design Patents have

19   conceptual and economic value in the market" relied on the implicit condition precedent that the

20   patents were valid. Any determination that the patents, including the claims therein, were invalid

21   would have diminished the "conceptual and economic value" of the resulting amplifier products,

22   leading Maxim to reach a different conclusion on Royalty payments. Further, Maxim relied on

23   the exclusivity of the Plaintiff's patents based on the License Agreement and presumption that the

24   patents held additional value because their exclusive use by Maxim.

25         Additionally, Section 3.3 provides that each Stand-Alone Amplifier evaluation requires

26   Maxim to "decide on any product launch and a Business Unit executive at Maxim's headquarters

27   in Sunnyvale, CA, USA, shall need to approve of any such launch." The section further notes

28   how "[a] certain portion of a design center that Maxim is planning to establish in Delft, The

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1   Netherlands, would be dedicated to designing stand-alone amplifiers and defined by local product

2   definers in Delft" including, the Inventors.  The Inventors, by managing and controlling Maxim's

3   Delft design center for stand-alone amplifier products, establishing an employment and licensing

4   relationship with Maxim, and serving as "local product definers," exerted significant influence

5   over Maxim's stand-alone amplifier product designs and launches.  The Inventors' influence

6   allowed them to retain control over the conditions precedent for royalty eligibility by maintaining

7   ongoing influence over the development of Amplifier Design Technology.  Through this

8   influence, the Inventors elected to unnecessarily incorporate portions of the claims of the

9   Amplifier Design Patents into Maxim's stand-alone amplifiers when such products could have

10  been developed without using any portion of the Amplifier Design Patent claims.  The Inventors

11  also controlled or influenced the determination of whether the Amplifier Design Patents gave "the

12  product significant economic value" and added "demonstrable benefits."  The Inventors' self-

13  interested and biased determination of entitlement to royalty deprived Maxim of the opportunity

14  to have an independent and unbiased product launch decision.

15       Therefore, not all products that utilize the Amplifier Design Patents are eligible for

16  Royalty payments as they fail to satisfy at least one condition precedent.

17                          **TENTH AFFIRMATIVE DEFENSE**

18                            **(Financial Interest Privilege)**

19       AS A TENTH, SEPARATE AND AFFIRMATIVE DEFENSE TO THE COMPLAINT

20  ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION CONTAINED

21  THEREIN, Defendants allege that Plaintiff's causes of action in the Complaint are barred because

22  ADI's conduct is protected by the Financial Interest Privilege.

23       California courts have followed the Restatement of Torts § 769 in allowing "[o]ne who

24  has a financial interest in the business of another is privileged purposely to cause him not to

25  perform a contract with a third person . . . if the actor (a) does not employ improper means, and

26  (b) acts to protect his interest from being prejudiced by the contract." Restat. 2d of Torts, §§ 769,

27  770; *Chicago Title Ins. Co. v. Great Western Financial Corp.* (1968) 69 Cal.2d 305, 319; *Culcal*

28  *Stylco, Inc. v. Vornado, Inc.* (1972) 26 Cal.App.3d 879, 882.

ROPERS
MAJESKI
A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1    If Defendant, ADI, interfered with the existing contractual and economic relationship

2  between Maxim and Plaintiff it was solely because ADI was acting in the best interests of Maxim,

3  as its parent company following the acquisition.  The interference, if any, was justified because

4  ADI did not employ wrongful means and was acting to protect its own financial interests from

5  being prejudiced by the relationship.

6                            **ELEVENTH AFFIRMATIVE DEFENSE**

7                 **(Reservation of Rights to Assert Additional Affirmative Defenses)**

8    AS AN ELEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE TO THE

9  COMPLAINT ON FILE HEREIN, AND TO EACH ALLEGED CAUSE OF ACTION

10  CONTAINED THEREIN, Defendants presently have insufficient knowledge or information on

11  which to form a belief as to whether it may have additional unstated affirmative defenses.

12  Therefore, Defendants reserve the right to assert additional defenses in the event that the

13  discovery indicates it would be appropriate.

14                                  **COUNTERCLAIMS**

15                                  **INTRODUCTION**

16    Counterclaimants ANALOG DEVICES, INC. and MAXIM INTEGRATED PRODUCTS,

17  INC. (collectively, "Counterclaimants") bring these Counterclaims against NUMBER 14 B.V.

18  ("Counter-Defendant") to recover Royalties to which Counter-Defendant was never entitled and

19  to recover damages from Counter-Defendant's breach of the covenant of good faith and fair

20  dealing under the License Agreement.  Counterclaimants also bring these Counterclaims against

21  Counter-Defendant to receive a declaration from this Court that under the written License

22  Agreement, in addition to the products meeting the required specifications, payment of Royalties

23  are also dependent on Maxim's evaluation of whether a patent covered by the License Agreement

24  gives a product "significant economic value and adds demonstrable benefits."  Counterclaimants

25  additionally bring these Counterclaims to receive declarations from this Court that the patents

26  covered under the written License Agreement invalid[3] and that none of the products utilize the

27

28  [3] ADI filed two petitions for *Inter Partes* Review for U.S. Patent No. 7,975,596 and U.S. Patent No. 7,812,665 before the Patent and Trademark Appeal Board. *See* IPR2025-00550, IPR2025-

---

ROPERS
MAJESKI

A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1    patented technology.

2        These claims arise from a relationship between Maxim on the one hand and Mr.

3    Rudy Eschauzier and Mr. Nico van Rijn (the "Inventors") on the other. In 2007, Maxim entered

4    into a License Agreement and separate employment agreements with the Inventors to develop

5    amplifier technology and products. The License Agreement required the Inventors to develop

6    technology sufficient to create amplifier products that met explicitly-stated specifications, as a

7    condition to receiving Royalty payments. While employed by Maxim, the Inventors obtained

8    patents related to the amplifier technology developed. The Inventors, in bad faith, started to

9    demand Royalties from Maxim. Maxim commenced Royalty payments on all products identified

10    by Inventors, including some developed personally by the Inventors. However, none of the

11    amplifier products identified by Inventors met the required specifications. Even after Inventors'

12    employment with Maxim terminated, Inventors continued to demand Royalty payments on

13    additional products developed by Maxim. These too did not meet the required specifications to

14    be royalty-bearing products. The Inventors' bad faith requests, while knowing the products did

15    not meet the required specifications, allowed Inventors to receive millions of dollars of Royalty

16    payments under the License Agreement to which Inventors were never entitled to receive. In

17    addition, the Inventors now hide behind Number 14 as an alter ego to shield themselves from

18    personal liability for their improper conduct.

19        Essentially, Maxim entered into a License Agreement with Inventors so that Maxim could

20    receive technology rights sufficient to create amplifier products with desired specifications.

21    Maxim has not received the technology for which it struck a bargain for, but has paid millions of

22    dollars for the Inventor's incomplete technology which it now seeks to recover.

23        Thus, Counterclaimants hereby allege claims against Counter-Defendant as follows:

24        **COUNTERCLAIM PARTIES**

25    1.    Counterclaimant Analog Devices Inc. ("ADI") is a Massachusetts corporation with

26    a principal place of business at One Analog Way, Wilmington, MA 01887.

27

28    00551. Shortly after, Counterclaimants moved to stay this case pending institution and resolution
      of the IPRs, which is still pending before this Court. *See* ECF 96.

4909-6066-5399.9

ROPERS
MAJESKI

A Professional Corporation
San Jose

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

2.      Counterclaimant Maxim Integrated Products ("Maxim") is a Delaware corporation with a principal place of business at 160 Rio Robles, San Jose, CA 95134.

3.      On information and belief, Counter-Defendant, Number 14 B.V. ("Number 14") is a company organized and existing under the laws of the Netherlands, with its principal place of business at Roland Hostlaan 10, 2662 Bergschenhoek, The Netherlands that is wholly owned and managed by Rudy Eschauzier and Nico van Rijn.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 in that there is complete diversity among the parties and the amount in controversy exceeds $75,000, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

5.      Additionally, this Court has jurisdiction over the subject matter of these counterclaims action under 28 U.S.C. § 1331 to the extent the Counterclaims arise under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

6.      Venue in the United States District Court, for the Northern District of California is proper under 28 U.S.C. § 1391(a) because the counterclaims arise within this District and the Counterclaimants have a place of business within the District.

## FACTUAL ALLEGATIONS

A.      **The Relationship Between Maxim Integrated and the Inventors Led to Improper Royalty Payments to Inventors**

7.      ADI is a global semiconductor company, specializing in innovative analog, digital, and software solutions.

8.      Maxim is also in the semiconductor industry.  Maxim is a worldwide leader in the design, development, and manufacture of linear and mixed-signal integration circuits.  On August 26, 2021, Maxim was acquired by ADI and became a wholly-owned subsidiary of ADI.

9.      On or around July 20, 2007, Maxim entered into a License Agreement with the Inventors ("License Agreement").  A true and correct copy of the License Agreement is attached hereto as **Exhibit 1** and is incorporated in full herein. Under the License Agreement, the

ROPERS
MAJESKI
A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1 Inventors were to "use their experience and personal skills to develop certain Know-How relating

2 to Amplifier Design Technology."

3      10.    As part of the License Agreement, Maxim confirmed that a "certain portion of a

4 design center that Maxim is planning to establish in Delft, The Netherlands, would be dedicated

5 to designing stand-alone amplifiers and defined by local product definers in Delft."

6      11.    On or around September 3, 2007, the Inventors entered into employment with

7 Maxim.

8      12.    Mr. Eschauzier was employed as the "Design Director and Director of

9 Engineering" of Maxim's design center in Delft, The Netherlands.  Mr. van Rijn was employed as

10 the "Principal Member of Technical Staff" also at Maxim's design center in Delft.

11      13.    Mr. Eschauzier's LinkedIn profile described that he "co-founded Maxim's

12 development center in The Netherlands."  Specifically, Mr. Eschauzier described that in "2007 he

13 started Maxim Integrated's Delft site for Sensor Interfacing and Signal Conditioning products."

14      14.    Mr. van Rijn also described that in "2007 he started the Maxim Integrated design

15 center in Delft for high precision signal chain products where worked through 2015."

16      15.    Mr. Eschauzier and Mr. van Rijn's job descriptions stated that they were

17 "responsible for the definition, design and development of integrated circuit products for

18 Maxim's MulitMedia Business Unit.  These products include high performance operational

19 amplifiers, instrumentation amplifiers, comparators, video products and audio products."

20      16.    Thus, the Inventors work included developing Amplifier Design Technology[4]

21 within the Netherlands-based development center Maxim established in connection with the

22 License Agreement and the employment of Inventors.  The Inventors controlled development of

23 the Amplifier Design Technology and also the development of amplifier products referred to as

24 "Stand-Alone Amplifiers."  The Inventors had actual and detailed knowledge of the abilities and

25 specifications of each of the Stand-Alone Amplifiers developed within Maxim's Netherlands-

26 based development center.

27 ───────────────

28 [4] Amplifier Design Technology as defined in the License Agreement means "the technology on amplifier design, which may be developed after the date of entering into this License Agreement."

4909-6066-5399.9

ROPERS
MAJESKI

A Professional Corporation
San Jose

17.    While employed by Maxim, the Inventors obtained patents related to the amplifier technology developed.  The technology developed was patented under U.S. Patent No. 7,973,596; U.S. Patent No. 7,812,665; U.S. Patent No. 8,102,204; and U.S. Patent No. 7,898,330 (collectively, "Licensed Patents").

18.    On information and belief, the Inventors assigned the Licensed Patents to Counter-Defendant, Number 14.

19.    As stated below, Maxim's fiscal year was harmonized with ADI's fiscal year after ADI acquired Maxim.  This caused Maxim's business units and accounting to be harmonized with ADI's GAAP-compliant process, which included the accounting process for royalties.

**B.    The License Agreement Between Maxim and the Inventors Required Inventors to Develop and Deliver Amplifier Design Patents that Met Specifications to Qualify for Royalties**

20.    The License Agreement granted Maxim the right of first refusal to license patents that might result from the Inventors' work.  The License Agreement terms allowed Maxim to (1) "make a one-time payment" to exercise its right of first refusal, and (2) to subsequently pay an annual royalty ("Royalties") on amplifier products that were covered by one or more of the patents related to the Amplifier Design Technology.

21.    Under Section 2.7 of the License Agreement, Counter-Defendant would be entitled to Royalty payments only if "the Amplifier Design Patents enable products that show improvements of 'similar' magnitude as compared to the attached product and specifications listing ('Annex 1')."  This was essential to "establish that the Amplifier Design Patents have conceptual and economic value in the market for the purpose of payment of the fee."

22.    Section 3.1 specified that if the Amplifier Design Patents were used in:



ROPERS MAJESKI | A Professional Corporation | San Jose

4909-6066-5399.9

First Amended Answer to Complaint With Counterclaims; Demand for Jury Trial Case No. 5:24-CV-02435

23.    Section 3.2 explained that "[p]ayment under clause 3.1 above, *if any, shall be conditioned upon* the technology covered by the Amplifier Design Patents giving the product significant economic value and adds demonstrable benefits to the product.  Assessment of the value and benefits will be governed by the product and specifications listing as outlined in clause 2.7."

24.    Additionally, Section 3.3 specified that the Stand-Alone Amplifiers designed by the Inventors in Delft, The Netherlands, would be subject to Maxim's decision "on any product launch and a Business Unit executive at Maxim's headquarters in Sunnyvale, CA, USA, shall need to approve any such launch.  The parties to this Agreement, shall agree beforehand on the launch of four product families ████████████████ as outlined in the attached product and specifications listing provided that the subject matter is patentable."

25.    In short, all Royalty payments under the License Agreement are expressly conditioned on the Amplifier Design Patents creating "significant economic value and [] demonstrable benefits" by enabling products within product families that meet the explicit specification requirements described in the License Agreement, specifically Annex 1.

26.    To date, Maxim has never received a license to Amplifier Design Patents or other Amplifier Design Technology from Counter-Defendant that would allow it to create products and technology that meet the requirements under Annex 1.  In order to create such products that meet the requirements under Annex 1, further development of technology would be required.  Despite the fact that the Licensed Patents do not deliver the full technology required to meet the specifications in the License Agreement, Counter-Defendant have and continue to request Royalty payments.

C.    **The Inventors Develop Amplifier Design Patents But Fail To Enable Products that Meet the License Agreements' Required Specifications**

27.    As a result of the work the Inventors performed as employees of Maxim, the Inventors obtained multiple patents related to the Amplifier Design Technology, the Licensed Patents.

28.    On information and belief, in or around February 2009, the Inventors transferred

ROPERS MAJESKI | A Professional Corporation | San Jose

First Amended Answer to Complaint With Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1    their rights and obligations under the License Agreement to Number 14, an entity that the

2    Inventors wholly own and control.  While Section 10.1 of the License Agreement permitted the

3    Inventors a limited ability to transfer rights under the License Agreement to a wholly-owned

4    entity, no separate license agreement between Maxim and Number 14 was ever created.

5         29.    In or around 2009, Counter-Defendant requested, in bad faith, to receive the ████

6    ████████████ and Royalties as described in the License Agreement, while knowing the

7    products do not meet the required specifications in Annex 1.

8         30.    Maxim paid Counter-Defendant ████████████████████████████.

9         31.    The Inventors developed or assisted with the development of numerous Stand-

10   Alone Amplifiers.

11        32.    Beginning in or around 2010, the Inventors began to request, in bad faith, Royalty

12   payments, while knowing the Stand-Alone Amplifiers did not meet the required specifications in

13   Annex 1, nor did the products utilize the Licensed Patents.  In 2010, Maxim commenced paying

14   the Royalty payments described in the License Agreement and has continued paying Royalty

15   payments to Counter-Defendant until the present.

16        33.    On or around May 31, 2015, the Inventors and Maxim terminated their

17   relationship via Settlement Agreement documents.

18        34.    The Inventors did not and have not created the Amplifier Design Technology and

19   Amplifier Design Patents sufficient to create products that meet the specification standards set for

20   in the License Agreement upon which Royalties are conditioned.  As detailed above, payment of

21   Royalties is conditioned upon the Amplifier Design Patents creating "significant economic value

22   and [] demonstrable benefits" by enabling Stand-Alone Amplifiers that meet the explicit

23   specification requirements described in the License Agreement, specifically Annex 1.  Annex 1

24   describes over 10 parameters[5] required for Stand-Alone Amplifiers in each of five separate

25   product families.  These specifications set the bar that Maxim and the Inventors agreed would

26   need to be met for Royalty payments to be made.

27

28   [5] **Exhibit 2** provides a technical explanation of the 10 parameters found Annex 1 of the License
     Agreement.
     4909-6066-5399.9

ROPERS
MAJESKI
A Professional Corporation
San Jose

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS
MAJESKI
A Professional Corporation
San Jose

35.    In sum, while still employees of Maxim, the Inventors began to request, and still do, request Royalty payments, in bad faith, while they were aware that the Stand-Alone Amplifiers did not meet the specification standards set for in the License Agreement upon which Royalties are conditioned.

        1.    How the Amplifier Design Products Do Not Meet the Required Specifications

36.    Section 2.7 of the License Agreement is explicit that Royalties are owed only when Stand-Alone Amplifiers "show improvements of 'similar magnitude as compared to the [Annex 1] specifications listing." The term "improvements" refers to advancements made to the known technology at the time the License Agreement was executed. Specifically, this technology includes the ████████ identified in the definition of "Stand-Alone Amplifiers" within the License Agreement: ████████████████████████████████████ ████████████████. These ███████████ are referred to herein as the "Baseline Products."

37.    **Exhibit 3** details how the ███████████ identified in the definition of "Stand-Alone Amplifiers" within the License Agreement were capable of meeting nearly all requirements of the specifications listed in Annex 1 of the License Agreement.

38.    It is apparent in **Exhibit 3** that:



    a.    For ████████ products, all the performances were already met by a Baseline Product ████████, except for ████████████ ████████████████;

    b.    For ███████████ products, all the performances were already met by a Baseline Product ████████ except for ████████████ ████████████████████████, an ████████████, and a change in █████;

    c.    For ████████████ products, all the performances were already met by a Baseline Product ████████ except for ████████████ ████████████████████, a

1        ██████████████████████████, and a ██████████████;

2        d.  For ████████████ products, all the performances were already met

3           by a Baseline Product ██████, except for a ████████████████

4        ██████████████████, an ████████████████████████

5        ████████, and a ████████████;

6        e.  For ████████████ products, all the performances were already met

7           by a Baseline Product ██████████, except for a ████████████

8        ███████████████████████.

9      39.    As such, the goal of the License Agreement was to develop amplifiers which either

10 enhanced performance using the same ████████████ or maintained the existing the levels of

11 performance while requiring ████████████████ to operate.  Put simply, the goal was to create

12 more ████████████ amplifiers that did not sacrifice performance while ██████████████████

13 ████ requirement.

14      40.    Again, under the License Agreement, Royalties are owed only if Stand-Alone

15 Amplifier products show improvements of similar magnitude to the specifications in Annex 1.

16 However, as shown in **Exhibit 4**, none of the Stand-Alone Amplifier products identified as

17 Royalty bearing meet any of the five specification sets outlined Annex 1.  In fact, each Stand-

18 Alone Amplifier product misses at least two parameters from the specifications.

19      41.    The specifications for the Stand-Alone Amplifier products are the Typical Values

20 provided in their respective datasheets, which are publicly available online.

21      42.    As described in **Exhibit 4**, the Stand-Alone Amplifier products do not come close

22 to meeting the specifications in Annex 1 of the License Agreement.  For example,

23 MAX44259/60/61/63 features a ████████████████████████ still more ██████████████

24 ████████████████████████████. MAX44259/60/61/63 shows less than half of the

25 "improvement" between the Baseline Product ██████████ at ████████ and the ██████████

26 ██████████.  The same is true for nearly all of the Stand-Alone Amplifier products aligning

27 with the ████████████, requiring more than double the target ██████████████████████

28 ████████████.

ROPERS | A Professional Corporation
MAJESKI | San Jose

43.    This lack of "improvements of 'similar' magnitude'" is also true for the ████,

████████████████ specification categories.  For instance, in the ████ category, the Stand-

Alone Amplifier products MAX40100 and MAX9617/18/19/20 each exhibit a Voltage Noise

parameter nearly ████████████ than the Annex 1 specification requirement and only ██ of

the required Slew Rate.  In the ████ category, the Stand-Alone Amplifier product MAX22242

has a current consumption of ████, which is ████████ the ████ specification of ████.

44.    Furthermore, the License Agreement only requires Royalties on Stand-Alone

Amplifiers which meet the specification requirements in Annex 1.  As noted above, Stand-Alone

Amplifiers are defined as ████████████████████████████████

████████████████████████████████████████████

████████████████

45.    Each of these Baseline Products is considered an operational amplifier or a

comparator. Amplifiers in this category are voltage input amplifiers.

46.    Two of the allegedly Royalty bearing products belong to a very different class of

amplifiers.  Specifically, MAX49921 and MAX44286, are within a specific class of amplifiers

known as current-sense amplifiers.  Rather than operating as an amplifier of a voltage input, these

current-sense amplifiers function as amplifiers of current input.

47.    The functionality of both MAX49921 and MAX44286 are completely different

from the Baseline Products.  Given the express definition of Stand-Alone Amplifiers, MAX49921

and MAX44286 cannot be considered Stand-Alone Amplifiers under the License Agreement.

The result of this is that these products cannot be Royalty bearing under the License Agreement

which only provides for Royalties on Stand-Alone Amplifiers.

48.    In summary, as demonstrated in **Exhibit 4**, the Stand-Alone Amplifier products do

not meet the required specifications outlined in Annex 1 of the License Agreement and therefore

do not qualify as Royalty bearing.  As a result, these products failed to achieve the fundamental

objective of the License Agreement: to produce amplifiers that maintained the performance levels

of the Baseline Products while offering improved ████████████ in accordance with the

Annex 1 specification requirements.

4909-6066-5399.9

ROPERS
MAJESKI

A Professional Corporation
San Jose

1

        2.      **Amplifier Design Patents Are Not Utilized In Several Stand-Alone Amplifier Products**

2

    49.    Section 3.1 of the License Agreement explicitly states that the Inventors will be

3

eligible to receive Royalties "[i]n the event the Amplifier Design Patents are *utilized* in one or

4

more Stand-Alone Amplifiers…sold to third parties…for the life of the particular patent"

5

(emphasis added).  However, none of the Licensed Patents are utilized in Counterclaimants'

6

Stand-Alone Amplifier products that have been identified as Royalty bearing.

7

    50.    For example, MAX40111 does not utilize



8

9

10

11

12

13

    51.    Another example is MAX9617/18/19/20, which does not utilize



14

15

16

17

18

19

20

21

22

23

    52.    MAX44259/60/61/63 serves as a third example, as it does not utilize Claims



24

25

26

27

28

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS | A Professional Corporation
MAJESKI | San Jose

1    not practiced because ████████████████████████████████████████████.

2    Maxim did not use ████████████████████████████████████████. Finally, Claim

3    ██ is not practiced because ████████████████████████████.

53.    The same reasoning found above applies to Patent '204 because the claims are not

patentably distinct from those of its parent, Patent '665.  Accordingly, at a minimum, the claims

of Patent '204 that are not patentably distinct from Claims ███████ of Patent '665 are not

utilized.

54.    Essentially, at least some of the Stand-Alone Amplifier products at issue fail to

utilize the Licensed Patents as a condition under Section 3.1 of the License Agreement.  As a

result, these products do not fulfill the necessary criteria to qualify for Royalties.

55.    Section 2.7 of the License Agreement is explicit that Royalties are owed only

when Stand-Alone Amplifiers "show improvements of 'similar magnitude as compared to the

[Annex 1] specifications listing."

56.    In reliance on the representations by the Inventors as Maxim employees, Maxim

commenced paying Royalties on all Stand-Alone Amplifier products identified as royalty-bearing

by Inventors, which Royalty payments have continued through the present.

**B.    The Inventors Request Royalty Payments In Bad Faith, Despite Knowing The Stand-Alone Amplifiers Do Not Meet The Required Specifications In Annex 1 of the License Agreement**

57.    Even after the termination of their employment with Maxim, the Inventors,

specifically Mr. Eschauzier, remained in contact with Maxim and ADI employees.  The

Inventors, in bad faith, continued to request Royalty payments on certain Stand-Alone Amplifier,

while knowing those Stand-Alone Amplifier products do not meet the required specifications in

Annex 1.  They did this in order to continue receiving Royalty payments to which they were not

entitled.

58.    For example, on March 16, 2018, Mr. Eschauzier, on behalf of Counter-Defendant,

contacted Maxim and stated "I have two new parts for the royalty list: MAX40010 MAX40201".

Mr. Eschauzier, in bad faith, failed to disclose that neither MAX40010 nor MAX40201 met the

required specifications in Annex 1.  As stated in the License Agreement, failure to meet the

4909-6066-5399.9

ROPERS MAJESKI | A Professional Corporation San Jose

ROPERS MAJESKI

A Professional Corporation
San Jose

1    express specifications in Annex 1 confirmed that Counter-Defendant had not developed or

2    delivered Amplifier Design Patents sufficient to give MAX40010 or MAX40201 significant

3    economic value and add demonstrable benefits as required to receive Royalty payments under

4    Section 3.2 of the License Agreement.

5          59.    Another example occurred on or around July 11, 2023. Mr. Eschauzier, on behalf

6    of Counter-Defendant, contacted Maxim and stated "We have added two more parts to the royalty

7    list: MAX40108 MAX40263." Maxim inquired how Counter-Defendant's team arrived at the

8    conclusion to add the parts. Mr. Eschauzier, in bad faith, again, failed to disclose that neither

9    MAX40108 nor MAX40263 met the required specifications in Annex 1. As stated in the License

10   Agreement, failure to meet the express specifications in Annex 1 confirmed that Counterclaim

11   Defendants had not developed or delivered Amplifier Design Patents sufficient to give

12   MAX40108 or MAX40263 significant economic value and add demonstrable benefits as required

13   to receive Royalty payments under Section 3.2 of the License Agreement.

14         60.    The Inventors have repeatedly requested Royalty payments from Maxim, in bad

15   faith, even though they were not entitled to receive Royalty payments under the License

16   Agreement for Stand-Alone Amplifier products that they did not meet the required specifications

17   in Annex 1.

18         61.    Because all identified Stand-Alone Amplifiers fail to meet the specification

19   requirements of the License Agreement, Counter-Defendant has never been entitled to any

20   Royalty payments under the License Agreement. Counter-Defendant had actual knowledge of

21   this shortcoming at all times. Still, Counter-Defendant demanded Royalty payments and Maxim

22   has paid Counter-Defendant over ████████ pursuant to the License Agreement.

23         62.    Counter-Defendant breached its duty of good faith and fair dealing under the

24   License Agreement when it asked for and accepted Royalty payments from Counterclaimants,

25   despite knowing the Stand-Alone Amplifier products did not meet the required specifications in

26   Annex 1. Counter-Defendant also breached its duty of good faith and fair dealing when it asked

27   for and accepted Royalty payments from Counterclaimants, despite knowing the Stand-Alone

28   Amplifier products do not utilize the Licensed Patents in the products.

4909-6066-5399.9

63.    As former Maxim employees, the Inventors were hired and later entrusted in the License Agreement to develop Maxim and ADI with technology and Patents that would improve its products.  Instead of delivering on their promise, the Inventors now seek continued payment under the Licensed Patents even when they did not meet Royalty payment conditions.

64.    By willfully taking and refusing to alert ADI and Maxim of the fact that its Licensed Patents did not satisfy the agreed upon specifications, Counter-Defendant is liable for breach of its good faith and fair dealing under the License Agreement and responsible for the damages Counterclaimants' incurred.  Moreover, Counterclaimants deny that Counter-Defendant was damaged in any sum, or at all, through any act or omission by Counterclaimants.

**E.    Counter-Defendant Incorrectly Disputes Maxim's Calculation of Royalty Payments Under the Plain Language of the License Agreement**

65.    While Royalties were never earned by Counter-Defendant as alleged above, at all times, Maxim has provided Counter-Defendant with Royalty payments as described in the License Agreement since 2011.[6]

66.    As stated in Section 3.1 of the License Agreement, if the conditions for Royalty payments were met, Counter-Defendant "will be eligible to receive . . . the dollar amount equal to the excess, if any, of the Gross Margin that is greater than 70% for each particular Stand-Alone Amplifier sold to third parties utilizing such Amplifier Design Patents for the life of the particular patent."  The License Agreement clarifies that "'Gross Margin' shall mean the Net Revenues less Cost of Goods Sold calculated in accordance with U.S. generally accepted accounting principles (GAAP)."  The License Agreement does not define "Net Revenues" or "Cost of Goods Sold", leaving those terms to be determined in accordance with GAAP.  The Royalty obligation described in Section 3.1 of the License Agreement does not identify a singular definitive calculation method or formula in the terms or Annexes to calculate the Royalty payments.  Rather, the only limitation on the calculation method or formula used is that it be in accordance with GAAP.

---

[6] While discussing the payments that have been made to Counter-Defendant as though Royalties under the License Agreement, Counterclaimants maintain their dispute that any Royalties have ever been earned by Counter-Defendant under the License Agreement.

4909-6066-5399.9

ROPERS MAJESKI

A Professional Corporation
San Jose

ROPERS
MAJESKI

A Professional Corporation
San Jose

67.     GAAP consists of a common set of accounting rules, requirements, and practices issued by the Financial Accounting Standards Board and the Governmental Accounting Standards Board. GAAP sets out to standardize the classifications, assumptions and procedures used in accounting in industries across the US.  The purpose is to provide clear, consistent and comparable information on organizations financials.  However, as GAAP is an assorted set of accounting rules, requirements, and practices, methods of applying GAAP can vary and change over time.

68.     GAAP permits a change from one generally accepted accounting principle to another generally accepted accounting principle when there are two or more generally accepted accounting principles that apply.  GAAP also permits a change in the method of applying an accounting principle.

69.     If a corporation's stock is publicly traded, its financial statements must follow rules established by the U.S. Securities and Exchange Commission (SEC).  The SEC requires that publicly traded companies in the U.S. regularly file GAAP-compliant financial statements in order to remain publicly listed on the stock exchanges.  GAAP has guidelines for companies that choose to report consolidated financial statements with their subsidiaries.  Generally, a parent company and its subsidiaries will use the same financial accounting framework for preparing both separate and consolidated financial statements.

70.     At all times, Maxim has paid the Royalty described in in the License Agreement as determined under its then-existing accounting system in accordance with GAAP.  As part of its payment of Royalties, Maxim has calculated Gross Margin in accordance with GAAP as used in its accounting system, applying the same definition of Gross Margin, Net Revenues, and Cost of Goods Sold to Royalty payment calculations as Maxim used for all purposes.

71.     In August 2021, ADI completed an acquisition of Maxim, with Maxim becoming ADI's wholly-owned subsidiary.  As part of this corporate transition, Maxim conformed its former accounting practices to ADI's accounting procedure.  Both before and after the harmonizing of Maxim's accounting system to ADI's accounting system,

4909-6066-5399.9

1    Maxim has continuously employed a GAAP-compliant accounting system.  At all times, Maxim

2    has calculated Royalties under the License Agreement using a GAAP-compliant calculation

3    method.  As part of this financial harmonization, Maxim's fiscal year was harmonized with ADI's

4    fiscal year. Additionally, Maxim's accounting for royalties was harmonized to the process ADI

5    used to account for royalties.  ADI's process to account for royalties is a GAAP-compliant

6    method approved by ADI's auditors.  In order to remain GAAP-complaint, ADI must use the

7    same GAAP-compliant method to account for all royalties, or its accounting would not be GAAP-

8    compliant.  ADI's process for accounting is utilized uniformly for all company purposes,

9    including calculation of royalties, where applicable.

10        72.    As a result of the adjustment of Maxim's accounting system, the GAAP-compliant

11   royalty calculation under the License Agreement adjusted accordingly.  ADI's deployment of a

12   GAAP-compliant royalty calculation is consistently applied across all of Maxim's financials and

13   business units to ensure compliance, as confirmed by ADI's auditors.  Further, it is also essential

14   for ADI to apply its financials uniformly across all of its operations, including license obligations,

15   in order to maintain compliance with GAAP requirements.

16        73.    As alleged in Number 14's Complaint, Counter-Defendant has asserted in writing

17   that Maxim's post-transition, GAAP-compliant royalty calculation under the License Agreement

18   was a breach of the License Agreement.

19        74.    Counterclaimants dispute both that Counter-Defendant is entitled to any Royalty

20   under the License Agreement and furthermore that if any Royalty is owed to Counter-Defendant,

21   Maxim's post-transition, GAAP-compliant Royalty calculation under the License Agreement is

22   consistent with the plain language of the License Agreement and has not breached the License

23   Agreement in the past and will not breach the License Agreement with future Royalty payments.

24        75.    Counterclaimants are entitled to a declaration from this Court resolving the dispute

25   confirming that (1) Counter-Defendant is not entitled to any Royalty under the License

26   Agreement or (2) if Counter-Defendant is entitled to a Royalty, that Maxim's post-transition,

27   GAAP-compliant Royalty calculation under the License Agreement is consistent with the plain

28   language of the License Agreement and has not breached the License Agreement in the past and

ROPERS
MAJESKI
A Professional Corporation
San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS

MAJESKI

A Professional Corporation
San Jose

1    will not breach the License Agreement with future Royalty payments.

2                              **FIRST COUNTERCLAIM**

3               **(Breach of the Covenant of Good Faith and Fair Dealing)**

4         76.    Counterclaimants incorporate by this reference the allegations of paragraph 1 to

5    75, inclusive, as though fully set forth herein.

6         77.    As stated above, Maxim entered into a valid contract through the License

7    Agreement with the Inventors.  On information and belief, the Inventors transferred all rights in

8    the License Agreement to Number 14 in February 2009.  While Section 10.1 of the License

9    Agreement permitted the Inventors a limited ability to transfer rights under the License

10   Agreement to a wholly-owned entity, no separate license agreement between Maxim and Number

11   14 was ever created.

12        78.    In every contract or agreement, there is an implied promise of good faith and fair

13   dealing and that neither party will do anything which will injure the right of the other to receive

14   the benefits of the agreement.  *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 654,

15   658.

16        79.    Counter-Defendant has breached its duty of good faith and fair dealing in the

17   License Agreement by requesting Royalties on products it knew were not Royalty bearing under

18   the License Agreement because the Stand-Alone Amplifiers did not satisfy the specifications in

19   Annex 1.

20        80.    As shown above and in **Exhibits 2-4**, the Stand-Alone Amplifier products do not

21   meet the required specifications.  There are no products in any of the five categories in Annex 1

22   which exhibit "improvements of 'similar' magnitude as compared to the [Annex 1] specifications

23   listing."

24        81.    The Inventors were extensively involved in the development of the technology of

25   the Licensed Patents during their employment at Maxim.  They also played a significant role in

26   the design and development of the Stand-Alone Amplifier products, at least some of which are

27   now alleged to be royalty-bearing and were initially expected to incorporate the Licensed Patents.

28   However, as detailed above, the Stand-Alone Amplifier products do not utilize the licensed

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1    patented technology.

2         82.    Therefore, Counter-Defendant has breached its duty of good faith and fair dealing

3    in the License Agreement by requesting Royalties on Stand-Alone Amplifiers, developed at least

4    in part by the Inventors, which the Inventors knew did not utilize the Licensed Patents.

5    Additionally, on information and belief, the Inventors were involved with developing the initial

6    Stand-Alone Amplifier products, and as such, knew or should have known about the subsequent

7    related Stand-Alone Amplifier products, since each iteration was built upon the last.

8    Accordingly, they knew or should have known that the subsequent Stand-Alone Amplifier

9    products did not utilize the Licensed Patents.

10        83.    Upon information and belief, Counter-Defendant willfully demanded and kept

11   Counterclaimants' Royalty payments for over a decade when they were not entitled or eligible to

12   receive the Royalty.  This allowed Counter-Defendant to receive the benefit of the License

13   Agreement while harming Counterclaimants by not conferring the promised benefit of their

14   Amplifier Design Patents to Counterclaimants.

15        84.    Counterclaimants seeks damages from Counter-Defendant's breach of good faith

16   and fair dealing occurring within the applicable statute of limitations period.

17                          **SECOND COUNTERCLAIM**

18                             **(Unjust Enrichment)**

19        85.    Counterclaimants incorporate by reference the allegations of paragraph 1 to 84,

20   inclusive, as through fully set forth therein.

21        86.    A claim for unjust enrichment as an independent cause of action requires the

22   plaintiff to show that the defendant received and unjustly retained a benefit at the plaintiff's

23   expense. *ESG Capital Partners, Ltd. P'ship v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016).

24        87.    Counter-Defendant has unjustly received benefits at the expense of

25   Counterclaimants.

26        88.    Specifically, Counter-Defendant received millions of dollars in Royalties from

27   Maxim's use of the Licensed Patents that supposedly met agreed upon requirements and

28   specifications.

A Professional Corporation
San Jose

ROPERS
MAJESKI

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS
MAJESKI

A Professional Corporation
San Jose

89.    Counter-Defendant was unjustly enriched through financial benefits, specifically, Royalty payments issued by ADI and Maxim for Maxim's use of Patents.  Upon information and belief, Counter-Defendant knew or should have known that their Licensed Patents did not meet the specifications in the License Agreement and in bad faith, did not disclose this information to ADI and Maxim.

90.    Specifically, prior to even receiving Royalties, Counter-Defendant failed to disclose to the United States Patent and Trademark Office ("USPTO") that their Licensed Patents were not patentable because of pertinent prior art.  Counter-Defendant failed to disclose to Counterclaimants its Patents should not have been patentable and eligible for Royalties.

91.    In exchange for Counter-Defendant's unjust benefits, Counterclaims received nothing.  Counter-Defendant's silence and failure to disclose material facts about its Patents and Royalty eligibility hid its misconduct.  Instead, Counterclaimants were and have been deprived of the benefits the Patents were supposed to provide under the License Agreement.

92.    Counter-Defendant knew or should have known that it would and did receive a financial benefit from not disclosing that the Patents did not confer the promised requirements and specifications ADI and Maxim expected.  Counter-Defendant knew or should have known that it would and did receive a financial benefit from not disclosing that the Stand-Alone Amplifiers on which it claimed Royalties did not meet the specifications ADI and Maxim expected.

93.    The benefits that Counter-Defendant derived from Counterclaimants rightly belong to Counterclaimants.  The principles of unjust enrichment make it inequitable for Counter-Defendant to retain the profit and/or other benefits it derived from its wrongful conduct alleged in the First Amended Answer and Counterclaim.

94.    Counterclaimants plead this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8, because if the Court dismisses Counterclaimants causes of actions for damages or enters judgment on them in favor of Counter-Defendant, Counterclaimants will have no adequate legal remedy.  *See* Fed. R. Civ. P.  8(a), (d); *Boobuli's LLC v. State Farm Fire*, 562 F. Supp. 3d 469, 486-87 (N.D. Cal. 2021).

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

95.     Although the License Agreement establishes the relationship between Counterclaimants and Counter-Defendant, it however, does not account for issues regarding disgorgement of ill-gained sums outside the scope of the License Agreement.  The License Agreement does not provide a clear definition or allocation of rights as to which party is responsible for determining which products were eligible for Royalties.  In addition, the License Agreement operates on the assumption that the Counter-Defendant's patents are valid.  Instead, quasi-contract claims now arise because Counterclaimants have made many payments to Counter-Defendant which fall outside the scope of the License Agreement and are thus not governed by it. *See ESG Capital Partners, Ltd. P'ship v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016); *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).  As these payments fall outside the scope of the License Agreement, a quasi-contract claim arises permitting Counterclaimants to recover the amounts by which Counter-Defendant has been unjustly enriched.  *Id.*

96.     Under the principles of equity and good conscience, Counterclaim Defendants should not be permitted to retain the money and should be compelled to return and disgorge all unlawful or inequitable payments they received as a result of their conduct and omissions alleged herein.

### **THIRD COUNTERCLAIM**

#### **(Declaratory Relief – Royalty Eligibility)**

97.     Counterclaimants incorporate by this reference the allegations of paragraph 1 to 96, inclusive, as though fully set forth herein.

98.     Counterclaimants seek a court declaration that satisfying and meeting the specifications in Annex 1 is an essential requirement to obtain Royalty payments, and Royalty payments are also dependent on Maxim's evaluation of whether an Amplifier Design Patent gives a product "significant economic value and adds demonstrable benefits to the product."

99.     This evaluation is based on Section 2.7's requirements that the Amplifier Design Patents will "enable products that show improvements of "similar" magnitude" when *compared* to Annex 1's specifications.  Maxim disputes that any of the Stand-Alone Amplifier products that supposedly utilize Counter-Defendant's Amplifier Design Patents meet the requirements

4909-6066-5399.9

ROPERS
MAJESKI

A Professional Corporation
San Jose

ROPERS
MAJESKI

A Professional Corporation
San Jose

1    articulated in the License Agreement.  Put simply, as shown above, none of the Stand-Alone

2    Amplifier products for which Counter-Defendant seek Royalty payments meet Annex 1's

3    specifications or Maxim's examination of economic and demonstrable benefits to entitle Counter-

4    Defendant to Royalties.

5          100.    Section 2.6 and 2.7 of the License Agreement specifically focus on the

6    "conceptual and economic value in the market" that the Amplifier Design Patents will have.

7    Moreover, Section 2.7 conditions Royalty payments by stating: "if the Amplifier Design Patents

8    enable products that show improvements of "similar" magnitude as compared to *the attached*

9    *product and specifications listing* [Annex 1 specifications], then this will establish that the

10   Amplifier Design Patents have conceptual and economic value in the market for the purpose of

11   payment of the fee specified above [Royalty payment]."  As explained in Paragraphs 35-47

12   above, none of the Stand-Alone Amplifier products for which Counter-Defendant seeks Royalty

13   payments meet the specifications set forth in Annex 1.

14         101.    Counterclaimants have an actual controversy with Counter-Defendant about the

15   payment of Royalties based on License Agreement interpretation including whether a Royalty

16   payment is only owed when an alleged royalty-bearing product meets the License Agreement

17   specifications, and whether a Royalty payment is owed on any Stand-Alone Amplifiers on which

18   any Royalties have been previously claimed or paid.

19                              **FOURTH COUNTERCLAIM**

20                     **(Declaratory Judgment – Patent Invalidity)**

21         102.    Counterclaimants incorporate by this reference the allegations of paragraph 1 to

22   101, inclusive, as though fully set forth herein.

23         103.    Counter-Defendant has sought Royalties for U.S. Patent No. 7,973,596; U.S.

24   Patent No. 7,812,665; U.S. Patent No. 8,102,204; and U.S. Patent No. 7,898,330 (collectively,

25   "Licensed Patents").  However, as detailed below, these Licensed Patents are invalid based on

26   prior art, obviousness, indefiniteness, and/or double patenting under 35 U.S.C. §§ 102, 103, 112,

27   and 204, and therefore do not entitle Counter-Defendant to Royalty payments.

28                     Invalidity of U.S. Patent 7,812,665

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

104.    Counterclaimants allege that each claim of '665 is invalid and indefinite for failure to comply with one or more of the requirements and conditions for patentability set forth in the patent laws, 35 U.S.C. §§ 100 *et. seq.*, including, but not limited to 35 U.S.C. §§ 102, 103, and/or 112.

105.    The claims of the '665 Patent are invalid, in whole or in part under § 112 as indefinite and/or lacking adequate and enabling written description, or fails to enable one of ordinary skill in the art ("POSITA") to make and use the alleged inventions described and claimed in the '665 Patent.  For example, the following claim terms are not adequately described in the specification, are not supported by an enabling disclosure, and fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention and thus render the claims in which they are found invalid under 35 U.S.C. § 112:

a.    "using a radix of less than 2 for at least the most significant bits" ('665 Claim 1) – A POSITA would not know if the recited radix corresponds to the ratio between the most significant bits, or whether each bit is associated with a radix corresponding to the ratio between that bit and its next less significant bit. Therefore, a POSITA would not know with reasonable certainty the scope of Claim 1;

b.    "the output of the D/A converter being coupled to inputs of the second transconductance differential input stage" ('665 Claim 5) – Throughout the Specification of the '665 Patent, each of the two outputs of the D/A converter is coupled to exactly one input of the second transconductance differential input stage, as opposed to the "inputs" (plural). Therefore, Claim 5 lacks adequate written description, and would not enable a POSITA to practice the invention.

106.    One or more of the claims of the '665 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because claims were anticipated and/or rendered obvious by prior art.  By way of example, claims in the '665 Patent were rendered obvious in view of at least A High-Performance Autozeroed CMOS Opamp with 50pV Offset, by Krummenacher et al., from the 1997 IEEE

4909-6066-5399.9

1    International Solid-state Circuits Conference, 1997 ("*Krum*") and/or in view of U.S. Patent No.

2    6,486,806 ("*Munoz*").

3        107.    Claims in the '665 Patent are also rendered obvious by *Krum* and *Munoz* in view

4    of U.S. Patent No. 7,642,846 ("*Yan*").  Each of the *Krum*, *Munoz*, and *Yan* patents, alone or in

5    combination, render the corresponding limitations obvious to a person of ordinary skill in the art.

6        108.    By way of example, all elements of Claim 1 of the '665 Patent are rendered

7    obvious by *Krum* and *Munoz*, alone or in combination:

8                a.    [1pre]: the claimed "amplifier system" in the preamble is disclosed by

9                      *Krum*'s amplifier in Fig. 1;

10               b.    [1a]: the claimed "first amplifier" is disclosed by *Krum*, as a portion of the

11                     amplifier in Fig. 1, including the input stages, the mid stage, and a portion

12                     of the output stage;

13               c.    [1b]: the claimed "comparator" is disclosed by *Krum*, as a portion of the

14                     amplifier in Fig. 1, including the driver to the Low-Pass Filter, the Low-

15                     Pass Filter, and the Schmitt trigger;

16               d.    [1c]: the claimed "successive approximation register" is disclosed by

17                     *Krum*, as a portion of the amplifier in Fig. 1, including the block SAR;

18               e.    [1d]: the claimed "first switch" is disclosed by *Krum*, as a portion of the

19                     amplifier in Fig. 1, including the passgates at the differential inputs;

20               f.    [1e]: the claimed "second switch" is disclosed by *Krum*, as a portion of the

21                     amplifier in Fig. 1, including the output stage source switches and the

22                     passgate at the output;

23       109.    [1g]: the claimed "radix of less than 2" is disclosed by Munoz, since Munoz' DAC

24    from Fig. 3A has a radix of less than two; and

25       110.    [1h]: the claimed "control" of the input offset of the amplifier is disclosed by

26    Krum, as its CAL DAC operates to cancel the input offset of Krum's amplifier.

27

28

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS
MAJESKI

A Professional Corporation
San Jose

ROPERS
MAJESKI

A Professional Corporation
San Jose

1    111.    A combination of the teachings of Krum and Munoz is schematically represented

2    below:



17    112.    Counterclaimant has also challenged the validity of the '665 Patent through the

18    filing of a Petition for *Inter Partes* Review with the U.S. Patent and Trademark Office, Petition

19    No. IPR2025-00551.  In addition to its request for an order invalidating the Counterclaimant

20    requests that the present Action be stayed pending the resolution of IPR2025-00551.

21                        <u>Invalidity of U.S. Patent 8,102,204</u>

22    113.    Counterclaimants allege that each claim of '204 is invalid and indefinite for failure

23    to comply with one or more of the requirements and conditions for patentability set forth in the

24    patent laws, 35 U.S.C. §§ 100 et seq., including, but not limited to, 35 U.S.C. §§ 103 and 112.

25    114.    The claims of the '204 Patent are invalid, in whole or in part, under 35 U.S.C. §

26    103 because during patent prosecution, all of '204 Patent's claims were rejected as being obvious

27    over the claims of its parent, the '665 Patent. '204 Patent's issuance was based on a terminal

28    disclaimer.  However, its claims are still rendered obvious in view of '665 Patent.

4909-6066-5399.9

115.    Apart from '204 Claim 1d, where "a first switch for switching an input of the first amplifier from the amplifier system input to shorting the first transconductance differential input stage;" differs to where the shorted inputs are the inputs of the first amplifier inputs, all '204 Patent claims have a similar element from the '665 Patent.  Simply put, '204 Claims 1-8 reference back to claims already present in the '665 Patent.

116.    Therefore, the '204 Patent is invalid for obviousness-type double patenting because its claims were not patentably distinct from its parent patent.

<u>Invalidity of U.S. Patent 7,898,330</u>

117.    Counterclaimants allege that each claim of '330 is invalid and indefinite for failure to comply with one or more of the requirements and conditions for patentability set forth in the patent laws, 35 U.S.C. §§ 100 et seq., including, but not limited to, 35 U.S.C. §§ 102, 103, and/or 112.

118.    The claims of the '330 Patent are invalid, in whole or in part under § 112 as indefinite and/or lacking adequate and enabling written description, or fails to enable one of skill in the art to make and use the alleged inventions described and claimed in the '330 Patent.  For example:

a.    "current input INA of each circuit being coupled to the current output OUTA1 of the other circuit" ('330 Claim 13) – This element is duplicative of element [1f] of claim 1, which does not allow a POSITA to give any weight to the term. Therefore, Claim 13 is indefinite; and

b.    "The circuits of claim 1 further comprising a differential input stage ('330 Claim 2) – The first circuit is of transistors of a first conductivity type, and the second circuit of transistors of a second conductivity type. The second circuit is a duplicate of the first circuit. Thus, the differential input stage must include transistors of both types. The Specification of the '330 Patent does not teach a differential input stage with transistors of both types. Therefore, Claim 1 lacks adequate and enabling written description of the recited invention.

A Professional Corporation
San Jose

ROPERS
MAJESKI

4909-6066-5399.9

119. One or more of the claims of the '330 Patent are invalid under 35 U.S.C. §§ 102 and/or 103 because claims were anticipated and/or rendered obvious by prior art. By way of example, claims in the '330 Patent were rendered obvious over of at least U.S. Patent No. 5,646,518 ("*Lakshmi*") in view of U.S. Patent No. 7,920,015 ("*Chelappa*").

120. Claims in the '665 Patent are also rendered obvious over at least U.S. Patent No. 6,118,341 ("*Huijsing 341*") in view of *Chelappa*. Each of the *Lakshmi*, *Chelappa*, and *Huijsing 341* patents, alone or in combination, render the corresponding limitations obvious to a person of ordinary skill in the art.

121. By way of example, all elements of Claim 1 of the '330 Patent are rendered obvious by a combination of the teachings of *Lakshmi's* amplifier in Fig. 3 and *Chelappa's* PTAT reference in Fig. 3:

    a. [1pre]: the claimed "first and second circuits" in the preamble are disclosed by the combination of *Lakshmi* and *Chelappa*;

    b. [1a]: the claimed "first circuit" description, including conductivity type, inputs are outputs, is also disclosed in, and apparent from the schematics of, the combination of *Lakhsmi* and *Chelappa*;

    c. [1b]: the claimed proportionality between currents OUT2 and IN2, is disclosed in, and apparent from the schematics of, the combination of *Lakhsmi* and *Chelappa*;

    d. [1c]: the claimed relationship between currents OUTA2 and other currents, is disclosed in, and apparent from the schematics of, the combination of *Lakhsmi* and *Chelappa*;

    e. [1d]: the claimed "duplicating the first circuit", is disclosed in, and apparent from the schematics of, the combination of *Lakhsmi* and *Chelappa*;

    f. [1e]: the claimed "current OUTA1 being a quiescent current" is disclosed by *Chelappa's* constant current generator 110;

    g. [1f]: the claimed coupling between the first and the second circuit is

ROPERS
MAJESKI

A Professional Corporation
San Jose

1    disclosed in, and apparent from the schematics of, the combination of

2    *Lakhsmi* and *Chelappa*.

3        122.    The combination of the teachings of *Lakhsmi* and *Chelappa* is schematically

4    represented below, showing the claimed "first circuit" and the "second circuit":



13                              Invalidity of U.S. Patent 7,973,596

14        123.    Counterclaimants allege that each claim '596 is invalid and indefinite for failure to

15    comply with one or more of the requirements and conditions for patentability set forth in the

16    patent laws, 35 U.S.C. §§ 100 et seq., including, but not limited to, 35 U.S.C. §§ 102, 103 and/or

17    112.

18        124.    The claims of the '596 Patent are invalid, in whole or in part under § 112 as

19    indefinite and/or lacking adequate and enabling written description, or fails to enable one of skill

20    in the art to make and use the alleged inventions described and claimed in the '596 Patent.  For

21    example, the following claim terms are not adequately described in the specification, are not

22    supported by an enabling disclosure, and fail to inform, with reasonable certainty, those skilled in

23    the art about the scope of the invention and thus render the claims in which they are found invalid

24    under 35 U.S.C. § 112:

25        a.    "the second frequency being twice the first frequency" ('596 Claim 21) – A

26            POSITA would not give any weight to the element, given that the element

27            above ("the ratio of the frequencies being two to one"). If the second

28            frequency is twice the first frequency, then necessarily the ratio of the

ROPERS
MAJESKI
A Professional Corporation
San Jose

1    frequencies is two to one. Therefore, Claim 21 is indefinite;

2        b.   "operating the first and second switches at a first frequency" ('596 Claim

3            24) – A previous element requires the first switches to be "closed at a

4            second frequency equal to one half the first frequency". The Specification

5            of the '596 Patent does not teach how the first switches are both "operating

6            at a first frequency" and closed at half the first frequency. Claim 24 lacks

7            written specification and is not enabling.

8        125.   One or more of the claims of the '596 Patent are invalid under 35 U.S.C. §§ 102

9    and/or 103 because claims were anticipated and/or rendered obvious by prior art.  By way of

10    example, claims in the '596 Patent were rendered obvious in view of at least U.S. Patent No.

11    7,834,685 ("*Pertijs*").

12        126.   Claims in the '665 Patent are also rendered obvious in view of at least U.S. Patent

13    No. 6,476,671 ("*Tang*").  Each of the *Pertijs* and *Tang* patents, alone or in combination, render

14    the corresponding limitations obvious to a person of ordinary skill in the art.

15        127.   By way of example, all elements of Claim 21 of the '596 Patent are rendered

16    obvious by *Pertijs*:

17        a.   [21pre]: the claimed "chopper stabilized first amplifier" in the preamble is

18            disclosed by *Pertijs's* amplifier 102 in Fig. 1;

19        b.   [21a]: the claimed "operating the chopper stabilization at a first frequency"

20            is disclosed by *Pertijs* as the operation of switches 110 and 126, as shown in

21            *Pertijs* Fig. 2;

22        c.   [21b]: the claimed "operating the autozeroing at a second frequency" is

23            disclosed by *Pertijs* as the operation of switches 112 and 130, as shown in

24            *Pertijs* Fig. 2;

25        d.   [21c]: the claimed "ratio of the frequency being two to one" is disclosed by

26            *Pertijs* Fig. 2;

27        e.   [21d]: the claimed "second frequency being twice the first frequency" is

28            disclosed by *Pertijs* Fig. 2;

ROPERS MAJESKI
A Professional Corporation
San Jose

ROPERS
MAJESKI
A Professional Corporation
San Jose

f.     [21e]: the claimed "duty cycle of less than one half" is disclosed by *Pertijs* Fig. 2.

128.     Pertijs' teachings rendering Claim 21 of Patent '596 obvious are schematically illustrated below (showing the first amplifier, chopper switches, and autozeroing switches):



129.     Counterclaimant has also challenged the validity of the '596 Patent through the filing of a Petition for *Inter Partes* Review with the U.S. Patent and Trademark Office, Petition No. IPR2025-00550.  In addition to its request for an order invalidating the Counterclaimant requests that the present Action be stayed pending the resolution of IPR2025-00550.

130.     A substantial, immediate, and real controversy therefore exists between Counterclaimants and Counter-Defendant regarding whether the Licensed Patents are invalid, and if Royalties are due under the License Agreement.

131.     Because the '665, '204, 330, and '596 Patents are invalid under 35 U.S.C. §§ et seq., including, but not limited to 35 U.S.C. §§ 102, 103, and/or 112, a judicial declaration is both appropriate and necessary to resolve the parties' respective rights and determine whether Counterclaimants' products are subject to Royalties.

132.     Counterclaimants seek a judicial declaration that they are not obligated to pay Royalties under the License Agreement because the Licensed Patents are invalid under 35 U.S.C.

4909-6066-5399.9

1    §§ et seq., including, but not limited to 35 U.S.C. §§ 102, 103, and/or 112.

2       133.    An actual controversy exists because Counterclaimants dispute Counter-

3    Defendant's allegations that Counterclaimants are obligated to pay Royalties on the Products

4    under the License Agreement, and that their failure to do so constitutes a breach.  At the same

5    time, Counterclaimants allege that the Licensed Patents are invalid for the reasons above and, as

6    such, should not entitle Counter-Defendant to any Royalties.

7                              **FIFTH COUNTERCLAIM**

8                   **(Declaratory Judgment – Inequitable Conduct)**

9       134.    Counterclaimants incorporate by this reference the allegations of paragraph 1 to

10   133, inclusive, as though fully set forth herein.

11      135.    Patent '596, which Counter-Defendant claims Royalties on, is unenforceable

12   because of inequitable conduct that occurred during the prosecution of the respective application

13   resulting in the issuance of the patent.

14              <u>Counter-Defendant's Material Misrepresentation to the USPTO</u>

15      136.    In connection with the prosecution of Patent '596, Mr. Eschauzier and Mr. van

16   Rijn signed a declaration acknowledging that they had a duty to disclose to the USPTO,

17   information known to be material to patentability of the claims in the Patent '596 in accordance

18   with 37 C.F.R. § 1.56.  A copy of Mr. Eschauzier and Mr. van Rijn's Declaration and Power of

19   Attorney for Patent Application from the U.S. Patent Application Serial No. 12/464,572 is

20   attached hereto as **Exhibit 5**.

21      137.    Upon information and belief, Counter-Defendant, through its co-owners, Mr.

22   Eschauzier and Mr. van Rijn, understood their duty to disclose to the USPTO, material

23   information they knew that may impact the patentability of the claims in Patent '596.

24      138.    During the prosecution of Patent '596, the Patent Examiner independently

25   discovered that the patent referenced U.S. Patent No. 6,734,723 ("*Huijsing*").  Counter-Defendant

26   failed to disclose that Patent '596 contained references to *Huijsing* and the Examiner rejected the

27   patent as obvious over *Huijsing*.

28      139.    In fact, Counter-Defendant was well-acquainted with Mr. Hujising, since Mr.

ROPERS MAJESKI

A Professional Corporation

San Jose

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

Eschauzier co-authored a book with him. Given the substantial overlap between the subject matter of *Huijsing* and Patent '596, Counter-Defendant knew Patent '596 references *Huijsing* during the prosecution process.

140. Upon information and belief, Counter-Defendant knowingly and deliberately failed to disclose that the subject matter of Patent '596 existed in prior art references in *Huijsing*. Upon information and belief, Counter-Defendant knowingly and deliberately made affirmative misrepresentations to the USPTO that Patent '596 met the requirements to be patentable, such as being a novel, useful, and non-obvious invention while Patent '596 obviously referenced *Huijsing*. A copy of Mr. Eschauzier's Information Disclosure Statement from the U.S. Patent Application Serial No. 12/464,572 with the United States Patent and Trademark Office is attached hereto as **Exhibit 6**.

141. The materiality required to establish inequitable conduct is "but-for," which requires that "but-for" the misrepresentation, the patent would not have been issued. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011). Specifically, a Patent Examiner would have understood that a reference to *Huijsing* would have been prior art and anticipated. Therefore, the alleged novelty in Patent '596 and its claims would have been invalid under 35 U.S.C. §§ 102 and/or 103.

<u>Counter-Defendant Intended to Misrepresent Patent '596 and Deceive the USPTO</u>

142. Accordingly, "but-for" Counter-Defendant's misrepresentations, Patent '596 should not have been patented because of references and pertinent prior art. Initially, the Patent Examiner rejected certain claims in Patent '596 as anticipated and obvious because of the references to *Huijsing*. Therefore, the Examiner's initial rejection establishes that the undisclosed information was "but for" material information that would was important in deciding whether to allow the application to issue as a patent.

143. Upon information and belief, Counter-Defendant's misrepresentations, omissions, and actions discussed above were carried out with an intent to deceive the USPTO. Counter-Defendant knew the contents of Patent '596 through its involvement with the development and application process. Additionally, the fact that Mr. Eschauzier, a co-owner of Counter-

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS
MAJESKI

A Professional Corporation
San Jose

ROPERS
MAJESKI

A Professional Corporation
San Jose

1    Defendant, had a close relationship with Mr. Hujising, worked in the same field/industry as Mr.

2    Hujising, and the Inventors were active in the same industry, and still failed to submit *Hujising*

3    references in the prosecution of Patent'596, strongly suggests he was knowledgeable about the

4    materiality of his failure to disclose.

5            144.    Upon information and belief, despite having knowledge that *Huijsing* would be

6    relevant to Patent '596's patentability, Counter-Defendant chose to not disclose to the USPTO

7    *Huijsing* as a reference or prior art, and continued to misrepresent to the PTO that Patent '596

8    was a novel invention.

9            145.    To the extent that Counter-Defendant claims to have disclosed references and prior

10   art during prosecution, the facts still reflect that Counter-Defendant intended to avoid disclosing

11   that Patent '596 referenced *Huijsing*.

12           146.    Further, given the "but-for" material nature of the information Patent '596

13   references, which were not submitted in the prosecution, as discussed above, support an inference

14   that Counter-Defendant made a deliberate decision to withhold the information from the USPTO

15   during the prosecution.  In particular, the decision to omit disclosing the references to *Huijsing*

16   was done with the intention that the Patent Examiner would not discover the reference.

17           147.    Upon information and belief, the License Agreement motivated Counter-

18   Defendant to omit *Huijsing*.  By failing to disclose the reference and prior art, Counter-Defendant

19   could obtain another patent to license to Counterclaimants in exchange for Royalty payments.

20   Specifically, the prosecution and application process occurred after the formation of the License

21   Agreement.  Counter-Defendant's specific intent to deceive the Patent Office is the single most

22   reasonable inference to be drawn from their actions and omissions.

23           148.    For all the reasons set forth above, the Counter-Defendant's acts and omissions

24   constituted inequitable conduct before the USPTO.  Counterclaimants request a declaration from

25   the Court that Counter-Defendant's that Patent '596 be declared unenforceable due to inequitable

26   conduct.

27           149.    An actual controversy exists because Counterclaimants dispute Counter-

28   Defendant's allegations that Counterclaimants are obligated to pay Royalties on the Products

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

1    under the License Agreement, and that their failure to do so constitutes a breach. At the same

2    time, Counterclaimants allege that Patent '596 is unenforceable based on inequitable conduct so

3    no Royalties are owed and earned to Counter-Defendant.

## SIXTH COUNTERCLAIM

### (Declaratory Judgment – Stand-Alone Amplifier Products Do Not Utilize the Licensed Patented Technology)

7    150.    Counterclaimants repeat and incorporate by reference, as though set forth in full,

8    all allegations set forth in paragraphs 1 through 149 of this Counterclaim.

9    151.    Counterclaimants seek a judgment declaring that some or all claims in U.S. Patent

10    No. 7,973,596; U.S. Patent No. 7,812,665; U.S. Patent No. 8,102,204; and U.S. Patent No.

11    7,898,330 are not practiced in Counterclaimants' amplifier products.

12    152.    Because the '665; '204; '330; and/or '596 Patents are not practiced,

13    Counterclaimants' amplifier products would not directly or indirectly infringe on the '665; '204;

14    '330; and/or '596 Patents and thus are not subject to Royalties.

15    153.    As a result, some or all of Counterclaimant's amplifier products are not subject to

16    Royalties.

### U.S. Patent 7,812,665 is Not Utilized in Stand Alone Amplifiers

18    154.    Even in the absence of the rights granted under License Agreement,

19    Counterclaimants allege that some or all of their amplifier products would not directly or

20    indirectly infringe the '665 Patent, either literally or under the doctrine of equivalents, at least

21    because the amplifier products do not comprise amplifier design technology that creates

22    embodiments for an amplifier, comparator, and D/A converter, used in the field of operational

23    and instrumentation amplifiers.

24    155.    Counterclaimants allege that at least some of the amplifier products for which

25    Counterclaim Defendants claim a royalty is owed do not practice any claim of the '665 Patent and

26    therefor are not subject to the License Agreement, including any royalty obligation, and are

27    likewise non-infringing on the '665 Patent.

28    156.    Counter-Defendant claims to own all rights, title, and interest in and under the

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

'665 Patent.

157.    Even in the absence of the rights granted under the License Agreement, Counterclaimants allege that some or all of their amplifier products would not directly or indirectly infringe the '665 Patent, either literally or under the doctrine of equivalents, at least because the amplifier products do not comprise amplifier design technology that creates embodiments for an amplifier, comparator, and D/A converter, used in the field of operational and instrumentation amplifiers.

158.    At least '665 Patent Claims ▓▓▓▓▓▓ are not practiced in a product.  For example, MAX44259/60/61/63:



a.    Claim ▓ is not practiced, because ▓▓▓▓▓▓▓▓▓▓▓▓;

b.    Claim ▓▓▓▓▓▓▓▓▓ are not practiced because ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓;

c.    Claim ▓ is not practiced because ▓▓▓▓▓;

d.    Claim ▓ is not practiced because ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓; and

e.    Claim ▓ is not practiced because ▓▓▓▓▓▓▓.

<u>U.S. Patent 8,102,204 is Not Utilized in Stand Alone Amplifiers</u>

159.    Counter-Defendant claims to own all rights, title, and interest in and under the '204 Patent.

160.    Counterclaimants allege that at least some of the amplifier products for which Counter-Defendant claim a royalty is owed do not practice any claim of the '204 Patent and therefor are not subject to the License Agreement, including any royalty obligation, and are likewise non-infringing on the '665 Patent.

161.    Even in the absence of the rights granted under License Agreement, Counterclaimants allege that some or all of their amplifier products Counterclaimants do not directly or indirectly infringe the '204 Patent, either literally or under the doctrine of equivalents,

1  at least because the amplifier products do not comprise amplifier design technology related to

2  amplifiers with power-on trim and methods using an amplifier system having an amplifier system

3  input and output, amplifier, comparator, and D/A converter that are used in field of operational

4  and instrumentation amplifiers.

5      162.   As explained above, the '204 Patent claims are not patentably distinct from the

6  claims of its parent, the '665 Patent.  Thus, at least the '204 Patent claims that are not patentably

7  distinct from the Claims ███████ of Patent '665, are not practiced.

8      <u>U.S. Patent 7,898,330 is Not Utilized in Stand Alone Amplifiers</u>

9      163.   Counterclaimants allege that at least some of the amplifier products for which

10  Counter-Defendant claims a royalty is owed do not practice any claim of the '330 Patent ("'330

11  Patent") and therefore are not subject to the License Agreement, including any royalty obligation,

12  and are likewise non-infringing on the '330 Patent.

13      164.   Counter-Defendant claims to own all rights, title, and interest in and under the

14  7,898,330 Patent ("330 Patent").

15      165.   Even in the absence of the rights granted under License Agreement,

16  Counterclaimants allege that some or all of their amplifier products would not directly or

17  indirectly infringe the '330 Patent, either literally or under the doctrine of equivalents, at least

18  because the amplifier products do not comprise amplifier design technology comprising of AB

19  amplifier systems that exhibit low power, low-voltage operation, high gain, high bandwidth, low

20  noise and low offset, reduces power consumption, and utilize a differential first and second stage

21  of two pair of nested current mirrors.

22      166.   None of the '330 Patent Claims are practiced in a product. For example, for

23  MAX40111:



24      a.   Claim ████████████ is not practiced, at least because

25  ████████████████████████████████;

26      b.   Claims ████████ are not practiced, at least because

27  ████████████████████████████████

28  ███; and

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS | A Professional Corporation San Jose
MAJESKI

c.   Claims ████████████████████, are not practiced because ██████████████████████████.

<u>U.S. Patent 7,973,596 is Not Utilized in Stand Alone Amplifiers</u>

167.   Counter-Defendant claims to own all rights, title, and interest in and under the '596 Patent.

168.   Even in the absence of the rights granted under License Agreement, Counterclaimants allege that some or all of their amplifier products would not directly or indirectly infringe the '596 Patent, either literally or under the doctrine of equivalents, at least because the amplifier products do not comprise of amplifiers that use different combinations of chopping and auto-zeroing techniques.

169.   At least '596 Patent Claims ████████ are not practiced in a product. For example, for MAX9617/18/19/20:



a.   Claim ██████████████ is not practiced, at least because ██████████████████████████████ ██████████████ ;

b.   Claim ██████████████ is not practiced, at least because ██████████████████████████████████ ██████████████████████████████████ ██████████████████ ;

c.   Claim ████ is not practiced, at least because ██████████████████ ██████████████ ; and

d.   Claim ████ is not practiced, at least because ██████████████████ ██████████████████████████████ ██████████████████████ .

170.   A substantial, immediate, and real controversy therefore exists between Counterclaimants and Counter-Defendant regarding whether Counterclaimants products utilize any claim of the '665, '204, '330, and'596 Patents and would therefore infringe them in the absence of the License Agreement, and if Royalties are therefore due under the License

1    Agreement.

2        171.    Because the '665; '204; '330; and/or '596 Patents are not practiced by

3    Counterclaimants in some or all amplifier products, there is "nothing to be infringed", therefore, a

4    judicial declaration is appropriate and necessary to determine the parties' respective rights

5    regarding whether Counterclaimants' products are subject to Royalties.

6        172.    Counterclaimants seek a court declaration that they are not required to pay

7    Royalties under the License Agreement since no Amplifier Products fall within the scope of the

8    Counter-Defendant's Licensed Patents.

9        173.    In the alternative, Counterclaimants seek a court declaration permitting them to

10   deposit any current or future Royalties under the License Agreement into an escrow account

11   while litigation is ongoing.

12       174.    An actual controversy exists as Counterclaimants dispute Counter-Defendant's

13   allegations that Counterclaimants are obligated to pay Counter-Defendant Royalties on the

14   Products under the License Agreement and failure to pay Counter-Defendant Royalties is a

15   breach of the License Agreement.

16                          **SEVENTH COUNTERCLAIM**

17                   **(Declaratory Judgment – Royalty Calculation)**

18       175.    Counterclaimants repeat and incorporate by reference, as though set forth in full,

19   all allegations set forth in paragraphs 1 through 174 of this Counterclaim.

20       176.    Counterclaimants seek a court declaration that Maxim's current method of

21   calculating Royalty under the License Agreement is GAAP-compliant and is not a breach of the

22   License Agreement.

23       177.    Following the harmonization of Maxim's cost accounting system after the

24   acquisition by ADI, Maxim's cost accounting method for calculating the cost of goods sold was

25   aligned with ADI's approach, while still compliant with GAAP.  However, the calculation itself,

26   as set forth in Section 3.1 of the License Agreement, remained unchanged after the acquisition.

27       178.    As alleged in Number 14's Complaint, Counter-Defendant has asserted in writing

28   that Maxim's post-transition, GAAP-compliant Royalty calculation under the License Agreement

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435

ROPERS
MAJESKI

A Professional Corporation
San Jose

1    was a breach of the License Agreement.

2        179.    An actual controversy exists as Counterclaimants dispute Counter-Defendant's

3    allegations because Maxim's post-transition, GAAP-compliant Royalty calculation under the

4    License Agreement is consistent with the plain language of the License Agreement, is not a

5    breach of the License Agreement and will not breach the License Agreement with future Royalty

6    payments.

7        180.    Counterclaimants are entitled to a declaration from this Court resolving the parties'

8    dispute confirming that if any Royalty is owed under the License Agreement, Maxim's post-

9    transition, GAAP-compliant Royalty calculation under the License Agreement is consistent with

10   the plain language of the License Agreement and has not breached the License Agreement in the

11   past and will not breach the License Agreement with future Royalty payments.

12   **PRAYER FOR RELIEF**

13       WHEREFORE, Counterclaimants pray for judgment against Counter-Defendant as

14   follows:

15       1.    For a declaration of the parties' rights and obligations under the License

16   Agreement, including that:

17       a)    Counter-Defendant is not eligible for a Royalty under the License

18   Agreement; or in the alternative that,

19       b)    if Counter-Defendant is entitled to a Royalty, that Maxim's post-transition,

20   GAAP-compliant Royalty calculation under the License Agreement is consistent with the plain

21   language of the License Agreement and has not breached the License Agreement in the past and

22   will not breach the License Agreement with future Royalty payments.

23       2.    For a declaration that the United States Patent No. 7,973,596 is unenforceable due

24   to inequitable conduct;

25       3.    For a declaration that Counter-Defendant's licensed patents, U.S. Patent No.

26   7,973,596; U.S. Patent No. 7,812,665; U.S. Patent No. 8,102,204; and U.S. Patent No. 7,898,330,

27   are invalid for failure to comply with the requirements under 35 U.S.C. §§ 102, 103 and/or 112;

28       4.    For a declaration that Counterclaimants' amplifier products do not infringe,

**ROPERS**
**MAJESKI**

A Professional Corporation
San Jose

1  directly or indirectly, either literally or under the doctrine of equivalents, any valid patents owned

2  or assigned to Counter-Defendant, including U.S. Patent No. 7,973,596; U.S. Patent No.

3  7,812,665; U.S. Patent No. 8,102,204; and U.S. Patent No. 7,898,330;

4      5.      A preliminary injunction permitting the payment of any further Royalties under the

5  License Agreement into an escrow pending litigation underway;

6      6.      An injunction permanently enjoining the payment of any further Royalties under

7  the License Agreement;

8      7.      For compensatory damages in an amount according to proof at trial;

9      8.      For consequential damages in an amount according to proof at trial;

10     9.      For restitution and disgorgement of the revenues wrongfully retained as a result of

11 Counter-Defendant's wrongful conduct;

12     10.     For prejudgment interest at the legal rate on amounts owed by Counter-Defendant

13 to Counterclaimants;

14     11.     For cost of suit incurred herein, including reasonable attorney's fees pursuant to

15 contract; and

16     12.     For such other and further relief as the Court may deem just and proper.

17

18 Dated: April 21, 2025                    ROPERS MAJESKI PC

19

20                                   By: /s/ Kevin W. Isaacson
                                         MICHAEL J. IOANNOU
21                                       KEVIN W. ISAACSON
                                         PAULA B. NYSTROM
22                                       AMANDA M. OGATA
                                         Attorneys for Defendants and
23                                       Counterclaimants ANALOG DEVICES,
                                         INC. and MAXIM INTEGRATED
24                                       PRODUCTS, INC.

25

26

27

28

A Professional Corporation
San Jose

ROPERS
MAJESKI

4909-6066-5399.9

First Amended Answer to Complaint With
Counterclaims; Demand for Jury Trial
Case No. 5:24-CV-02435